JUDGE ABRAMS

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

MUHAMMAD TANVIR,

                    *Plaintiff,*

          v.

JAMES COMEY, DIRECTOR, FEDERAL
BUREAU OF INVESTIGATION;
CHRISTOPHER M. PIEHOTA, DIRECTOR,
TERRORIST SCREENING CENTER; RAND
BEERS, ACTING SECRETARY,
DEPARTMENT OF HOMELAND
SECURITY; JOHN S. PISTOLE,
ADMINISTRATOR, TRANSPORTATION
SECURITY ADMINISTRATION; "JOHN"
TANZIN, SPECIAL AGENT, FBI; SANYA
GARCIA, SPECIAL AGENT, FBI; JOHN
"LNU", SPECIAL AGENT, FBI; "JOHN
DOE", SPECIAL AGENT, FBI

                    *Defendants.*

# 13 CV 6951

**COMPLAINT**

Civil Action No.



## INTRODUCTION

1. This is an action for declaratory relief, injunctive relief, and damages under *Bivens*, seeking
   to remove Muhammad Tanvir, a lawful permanent resident of the United States, from the
   federal government's No Fly List, and to challenge the FBI's practice of abusing this U.S.
   government watch list to force American Muslims into serving as informants against their
   own communities. Mr. Tanvir is one of many individuals whom Federal Bureau of
   Investigation (FBI) agents have placed on the No Fly List in retaliation for their refusal to
   work as informants against their communities and to submit to questioning. FBI agents have
   also unlawfully coerced individuals into cooperating and serving as informants by promising
   to take them off the No Fly List.

2.  Defendants create, maintain and implement a blacklist that prevents individuals named on it from boarding a flight to, from or over the United States under any circumstances (barring waiver from the government). The No Fly List—one among several government watch lists—purports to be filled with the names of individuals too dangerous to fly under any circumstances, with any degree of additional search and scrutiny, but not worthy of arrest and criminal process.

3.  Plaintiff Muhammad Tanvir, a lawful permanent resident, was denied the right to board flights, deprived of his right to travel, and wrongly stigmatized as a security threat. Yet the government did not inform him of any reason why he presented a risk to civil aviation, and continues to deny him any after-the-fact explanation for his listing, and any meaningful assurance that his name is definitively cleared from the No Fly List.

4.  Mr. Tanvir was placed on the No Fly List after he was approached by FBI agents and asked to serve as an informant in his predominantly Muslim community. He refused. Subsequently, he was suddenly and without notice banned from flying. After his listing, he reached out to those same FBI agents to clear up what he presumed was an error that led to his placement on the No Fly List. Instead of providing that explanation or opportunity, FBI agents offered to help him get off the No Fly List—but only in exchange for relaying information about his community. Mr. Tanvir again refused.

5.  Mr. Tanvir has been prevented from flying despite the fact that he does not present any threat to aviation security. Instead, defendants sought to exploit the draconian burden posed by the No Fly List—including the inability to travel for work, or to visit family overseas—in order to coerce him into serving the FBI as a spy within American Muslim communities and places of worship.

## JURISDICTION AND VENUE

6. This court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702. Declaratory relief is available pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201.

7. This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391(e)(1) because defendants are officers and employees of the United States or its agencies operating under color of law, and a substantial part of the events or omissions giving rise to the claims have occurred and are occurring in this judicial district.

## PARTIES

8. Plaintiff Muhammad Tanvir is a lawful permanent resident who resides in Queens, New York. He has lived in the United States since 2002 and has been married since March 2, 2006. Because of his placement on the No Fly List, Mr. Tanvir was unable to visit his ailing mother for over two years. Mr. Tanvir has never been convicted of a crime nor does he pose any threat to aviation safety.

9. Defendant James B. Comey is the Director of the Federal Bureau of Investigation (FBI). The FBI is one of the agencies responsible for nominating individuals to government watch lists, known collectively as the Terrorist Screening Database (TSDB), and which includes the No Fly List. The FBI oversees the Terrorist Screening Center (TSC), which maintains the TSDB. When an individual on the No Fly List participates in the limited redress process known as Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP") to challenge his inclusion on the No Fly List, if that individual was nominated by the FBI, then the FBI coordinates with TSC in determining whether an individual should remain on the watch lists. Defendant Comey is sued in his official capacity.

3

10. Defendant Christopher M. Piehota is the Director of the TSC. The TSC is responsible for maintaining the No Fly List and for reviewing and accepting nominations from originating agencies such as the FBI. The TSC is also responsible for removing individuals from the No Fly List when requested by the nominating agency. In addition, in the redress process, the TSC is responsible for making the final determination whether to remove an individual from a watch list. Defendant Piehota is sued in his official capacity.

11. Defendant Rand Beers is the Acting Secretary of the Department of Homeland Security (DHS). The DHS maintains and administers the TRIP program and is the point of contact for individuals seeking redress for being unable to fly. The DHS is also responsible for overseeing the establishment of a timely and fair redress process for individuals who believe they were wrongly identified as a threat. Defendant Beers is sued in his official capacity.

12. Defendant John S. Pistole is the Administrator of the Transportation Security Administration (TSA). The TSA is a screening agency responsible for implementing the No Fly List at airports. The TSA receives the List from the TSC without the underlying, classified intelligence, and it in turn implements the List at the airport, determining whether an individual should be denied boarding. The TSA is responsible for implementing the results of the DHS TRIP process and for taking corrective action if a traveler has been misidentified. *See* 49 U.S.C. § 44903(j)(2)(G)(i). Defendant Pistole is sued in his official capacity.

13. Defendant "John" Tanzin (first name unknown) is a Special Agent with the FBI.[1] He is sued in his individual and official capacity.

14. Defendant Sanya Garcia is a Special Agent with the FBI.[2] She is sued in her individual and official capacity.

---

[1] Possible alternative spellings could include "Tanzen," "Tenzin," or "Tenzen." Also, it is unclear whether Tanzin is the agent's first or last name.

15. Defendant "John LNU" (last name unknown) is a Special Agent with the FBI. He is sued in his individual and official capacity.

16. Defendant "John Doe" is a Special Agent with the FBI. He is sued in his individual and official capacity.

## FACTUAL ALLEGATIONS

### Background on the FBI's Use of Informants in American Muslim Communities

17. In the past decade, the FBI has engaged in a policy and practice of targeting American Muslim communities for suspicionless surveillance and intelligence-gathering, without any factual basis to believe that specific violations or threats to national security exist. These law enforcement policies and practices have included the aggressive recruitment of and deployment of informants in Muslim communities, organizations, and houses of worship.

18. The identification and recruitment of informants, known in FBI parlance as Confidential Human Sources, is an important part of FBI agents' intelligence collection duties. The FBI maintains over 15,000 informants, a number that excludes unofficial informants. Many of them are tasked with infiltrating American Muslim communities.

19. Over the past decade, FBI recruitment of informants has significantly expanded. A November 2004 Presidential Directive required an increase in "human source development and management." In a 2007 statement before the Senate Select Committee on Intelligence, Defendant Pistole described the FBI response to this directive, which includes changes to the policies intended to "enhance the FBI's ability to share human intelligence information within its organization and will encourage [Special Agents] to open and operate new Human Sources." The FBI's 2008 fiscal year budget authorization request includes funding for a

---

[2] Possible alternative spellings could include "Sania," "Sonya," or "Sonia."

5

program to track and manage the growing number of informants. Many of these informants are recruited from and placed among Muslim communities.

20. FBI informants are often tasked with infiltrating mosques and participating in religious-based activities. For example, in Orange County, FBI agents sent an informant, Craig Monteilh, to various Southern California mosques to pose as a convert to Islam. Court documents and sworn testimony describe how he was tasked to infiltrate religious activities and to record religious lectures, discussion groups and classes, and other religious and cultural events occurring in mosques. In order to accomplish this, Mr. Monteilh publicly converted to Islam in front of a crowd of hundreds. Another FBI informer was asked to secretly tape conversations of the Muslim community and to go into a mosque in Lodi, California.

21. FBI agents have a number of investigative techniques at their disposal as they identify and recruit informants. Some of these are laid out in the FBI's 2011 Domestic Investigations and Operations Guide ("DIOG"), which implement the 2008 Attorney General's Guidelines for Domestic FBI Operations, which govern the FBI's conduct in criminal, national security, and counter-intelligence assessments and investigations. *See* Fed. Bureau of Investigation, Domestic Intelligence Operations Guide § 4.3(C)(2), *available at* http://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20(DIOG).

22. The DIOG allows for six types of "assessments" of individuals or groups. An assessment is a low-level investigation that does not require factual predication, or a factual indication of criminal wrongdoing. According to data obtained by investigative journalists through Freedom of Information Act requests, from 2009 to 2011, FBI agents opened 42,888

assessments of people or groups to see whether they were terrorists or spies;41,056 of the assessments yielded no indication of terrorist activity.

23. According to the DIOGs, an FBI agent opens a "Type 5" assessment when determining whether or not an individual is suited to become an informant. Agents may conduct investigations on a particular individual to determine whether he is suitable as a Confidential Human Source ("CHS"); they may also conduct investigations without any specific individual in mind, in order to identify individuals with "placement and access to particular information."

24. A Type 5 assessment may be based in part on religion or activities protected by the First Amendment.

25. Once an individual is identified, the DIOGs allow the FBI agent to evaluate the "background, authenticity, and suitability of a particular potential" informant, and to recruit a suitable informant. If the recruitment is successful, the Type 5 Assessment must be closed. If it is not successful, "either because the individual declines to become a CHS or a determination is made not to continue the recruitment," the assessment must also be closed. But unless such a determination is reached, the assessment may remain open.

26. A 2005 FBI Office of Investigator General Report evaluating FBI compliance with the Attorney General's Guidelines on the Use of Confidential Informants has found one or more compliance errors in 87 percent of the informant files the Inspector General examined.[3] The Report also found serious compliance deficiencies with provisions in the Guidelines relating to approval, monitoring, documentation, and notification of confidential informants. The

---

[3] OFFICE OF INSPECTOR GEN., DEP'T OF JUSTICE, THE FEDERAL BUREAU OF INVESTIGATION'S COMPLIANCE WITH THE ATTORNEY GENERAL'S INVESTIGATIVE GUIDELINES 7 (2005), *available at* http://www.justice.gov/oig/special/0509/final.pdf.

Report noted that FBI personnel felt that the Guidelines' requirements were cumbersome and onerous.

27. To recruit informants, FBI agents often resort to exploiting Muslim individuals' vulnerabilities. Civil rights organizations have documented instances where FBI agents have threatened Muslim individuals with withholding their immigration benefits, or to facilitate immigration benefits – a practice that is not allowed under the Attorney General's Guidelines Regarding the Use of Confidential Human Sources.[4]  One FBI training presentation obtained by civil liberties organizations on recruiting informants in the Muslim community suggested that agents exploit "immigration vulnerabilities" because Muslims in the U.S. are "an immigrant community."

28. Civil rights organizations have also reported that a wide variety of government interactions with Muslim individuals, such as interactions with Customs and Border Patrol upon entering the United States, will lead to subsequent and unrelated attempts to recruit those individuals as informants.

29. Muslim individuals have also been threatened with prosecution, often on minor, non-dangerous charges, if they refuse to become informants.

**The No Fly List**

30. The Terrorist Screening Center (TSC), which is administered by the FBI, develops and maintains the federal government's consolidated Terrorist Screening Database (TSDB), the federal government's terrorist watch list. In September 2003, Attorney General John Ashcroft established the TSC to consolidate the federal government's approach to terrorism screening. Although the TSA, Customs and Border Patrol, and various other front-line

---

[4] DEP'T. OF JUSTICE, THE ATTORNEY GENERAL'S GUIDELINES REGARDING THE USE OF CONFIDENTIAL HUMAN SOURCES 245, *available at* https://www.fas.org/irp/agency/doj/fbi/chs-guidelines.pdf.

agencies that engage in screening of individuals for varied purposes may use records provided by the TSC, it is the TSC that maintains and controls the TSDB.

31. The No Fly List is a subset of this master watch list. Individuals named on the No Fly List will be categorically barred from boarding an aircraft for (at minimum) flights that originate, terminate, or pass over the United States, absent a specific waiver from the government. The No Fly List is thus distinct from another list—known as the Selectee List—used to identify passengers who will be subject to a higher level of scrutiny at TSA security screening checkpoints and at customs on return from international travel. Individuals on the Selectee List are not barred from boarding but are forced to submit to additional searches before doing so.

32. A number of federal agencies may nominate individuals to the TSC for inclusion on the consolidated TSDB watch list. The FBI and the National Counterterrorism Center are the primary agencies responsible for making nominations to the TSDB. When the FBI nominates an individual for inclusion, the TSC makes the final decision on whether the nominated individual purportedly meets the minimum requirements for inclusion on the watch list as a "known or suspected terrorist," based on a summary of underlying information provided by an FBI case agent.

33. Nominations to the TSDB are supposed to be based on a "reasonable suspicion" that the individual is a known or suspected terrorist derived from the totality of the information reviewed. According to TSC, the nominator's "[m]ere guesses or 'hunches'" are insufficient, as are race, ethnicity, nationality, religion, or protected First Amendment speech or association; instead, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual 'is known or

suspected to be, or has been engaged in conduct constituting, in preparation for, in aid of or related to, terrorism and terrorist activities.'" As of 2007, TSC rejected only approximately one percent of nominations to the TSDB.

34. The FBI also nominates individuals to be included specifically on the No Fly List. Additional underlying "derogatory information" is required if a nominator suggests the inclusion of an individual not only on the TSDB but on the No Fly List as well. Although the operation of the No Fly List suggests that individuals placed on it must somehow present threats to aviation security that cannot be mitigated if allowed to board an airplane, the government has not specified publicly what standards or criteria are applied to determine whether an individual on the consolidated TSDB watch list will additionally be placed on the No Fly List. The TSDB reportedly contains 875,000 names as of May 2013. Data provided to Congress in 2009 indicated that 1600 names were added to the watch list every day. The No Fly List contained approximately 21,000 individuals as of February 2012, including approximately 500 United States citizens.

35. The TSC disseminates watch list data in a variety of forms to a variety of agencies including the Transportation Security Administration, which uses TSC-provided data to screen travelers for commercial flights. Such information is also disseminated to cooperating governments for use by their agencies.

36. The TSC provides the No Fly List to the TSA for use in pre-screening airline passengers. Because the data disseminated to the TSA is unclassified, the list provided includes only identifiers such as name, date of birth, etc. and not the underlying information provided by the nominator to purportedly justify inclusion.

37. The TSA screens travelers by conducting a name-based search of a passenger prior to boarding. If that person has been placed on the No Fly List by the TSC, he or she will be denied boarding.

**Abuse of the No Fly List to Pressure Individuals to Become Informants**

38. FBI agents have used placement on the No Fly List as a way to pressure individuals to work as informants. According to publicly available information, the FBI has placed individuals on the No Fly List as a way to pressure them to submit to questioning by government agents. The FBI has also conditioned removal from the No Fly List upon agreeing to work for or submit to questioning by government agents.

39. Mr. Yonas Fikre, a United States Citizen, has filed a lawsuit in federal court alleging that FBI agents placed him on the No Fly List in order to coerce him into becoming a government informant.  According to the complaint, on or about April 21, 2010, his wife called him in Sudan, where he was pursuing a business opportunity, and told him that she received a call from the U.S. Embassy in Khartoum asking that Mr. Fikre contact a United States Embassy official, Mr. Noordeloos. Mr. Fikre called Mr. Noordeloos, who invited him to the U.S. Embassy in Khartoum. When Mr. Fikre arrived at the Embassy he was subjected to an interrogation and prevented from leaving the room. FBI Agent Noordeloos also told Fikre that he wanted him to work with the Agents on a "case" that was developing. Agent Noordeloos asked Fikre to come in the next day. Fikre agreed because he wanted to leave. The next day, Fikre called Agent Noordeloos to tell him that he was not interested in serving as an informant. Agent Noordeloos was upset, and told Fikre that when he wanted to travel back to the United States, he would have to go to the U.S. embassy. On June 15, 2010, Mr. Fikre traveled to the United Arab Emirates, where he was stripped of his passport and

tortured. Ultimately, he was unable to return to the United States because he had been placed on the No Fly List.

40. Michael Migliore, a dual citizen of the USA and Italy, had traveled by ship to Europe because he was on the U.S. government's No Fly List. Mr. Migliore believes he was placed on the List after he refused to be interviewed by the FBI without an attorney present.

41. In June 2012, Mr. Kevin Iraniha was boarding a flight home to San Diego on Frontier Airlines with his two brothers and father when he was informed that he was on the No Fly List. Mr. Iraniha went to the U.S. Embassy in Costa Rica. Once there, he was questioned extensively by FBI agents about his religious beliefs, his attendance and contacts at mosques in Costa Rica.  Mr. Iraniha states that he felt pressured to speak to the FBI agents.

42. In June 2009, Mr. Amir Meshal was denied boarding at Newark International Airport and was informed that he was on the No Fly list. In October 2010, an FBI agent offered to remove Mr. Meshal from the No Fly list if he agreed to serve as a government informant. Mr. Abe Mashal, an Illinois resident, was prevented from boarding a flight from Chicago, and told that he was on the No Fly List. Later that same day, FBI agents came to his home and questioned him. A few months later, the same agents asked him to become an undercover informant, promising to remove him from the No Fly List if he agreed to spy for the government.

43. Mr. Nagib Alo Ghaleb, a naturalized U.S. Citizen residing in San Francisco, traveled to Yemen in 2010 to visit his wife and children. Upon his return to the U.S., an FBI agent informed him at the Frankfurt airport in Germany that he would not be allowed back into the U.S. As a result, Mr. Ghaleb returned to Yemen and sought assistance from the U.S. Embassy. The U.S. officials in Yemen pressured him to submit to questioning by the FBI

agents. The FBI agents offered to help Mr. Ghaleb if he would work with them. They offered to arrange for him to fly back to the United States immediately if he would agree to tell them who the "bad guys" were in Yemen and in San Francisco, and provide names of individuals from his mosque and his community. Mr. Ghaleb declined to work as a government informant. When he again attempted to board a flight to the U.S. and was refused boarding, an FBI agent again informed him that he would be taken off the No Fly List if he would agree to become an FBI informant in the California Yemeni community

**The Redress Process**

44. Individuals, even U.S. citizens and LPRs, receive no notice that they have been placed in the TSDB or on the No Fly List.

45. An individual who has been barred from boarding an aircraft due to apparent placement on the No Fly List has no avenue for redress with the TSC, the government entity responsible for adding individuals to the list, maintaining their inclusion on the list, or removing them from the list. TSC does not accept redress inquiries directly from the public, nor does it provide final orders or disposition letters to individuals who have submitted redress inquiries.

46. The only avenue of relief available to individuals who find themselves unable to fly is the TRIP program, which is administered by DHS. DHS is responsible for establishing and implementing the redress procedures for individuals who are denied boarding, as well as for establishing the administrative appeals process for redress determinations. The TSA is responsible for implementing the results of the TRIP process.

47. Individuals may submit a DHS TRIP Traveler Inquiry Form by mail, e-mail or by submitting an online form. When the inquiry is filed electronically, the system automatically provides a

Redress Control Number to help monitor the progress of the inquiry (and to serve as additional identifying information for any future travel). When filing is done via hard-copy, the traveler receives a Redress Control Number at the conclusion of the DHS TRIP review.

48. If the inquiring individual's name is an exact or near match to an identity in the TSDB, DHS TRIP submits redress inquiries to the TSC, which makes the final decision as to whether any action should be taken (including removal from the list). The TSC has provided no public information about how it makes such decisions, other than to state that TSC "coordinates with" the agency that originally nominated the individual to be included in the TSDB during its review of whether the individual should continue to remain in the TSDB. However, the TSC is the final arbiter of whether an individual's name will be retained or removed from the list.

49. TSC's process for making this determination is entirely closed. There is no hearing or other further opportunity for the complaining individual to participate. Once the TSC makes a final determination regarding a particular individual's status on the watch lists, including the No Fly List, the TSC advises DHS that it has completed its process. DHS TRIP then responds to the individual with a letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual. The letter does not set forth any basis for inclusion in a terrorist watch list, does not state how the government has resolved the complaint at issue, and does not specify whether an individual will be permitted to fly in the future. Thus, the only "process" available to individuals who are prevented from boarding commercial flights is to submit their names and other identifying information to a government entity that has no authority to provide redress and to hope that an unspecified government agency corrects an error or changes its mind.

14

50. As a general matter of policy, the government provides no confirmation of whether or not a person is on the No Fly List, at any stage of the nomination or redress processes, even where presence on the no Fly List has already been confirmed by individual federal officers or airline employees.

**Plaintiff Muhammad Tanvir**

51. Plaintiff Muhammad Tanvir is a lawful permanent resident who resides in Queens, New York. He has lived in the United States since 2002 and has been married since March 2, 2006.

52. Mr. Tanvir was first questioned by FBI special agents in approximately February 2007 at his workplace, a "99 Cents" store in the Bronx. There, Defendants FBI Special Agent "John" Tanzin and another FBI agent questioned him about an old acquaintance who they believed had attempted to enter the United States illegally through Mexico. After the FBI agents finished questioning Mr. Tanvir, they asked him if he would be willing to relay information to them about the American Muslim community.

53. Two days later, Mr. Tanvir received a phone call from Agent Tanzin, and again asked if there was anything about the American Muslim community that Mr. Tanvir could share with the FBI. Mr. Tanvir replied that he did not know of anything that would concern law enforcement.

54. In 2008, Mr. Tanvir visited his wife and family in Pakistan.

55. On his return flight in late 2008, U.S. government officials escorted Mr. Tanvir off the airplane, led him to a private investigation room, searched his baggage, and questioned him for five (5) hours before confiscating his passport. The officials ultimately allowed Mr.

Tanvir to enter the United States, but they held onto Mr. Tanvir's passport and told him to pick it up a month later.

56. Shortly after this trip, FBI agents began aggressively attempting to recruit Mr. Tanvir to work for them as a government informant.

57. On January 26, 2009, Defendants Tanzin and another FBI agent, Defendant "John Doe" came to see Mr. Tanvir at his workplace, a "99 Cents" store in Queens. The FBI agents asked Mr. Tanvir to come with them to Manhattan.

58. Mr. Tanvir agreed to accompany Defendants, and was driven from Queens to the FBI's New York offices at 26 Federal Plaza in Manhattan.

59. At 26 Federal Plaza, Defendants informed Mr. Tanvir that they had been following him. They even showed him surveillance photos of himself standing on a New York City subway platform. The FBI agents then told Mr. Tanvir that he was special, hardworking, and that they wanted him to work for them.

60. The Defendant FBI agents offered Mr. Tanvir incentives, such as facilitating his wife's and family's visits from Pakistan to the United States and helping his aging parents in Pakistan go on religious pilgrimage to Saudi Arabia.

61. The FBI agents also threatened Mr. Tanvir by stating that if he did not work for them, they would not give him back his passport and that if he tried to pick up his passport at the airport, he would be deported to Pakistan.

62. Mr. Tanvir was terrified by the agents' threats and cried at the meeting. He pleaded with them. He asked them to not deport him because his family depends on him financially.  He told the agents that he believed working as an informant would be dangerous. The Defendant FBI agents told him to not repeat their discussion with anyone.

63. During that same FBI interview, the FBI agents also asked Mr. Tanvir whether he had attended any Taliban training camps, and whether he knew of any training camps near the village where he was raised. Mr. Tanvir responded that he never attended any training camps and didn't know of the whereabouts of any such camps.

64. The next day, Agent Tanzin called Mr. Tanvir and told him that he was authorizing the release of his passport since Mr. Tanvir was cooperating with the agents.

65. On January 28, 2009, Mr. Tanvir picked up his passport from John F. Kennedy airport. Mr. Tanvir asked the DHS officials why they withheld his passport, and they replied that it was due to an investigation that has since been cleared.

66. Two days later, Agent Tanzin informed Mr. Tanvir that DHS was able to return his passport because he ordered its release. During this call, Agent Tanzin again asked Mr. Tanvir to work as an informant for the government.

67. Over the course of the next few weeks, Mr. Tanvir received multiple phone calls and visits from Defendants Tanzin and John Doe at his workplace. The FBI agents repeatedly asked Mr. Tanvir whether he had decided to work for them as a confidential informant.

68. Defendants told Mr. Tanvir that they wanted him to gather information on criminal activities. Further, the agents stated that they were generally interested in people from the "Desi" (South Asian) communities. Mr. Tanvir repeatedly told the FBI agents that if he knew of any criminal activities he would tell them but that he did not want to proactively seek out such information nor spy on any communities generally.

69. Mr. Tanvir did not want to work as an informant because he felt that it was a dangerous job not only for himself, but for his entire community. He was concerned about the dangers of prolonged and repeated interactions with federal government agents, and his resulting

vulnerability to potential criminal or immigration retaliatory acts. Based on the way the agents pressured Mr. Tanvir to tell them about criminal activity that he knew nothing about, or even that did not exist, he was also worried that if he agreed to be an informant, he would be required to monitor and potentially entrap innocent individuals in his community. For Mr. Tanvir, spying and eavesdropping on others, especially when they have done nothing wrong, is fundamentally incompatible with his moral and religious beliefs.

70. Due to these repeated visits and calls, Mr. Tanvir felt intimidated and harassed. Mr. Tanvir spoke to a relative who had been in the United States longer than he had, and was told that he was under no obligation to continue speaking with the FBI agents, and that in fact it would be safer for him not to engage with them. Based on his relative's advice, he stopped answering Defendants' phone calls.

71. Eventually, Defendants again visited Mr. Tanvir at his workplace and asked him why he was no longer answering their phone calls. Mr. Tanvir explained that he had answered all of their questions on multiple occasions and that he no longer had anything to tell them. The FBI agents then asked him to take a polygraph test. When Mr. Tanvir declined to take the test, the FBI agents threatened to arrest him. Mr. Tanvir responded that if they arrested him, he would obtain an attorney.. After this encounter, Defendants Tanzin and John Doe ceased attempting to recruit Mr. Tanvir.

72. In January 2010, Mr. Tanvir traveled to Pakistan to visit his wife and parents. During this time, Agent Tanzin visited Mr. Tanvir's sister at her workplace and questioned her about Mr. Tanvir's travel.

73. The FBI agents had Mr. Tanvir's itinerary and wanted to know why Mr. Tanvir had flown on Kuwait Airways instead of Pakistan International Airlines.

74. Mr. Tanvir's sister replied that Mr. Tanvir had found a cheaper airfare on the Kuwaiti airline. She also told the FBI agents that she was not comfortable speaking with them.

75. Mr. Tanvir returned to the United States and took a job as a truck driver, as this work generated more income even though it required significant travel.

76. In October 2010, while Mr. Tanvir was in Atlanta for work, he received word that his mother was visiting New York from Pakistan. Mr. Tanvir planned to fly from Atlanta to New York City. When he arrived at the check-in counter at the airport, airline officials told him that he was not allowed to fly.

77. Two unknown FBI agents approached Mr. Tanvir at the airport and told him to call the New York FBI agents he had originally been in touch with.

78. The two unknown FBI agents then drove Mr. Tanvir to the nearby bus station where he could take a New York-bound bus.

79. Mr. Tanvir called Defendant Tanzin while waiting at the bus station. However, Agent Tanzin told Mr. Tanvir that he was no longer assigned to his case, but that he should cooperate with the FBI agent who would be contacting him.

80. Two days after Mr. Tanvir arrived in New York City by bus, Defendant FBI agent Sanya Garcia called him and told him that she wanted to speak with him and ask him some more questions.

81. Upon information and belief, Agent Garcia knew about Agent Tanzin's prior failed attempts to recruit Mr. Tanvir as an informant, and his subsequent placement of Mr. Tanvir on the No Fly List in retaliation for his refusal to become an informant.

82. Frustrated, Mr. Tanvir told Agent Garcia that he had answered the FBI's questions on multiple occasions and that he was not interested in further questioning, and hung up the phone.

83. Almost a year later, Mr. Tanvir reached out to the Department of Homeland Security (DHS) to see whether he would be allowed to board a plane. DHS instructed Mr. Tanvir to file a DHS TRIP complaint.

84. Mr. Tanvir filed a TRIP complaint on September 27, 2011.

85. In October 2011, Mr. Tanvir purchased plane tickets to Pakistan for himself and his wife. The date of travel was booked for November 3, 2011. On November 2, 2011, the day before Mr. Tanvir and his wife were set to fly, Defendant Garcia called Mr. Tanvir. She told him that he would not be allowed to fly the next day.

86. When Mr. Tanvir asked why, Agent Garcia told him that it was because he hung up on her the last time she had tried to question him.

87. Agent Garcia again demanded that Mr. Tanvir meet with her as a precondition before she could allow him to fly out the following day. Because Mr. Tanvir wanted to fly to visit his ailing mother, he agreed to meet with her and another FBI agent, Defendant "John LNU," at a restaurant.

88. At that meeting, Defendants Garcia and Roe subjected Mr. Tanvir to the same questions Defendant Tanzin had repeatedly asked on multiple occasions, including questions about his family, his religious and political beliefs, and whether he had any military training,

89. After the meeting, Defendants Garcia and Roe advised Mr. Tanvir that they would try to permit him to fly again by obtaining a one-time waiver to enable him to visit his ailing

mother, but that it would take some weeks. As a condition, Mr. Tanvir had to agree to meet with the agents upon his return.

90. Mr. Tanvir begged Agent Garcia to let him fly the next day with his wife.

91. Agent Garcia stated that she might be able to do so, but an FBI agent would have to accompany him.

92. The next day, Agent Garcia called Mr. Tanvir and told him that he would not be permitted to fly on that day. She wanted him to come to the FBI headquarters to take a polygraph test. When Mr. Tanvir's cousin asked if he could accompany Mr. Tanvir to the polygraph test, Agent Garcia refused.

93. At that point, Mr. Tanvir contacted the Creating Law Enforcement Accountability & Responsibility (CLEAR) project of Main Street Legal Services, Inc., at CUNY School of Law to represent him in connection with his interactions with the FBI.

94. Mr. Tanvir's attorneys reached out to the FBI agents, but the agents did not want to speak to his attorneys. Mr. Tanvir's attorneys offered to meet with the FBI agents to resolve his placement on the No Fly List, but the agents rejected their proposals. The agents directed the attorneys to the FBI legal counsel's office, which in turn directed them to the TRIP process. Mr. Tanvir had already tried TRIP and it had not provided him with any redress.

95. The FBI agents no longer contacted Mr. Tanvir after he obtained legal representation, and no longer sought to recruit him to work as an informant for them.

96. This confirmed Mr. Tanvir's suspicion that the FBI had placed him on the No Fly List in retaliation for his refusal to work for them as an informant, and as a way to coerce him to agree to work as an informant with promises of permanent, or even temporary, removal from the No Fly List.

97. On December 10, 2011, Mr. Tanvir again attempted to visit his mother, whose health continued to deteriorate.

98. At John F. Kennedy (JFK) Airport, Mr. Tanvir was informed by the airline carrier's employees that they could not issue him a boarding pass because he was on the No Fly List.

99. On April 16, 2012, Mr. Tanvir received a response to his TRIP complaint. The letter noted that "no changes or corrections are warranted at this time."

100. On May 17, 2012, Mr Tanvir's attorneys wrote a letter to the FBI's legal counsel. The letter described Mr. Tanvir's predicament and the FBI's retaliatory actions, and it also stated that Mr. Tanvir was prepared to take legal action. Neither Mr. Tanvir nor his attorneys have heard back from the FBI in response to that letter.

101. On May 23, 2012, Mr. Tanvir appealed his TRIP determination. Mr. Tanvir also requested the releasable materials upon which the TRIP determination was based.

102. In November 2012, Mr. Tanvir again purchased a ticket to visit his sick mother in Pakistan.

103. On November 28, 2012, Mr. Tanvir arrived at JFK airport and was not allowed to board.

104. An FBI agent who introduced herself as Janet Ambrisco approached Mr. Tanvir and his attorney from CLEAR at the check-in area and informed them that in order to be removed from the No Fly List, Mr. Tanvir would have to meet with Defendant Garcia.

105. Mr. Tanvir's attorney attempted to speak with Agent Garcia but she did not return their calls. Eventually, Ms. Dawn Bruno from the FBI's legal counsel office in New York informed Mr. Tanvir's attorneys that Ms. Garcia was no longer interested in speaking with Mr. Tanvir.

22

106.    On March 28, 2013, Mr. Tanvir received a letter from DHS which noted that it
supersedes the April 16, 2012 TRIP response. The letter stated that Mr. Tanvir's experience
"was most likely caused by a misidentification against a government record or by random
selection," and that the Government has "made updates" to records. As a result, the letter
stated, Mr. Tanvir's request for releasable materials was moot and would not be processed by
DHS.

107.    The DHS letter did not state whether Mr. Tanvir had previously been placed on the No
Fly List, whether he had been granted a temporary waiver permitting his travel on a single
occasion, or whether Mr. Tanvir would be now permitted to board flights. As a result, Mr.
Tanvir purchased another ticket and attempted to travel again. On June 27, 2013, Mr. Tanvir
was allowed to board a flight to Pakistan.

108.    Mr. Tanvir's placement on the No Fly List prevented him from visiting his sick mother in
Pakistan, causing him great distress.

109.    Mr. Tanvir also suffered economic loss because of his placement on the No Fly List,
including but not limited to loss of income and expenses and fees related to the purchase of
airline tickets.

110.    Upon information and belief, Defendants Comey, Piehota, Beers, and Pistole knew about,
should have known of, or willfully or recklessly ignored U.S. government agents' misuse of
the No Fly List for purposes other than ensuring aviation safety.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## Violation of the First Amendment: Retaliation

### (Against all Defendants)

111.   Plaintiff MUHAMMAD TANVIR incorporates by reference each and every allegation contained in the paragraphs above.

112.   By placing Mr. Tanvir on the No Fly List because of his refusal to work for or speak to Defendants, to disclose his political affiliations, and to associate with others, Defendants retaliated against Mr. Tanvir for exercising his protected rights in violation of the First Amendment to the United States Constitution.

113.   Defendants Comey, Piehota, Beers and Pistole supervised, willfully or recklessly disregarded, or failed to remedy FBI agents' policy and practice of using the No Fly List to retaliate against Mr. Tanvir when he refused to work as an informant or to submit to interrogation.

114.   Defendants' unlawful actions caused Mr. Tanvir emotional distress, deprivation of his constitutional rights, damage to his reputation, and material loss.

## SECOND CLAIM FOR RELIEF

## Violation of the Fifth Amendment: Retaliation

### (Against all Defendants)

115.   Plaintiff MUHAMMAD TANVIR incorporates by reference each and every allegation contained in the paragraphs above.

116.   By placing Mr. Tanvir on the No Fly List because of his refusal to be questioned by Defendants about his own religious and political beliefs and activities, and his refusal to

continue to submit to repeated questioning by agents, Defendants retaliated against Plaintiff for exercising his privilege against self-incrimination, in violation of the Fifth Amendment to the United States Constitution.

117.    Defendants Comey, Piehota, Beers and Pistole supervised, willfully or recklessly disregarded, or failed to remedy FBI agents' policy and practice of using the No Fly List to retaliate against Mr. Tanvir when he refused to work as an informant or to submit to interrogation.

118.    Defendants' unlawful actions caused Mr. Tanvir emotional distress, deprivation of his constitutional rights, damage to his reputation, and material loss.

## THIRD CLAIM FOR RELIEF

## Violation of the First Amendment: Right to Associate

### (Against all Defendants)

119.    Plaintiff MUHAMMAD TANVIR incorporates by reference each and every allegation contained in the paragraphs above.

120.    By conditioning Mr. Tanvir's removal from the No Fly List on becoming an informant, associating with others, and disclosing his political and religious affiliations, Defendants impermissibly coerced Mr. Tanvir to associate in violation of the First Amendment to the United States Constitution.

121.    Defendants Comey, Piehota, Beers and Pistole supervised, willfully or recklessly disregarded, or failed to remedy FBI agents' policy and practice of using the No Fly List to coerce Mr. Tanvir into working as an informant or submitting to questioning in violation of his right not to associate.

122.    Defendants' unlawful actions caused Mr. Tanvir emotional distress, deprivation of his

constitutional rights, damage to his reputation, and material loss.

**FOURTH CLAIM FOR RELIEF**

**Violation of the First Amendment: Freedom of Speech**

**(Against all Defendants)**

123.    Plaintiff MUHAMMAD TANVIR incorporates by reference each and every allegation

contained in the paragraphs above.

124.    By conditioning Mr. Tanvir's removal from the No Fly List on becoming an informant

and on regularly speaking with U.S. government officials, Defendants impermissibly coerced

Mr. Tanvir to speak in violation of the First Amendment to the United States Constitution.

125.    Defendants Comey, Piehota, Beers and Pistole supervised, willfully or recklessly

disregarded, or failed to remedy FBI agents' policy and practice of using the No Fly List to

coerce Mr. Tanvir into working as an informant or submitting to questioning in violation of

his right not to speak.

126.    Defendants' unlawful actions caused Mr. Tanvir emotional distress, deprivation of his

constitutional rights, damage to his reputation, and material loss.

**FIFTH CLAIM FOR RELIEF**

**Violation of the First Amendment: Establishment Clause**

**(Against all Defendants)**

127.    Plaintiff MUHAMMAD TANVIR incorporates by reference each and every allegation

contained in the paragraphs above.

128.    By instructing Mr. Tanvir to report on activity and opinions within predominantly
Muslim communities after learning about Mr. Tanvir's religious beliefs and practices, and
conditioning Mr. Tanvir's removal from the No Fly List on his accession to those demands,
Defendants impermissibly endorsed or promoted religion and coerced Mr. Tanvir to engage
in religious activity in violation of the Establishment Clause of the First Amendment to the
United States Constitution.

129.    Defendants Comey, Piehota, Beers and Pistole supervised, willfully or recklessly
disregarded, or failed to remedy FBI agents' policy and practice of using the No Fly List to
coerce Mr. Tanvir into working as an informant or submitting to questioning, such that they
impermissibly endorsed or promoted religion and coerced Mr. Tanvir to engage in religious
activity in violation of the Establishment Clause.

130.    Defendants' unlawful actions caused Mr. Tanvir emotional distress, deprivation of his
constitutional rights, damage to his reputation, and material loss.

### SIXTH CLAIM FOR RELIEF

### Violation of the First Amendment: Free Exercise of Religion

### (Against all Defendants)

131.    Plaintiff MUHAMMAD TANVIR incorporates by reference each and every allegation
contained in the paragraphs above.

132.    By instructing Mr. Tanvir to report on activity and opinions within predominantly
Muslim communities after learning about Mr. Tanvir's religious beliefs and practices, and
conditioning Mr. Tanvir's removal from the No Fly List on his accession to those demands,
Defendants placed a substantial burden on Mr. Tanvir's practice of Islam without rational

basis in violation of the Free Exercise Clause of the First Amendment to the United States Constitution.

133.    Defendants Comey, Piehota, Beers and Pistole supervised, willfully or recklessly disregarded, or failed to remedy FBI agents' policy and practice of using the No Fly List to coerce Mr. Tanvir into working as an informant or submitting to questioning, such that they placed a substantial burden on Mr. Tanvir's practice of Islam without rational basis in violation of the Free Exercise Clause.

134.    Defendants' unlawful actions caused Mr. Tanvir emotional distress, deprivation of his constitutional rights, damage to his reputation, and material loss.

### SEVENTH CLAIM FOR RELIEF

### Violation of the Fifth Amendment: Procedural Due Process

### (Against all Defendants)

135.    Plaintiff MUHAMMAD TANVIR incorporates by reference each and every allegation contained in the paragraphs above.

136.    Mr. Tanvir has a liberty interest in travel free from unreasonable burdens within, to, and from the United States.

137.    Mr. Tanvir has a right to be free from being falsely stigmatized as an individual associated with terrorist activity.

138.    Mr. Tanvir has a liberty interest in non-attainder. Defendants singled out Mr. Tanvir for punishment by restricting his ability to travel by air and falsely associating him with individuals known or suspected to be involved in terrorism. The burdens placed on Mr. Tanvir were disproportionate to any legitimate government purpose.

139.    By failing to inform Mr. Tanvir of his placement on the list and the bases for being on the list, and failing to provide Mr. Tanvir with a meaningful opportunity to contest his placement on the list, Defendants deprived Mr. Tanvir of protected liberty interests without affording him due process of law in violation of the Fifth Amendment to the United States Constitution.

140.    Defendants' unlawful actions caused Mr. Tanvir emotional distress, deprivation of his constitutional rights, damage to his reputation, and material loss.

### EIGHTH CLAIM FOR RELIEF

### Unlawful Agency Action in Violation of the Administrative Procedure Act, 5 U.S.C. §§ 702, 706

### (Against all Defendants)

141.    Plaintiff MUHAMMAD TANVIR incorporates by reference each and every allegation contained in the paragraphs above.

142.    Defendants' placement of Mr. Tanvir on the No Fly List when Mr. Tanvir does not present a threat to aviation security, and Defendants' failure to provide Mr. Tanvir with meaningful notice of his placement on the No Fly List and the bases for being on the list, and a meaningful opportunity to challenge his placement on the No Fly List is arbitrary, capricious, an abuse of discretion, and contrary to constitutional rights, power, privilege or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1.    Declaring that the policies, practices, acts, and omissions of Defendants described here are unlawful and violate Plaintiff's rights under the Constitution of the United States and the Administrative Procedure Act;

2. Ordering Defendants to remove Plaintiff's name from the No Fly List and other U.S. government watch lists, and to provide Plaintiff with notice that his name has been removed;

3. Enjoining Defendants and their agents, employees, successors, and all others acting in concert with them, from subjecting Plaintiff to the unconstitutional and unlawful practices described here;

4. Ordering Defendants sued in their official capacity to provide a constitutionally adequate legal mechanism affording Plaintiff with meaningful notice of his placement on the No Fly List and of the grounds for his inclusion on the No Fly List, and a meaningful opportunity to contest his placement on the No Fly List before a neutral decision-maker;

5. Requiring the promulgation of guidelines prohibiting the abuse of the No Fly List for purposes other than the promotion of aviation safety, including for the unlawful purpose of pressuring individuals to become informants;

6. Awarding Plaintiff compensatory and punitive damages;

7. Awarding Plaintiff's counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and disbursements pursuant to 28 U.S.C. § 2412; and

8. Granting such other and further relief as the Court deems just and proper.

Dated:  October 1, 2013

Respectfully submitted,

_____
Shayana Kadidal [SK-1278]

Ramzi Kassem [RK-3567]                          Susan Hu, Esq.
*Supervising Attorney*                              Shayana Kadidal, Esq. [SK-1278]
Diala Shamas                                            Baher Azmy, Esq.
*Staff Attorney*                                        **Center for Constitutional Rights**
Nasrin Moznu                                           666 Broadway, 7th Floor
Versely Rosales                                         New York, NY 10012
*Law Student Interns*                               (212) 614-6491
**CLEAR project**                                   kadidal@ccrjustice.org
**Main Street Legal Services, Inc.**
City University of New York School of Law
2 Court Square
Long Island City, NY 11101                        *Attorneys for Plaintiff*
(718) 340-4558
ramzi.kassem@law.cuny.edu