**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MUHAMMAD TANVIR; JAMEEL
ALGIBHAH; NAVEED SHINWARI;
AWAIS SAJJAD,

                  *Plaintiffs*,

        v.

ERIC H. HOLDER, ATTORNEY GENERAL
OF THE UNITED STATES; JAMES
COMEY, DIRECTOR, FEDERAL BUREAU
OF INVESTIGATION; CHRISTOPHER M.
PIEHOTA, DIRECTOR, TERRORIST
SCREENING CENTER; JEH C. JOHNSON,
SECRETARY, DEPARTMENT OF
HOMELAND SECURITY; "FNU" TANZIN,
SPECIAL AGENT, FBI; SANYA GARCIA,
SPECIAL AGENT, FBI; FRANCISCO
ARTOUSA, SPECIAL AGENT, FBI; JOHN
"LNU", SPECIAL AGENT, FBI; MICHAEL
RUTKOWSKI, SPECIAL AGENT, FBI;
WILLIAM GALE, SUPERVISORY SPECIAL
AGENT, FBI; JOHN C. HARLEY III,
SPECIAL AGENT, FBI; STEVEN "LNU",
SPECIAL AGENT, FBI; MICHAEL "LNU",
SPECIAL AGENT, FBI; GREGG
GROSSOEHMIG, SPECIAL AGENT, FBI;
WEYSAN DUN, SPECIAL AGENT IN
CHARGE, FBI; JAMES C. LANGENBERG,
ASSISTANT SPECIAL AGENT IN
CHARGE, FBI; "JOHN DOES 1-9, 11-13",
SPECIAL AGENTS, FBI; "JOHN DOE 10",
SPECIAL AGENT, DHS,

                  *Defendants*.

**FIRST AMENDED COMPLAINT**

Case No. 13-CV-6951

ECF Case

**INTRODUCTION**

1.    In retaliation for the exercise of their constitutional rights, the United States government
      has deprived Plaintiffs Muhammad Tanvir, Jameel Algibhah, Naveed Shinwari and Awais
      Sajjad of their right to travel freely and wrongly stigmatized them without justification
      and without due process of law by placing them on the No Fly List.

2.    The No Fly List is supposed to be limited to individuals who are determined to be such
      significant threats to aviation safety that it is too dangerous to allow them on any
      commercial flight to, from or over the United States regardless of the extent of pre-
      boarding searches.

3.    Instead, shielded from public and, to a large extent, judicial scrutiny, and lacking
      effective controls and supervision, the No Fly List has swelled to approximately 21,000
      names as of February 2012, including approximately 500 United States citizens and an
      unknown number of lawful permanent residents.  On information and belief, the number
      of people on the No Fly List is even larger today.

4.    Plaintiffs are among the many innocent people who find themselves swept up in the
      United States government's secretive watch list dragnet.  Defendants have used the No
      Fly List to punish and retaliate against Plaintiffs for exercising their constitutional rights.
      Plaintiffs declined to act as informants for the Federal Bureau of Investigation ("FBI")
      and to spy on their own American Muslim communities and other innocent people.

5.    Inclusion on the No Fly List severely burdens Plaintiffs and significantly interferes with
      their constitutional right to travel freely.  Plaintiffs, like the thousands of other individuals
      on the No Fly List, lack any effective due process protections to challenge their

placement on the No Fly List and the deprivation of their constitutional rights that results from that placement.

6.    The Attorney General of the United States, the Secretary of the Department of Homeland Security ("DHS"), and the directors of the FBI and Terrorist Screening Center ("TSC"), (collectively, the "Agency Defendants") each play a part in creating, maintaining, implementing and supervising the No Fly List.

7.    The Agency Defendants have not articulated or published any meaningful standards or criteria governing the placement of individuals on the No Fly List.  Defendants have not informed any Plaintiff of the basis for his inclusion on the No Fly List.  Defendants have even denied the Plaintiffs after-the-fact explanations for their inclusion on the List or an opportunity to contest their inclusion before an impartial decision-maker.

8.    Certain FBI Special Agents and other government agents (collectively, the "Special Agent Defendants"), identified below, exploited the significant burdens imposed by the No Fly List, its opaque nature and ill-defined standards, and its lack of procedural safeguards, in an attempt to coerce Plaintiffs into serving as informants within their American Muslim communities and places of worship.  The Special Agent Defendants retaliated against Plaintiffs by placing or retaining them on the No Fly List when they refused to serve as informants.

9.    Because of institutional and supervisory pressure to increase the number of confidential informants in American Muslim communities, FBI agents, including the Special Agent Defendants, have used the No Fly List to retaliate against and coerce individuals in these communities who, like Plaintiffs, have refused to become informants but do not pose a threat to aviation safety.

10.    The Agency Defendants tolerated and failed to remedy a pattern and practice among FBI and other United States government Special Agents, including the Special Agent Defendants, of unlawfully exploiting the lack of due process surrounding the No Fly List to retaliate against individuals, including Plaintiffs, who exercised their constitutional rights.

11.    In order to vindicate their rights, Plaintiffs seek declaratory, injunctive and monetary relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706; the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*; and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).   Plaintiffs seek, *inter alia,* (i) to remove their names from the United States government's "No Fly List," (ii) declaratory and injunctive relief against the individuals who placed or kept them on the No Fly List without cause and in retaliation for their assertion of constitutional rights in refusing to serve as informants, (iii) declaratory and injunctive relief against the government officials responsible for maintaining a No Fly List that lacks due process and permits misuse, and (iv) monetary relief for damages they suffered as a result of their placement and maintenance on the No Fly List because they refused to act as informants for the FBI.

### JURISDICTION AND VENUE

12.    This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.  This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the RFRA, 42 U.S.C. § 2000bb-1(c); and the APA, 5 U.S.C. § 702.  This Court has the authority to compel agency action that has been unlawfully withheld or unreasonably delayed, and to hold unlawful and set aside agency actions

4

under 5 U.S.C. § 706.  Monetary damages are available pursuant to RFRA, 42 U.S.C. § 2000bb-1(c), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

13.    This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and employees of the United States or its agencies operating under color of law, and a substantial part of the events or omissions giving rise to the claims have occurred and are occurring in this judicial district.

**PARTIES**

14.    Plaintiff Muhammad Tanvir is a lawful permanent resident of the United States whose most recent residence in the United States was in Corona, Queens, New York.  Mr. Tanvir is Muslim.  Mr. Tanvir was placed on the No Fly List after he declined multiple requests by FBI agents to serve as an informant in his Muslim community.  He declined to do so because it would have violated his sincerely held religious beliefs.  He also felt that he had no relevant information to share.  After he learned that he had been placed on the No Fly List, he was told to contact the same FBI agents to clear up what he presumed was an error that led to his placement on the No Fly List. Instead, the FBI agents offered to help him get off the List—but only in exchange for relaying information about his community. Mr. Tanvir again refused.  Mr. Tanvir does not pose, has never posed, and has never been accused of posing, a threat to aviation safety.

15.    Plaintiff Jameel Algibhah is a United States citizen who resides in the Bronx, New York. Mr. Algibhah is a Muslim.  Mr. Algibhah was placed on the No Fly List after he declined a request from FBI agents to attend certain mosques, to act "extremist," and to participate in online Islamic forums and report back to the FBI agents.  After Mr. Algibhah learned

that he was on the No Fly List, the same FBI agents again visited him, telling him that only they could remove his name from the No Fly List if he agreed to act as an informant. Mr. Algibhah again exercised his constitutional right to refuse to become an informant and he remains on the No Fly List.  Because of his placement on the No Fly List, Mr. Algibhah has been unable to visit his wife and three young daughters in Yemen since 2009.  Mr. Algibhah does not pose, has never posed, and has never been accused of posing, a threat to aviation safety.

16.   Plaintiff Naveed Shinwari is a lawful permanent resident of the United States who resides in West Haven, Connecticut.  Mr. Shinwari is a Muslim.  Mr. Shinwari was placed or maintained on the No Fly List after he refused a request from FBI agents to be an informant on his Muslim community.  Subsequently, he was prevented from boarding a flight to Orlando, Florida, where he had found work.  Following his placement on the No Fly List, the same FBI agents approached Mr. Shinwari, told him they were aware of his inability to board his flight, and again asked him to work as an informant.  Mr. Shinwari again refused.  Because of his placement on the No Fly List, Mr. Shinwari's work has been disrupted and he has been unable to visit his wife and family in Afghanistan since 2012.  Mr. Shinwari does not pose, has never posed, and has never been accused of posing, a threat to aviation safety.

17.   Plaintiff Awais Sajjad is a lawful permanent resident of the United States who resides in Jersey City, New Jersey.  Mr. Sajjad is a Muslim.  Mr. Sajjad was prevented from flying because he was on the No Fly List.  After he sought to be removed from the List, he was approached by FBI agents and subjected to extensive interrogation, including a polygraph test, after which he was asked to work as an informant for the FBI. Mr. Sajjad had no

relevant information to share, so he refused.  Because of his placement on the No Fly List, Mr. Sajjad has been unable to visit his family in Pakistan, including his ailing 93-year old grandmother, since February 2012.  Mr. Sajjad does not pose, has never posed, and has never been accused of posing, a threat to aviation safety.

18. Defendant Eric H. Holder, Jr. is the Attorney General of the United States and the head of the United States Department of Justice, which oversees the FBI.  In turn, the FBI administers the TSC, which is tasked with maintaining the No Fly List.  All of the Plaintiffs were pressured to become informants and placed on the No Fly List by FBI Special Agents.  Defendant Holder is sued in his official capacity.

19. Defendant James B. Comey is the Director of the FBI.  The FBI administers the TSC. The FBI is also one of the agencies empowered to "nominate" individuals for placement on the No Fly List.  If an individual who has been placed on the No Fly List challenges his or her inclusion on the List, the FBI coordinates with the TSC to determine whether the individual should remain on the List.  The FBI also has an ongoing responsibility to notify the TSC of any changes that could affect the validity or reliability of information used to "nominate" someone to the No Fly List.  All of the Plaintiffs were pressured to become informants by FBI Special Agents.  Defendant Comey is sued in his official capacity.

20. Defendant Christopher M. Piehota is the Director of the TSC.  The TSC is responsible for coordinating the government's approach to terrorism screening and the dissemination of information collected in the Terrorist Screening Database ("TSDB"), which is used in the terrorism screening process. The TSC is responsible for reviewing and accepting nominations to the No Fly List from agencies, including the FBI and for maintaining the

List.   The TSC is responsible for making the final determination whether to add or remove an individual from the No Fly List. Defendant Piehota is sued in his official capacity.

21.      Defendant Jeh C. Johnson is the Secretary of Homeland Security and serves as the head of the Department of Homeland Security ("DHS"). The DHS is responsible for developing and coordinating the implementation of a comprehensive strategy to protect the United States from threats and attacks.   The DHS is additionally charged with establishing and implementing the Traveler Redress Inquiry Program ("TRIP") redress procedures for individuals, which is the sole and wholly inadequate mechanism for, *inter alia*, filing a complaint about placement on the No Fly List.   Defendant Johnson is sued in his official capacity.

22.      Defendant "FNU" (first name unknown) Tanzin is a Special Agent with the FBI.[1]  He is sued in his individual and official capacity.

23.      Defendant Sanya Garcia is a Special Agent with the FBI.[2]  She is sued in her individual and official capacity.

24.      Defendant John "LNU" (last name unknown) is a Special Agent with the FBI.  He is sued in his individual and official capacity.

25.      Defendant Francisco Artousa is a Special Agent with the FBI.   He is sued in his individual and official capacity.[3]

---

[1]   Possible alternative spellings could include "Tanzen," "Tenzin," or "Tenzen." Also, it is unclear whether Tanzin is the agent's first or last name.

[2]   Possible alternative spellings could include "Sania," "Sonya," or "Sonia."

[3]   Possible alternative designations could be "Frankie" or "Frank," and possible alternative spelling of his last name "Artusa."

26.     Defendant Michael Rutkowski is a Special Agent with the FBI.[4]   He is sued in his individual and official capacity.

27.     Defendant William Gale is a Supervisory Special Agent with the FBI.  He is being sued in his individual and official capacity.

28.     Defendant John C. Harley III is a Special Agent with the FBI.  He is sued in his individual and official capacity.

29.     Defendant Steven LNU (last name unknown) is a Special Agent with the FBI.  He is sued in his individual and official capacity.

30.     Defendant Michael LNU (last name unknown) is a Special Agent with the FBI.  He is sued in his individual and official capacity.

31.     Defendant Gregg Grossoehmig is a Special Agent with the FBI.  He is sued in his individual and official capacity.

32.     Special Agent in Charge Weysan Dun is a Special Agent with the FBI.  He is sued in his individual and official capacity.

33.     Assistant Special Agent in Charge James C. Langenberg is a Special Agent with the FBI.  He is sued in his individual and official capacity.

34.     Defendants "John Doe" 1 through 9 and 11 through 13 are Special Agents with the FBI.  They are sued in their individual and official capacities.

35.     Defendant "John Doe" 10 is an Agent with DHS.  He is sued in his individual and official capacity.

---

[4]   Possible alternative spellings could include "Rotkowski."

## FACTUAL ALLEGATIONS

### The FBI's Use of Informants in American Muslim Communities

36.    In the past twelve years, the FBI has engaged in widespread targeting of American Muslim communities for surveillance and intelligence-gathering.  These law enforcement policies and practices have included the aggressive recruitment and deployment of informants, known as "Confidential Human Sources," in American Muslim communities, organizations, and houses of worship.

37.    Since 2001, FBI recruitment of informants has significantly expanded.  A November 2004 Presidential Directive required an increase in "human source development and management." In 2007, then-Deputy Director of the FBI John Pistole testified before the United States Senate Select Committee on Intelligence that in response to this directive, the FBI "will encourage [Special Agents] to open and operate new Human Sources." The FBI's 2008 fiscal year budget authorization request included funding for a program to track and manage the growing number of such informants. Many of these informants are recruited from and deployed among American Muslim communities.

38.    To recruit informants, FBI agents often resort to exploiting individual vulnerabilities. FBI agents have threatened American Muslims with interfering with their immigration status, or offered to assist with their immigration status – practices that are prohibited under the Attorney General's Guidelines Regarding the Use of Confidential Human Sources, which states:   "No promises can be made, except by the United States Department of Homeland Security, regarding the alien status of any person or the right of any person to enter or remain in the United States."  American Muslims have also been

threatened with prosecution, often on minor, non-violent charges, if they refuse to become informants.

39. However improper these practices may be, they differ in kind from the increasingly common abuse challenged in this lawsuit: retaliation against those who refuse to become informants by placing them on the No Fly List. Withholding immigration benefits or bringing criminal charges against American Muslims can be challenged and resolved under known legal standards through procedurally adequate administrative or judicial proceedings. Unlike those situations, the No Fly List operates under unknown standards and a vague set of criteria with a process that provides no opportunity to learn of the purported bases for placement on the List or to respond to such claims. This secretive process is conducted with no impartial determination on the merits, and without regard to the possibly retaliatory or unduly coercive motives of the field agents who place people on the No Fly List.

**The No Fly List**

40. The TSC, which is administered principally by the FBI, develops and maintains the TSDB, which includes the No Fly List. The TSDB is the federal government's centralized database that includes information about all individuals who are supposedly known to be or reasonably suspected of being involved in terrorist activity. The TSC maintains and controls the Database and shares the information in it (including the names of individuals on the No Fly List) with federal, state, and local law enforcement agencies. The TSC also provides the No Fly List to the Transportation Security Administration ("TSA") and to airline representatives, which screen individual passengers before boarding, as well as to cooperating foreign governments for use by their agencies.

11

41.    The FBI is one of the primary agencies responsible for making "nominations" to the TSDB, though a number of other federal agencies may also "nominate" individuals.  To be nominated for inclusion in the TSDB, there is supposed to be "reasonable suspicion" that the individual is a "known or suspected terrorist."  It is up to each nominating agency to interpret this definition and decide when a person meets the "reasonable suspicion" standard for being a known or suspected terrorist and should be nominated to the Database.  The TSC makes the final decision on whether an individual should be placed on the No Fly List.

42.    To be properly placed on the No Fly List, an individual must not only be a "known or suspected terrorist," but there must be some additional "derogatory information" demonstrating that the person "pose[s] a threat of committing a terrorist act with respect to an aircraft."

43.    Beyond this, little information about the No Fly List has been made public, including its exact size.  The government refuses to publish or otherwise disclose the standard or criteria for inclusion on the No Fly List or what additional "derogatory information" is sufficient to deprive someone of their ability to fly on commercial airlines.

44.    Inclusion on the No Fly List imposes severe and onerous consequences on individuals.  Individuals on the No Fly List are indefinitely barred from boarding an aircraft for flights that originate from, terminate in, or pass over the United States.

45.    The TSDB also includes other watch lists, which identify people who are subject to less severe and intrusive restrictions.  For example, individuals on the Selectee List are subject to extensive pre-boarding physical screening but are allowed to travel by air.  The very existence of the Selectee List, which is not the subject of a challenge in this lawsuit,

implicitly reflects the government's recognition that the No Fly List, with its much more restrictive effect, is supposed to be limited to individuals who present so great a threat to aviation safety that no degree of pre-boarding examination and inspection is sufficient to obviate the perceived threat.

46.    Absent a meaningful articulated standard for inclusion on the No Fly List and an adequate set of procedural safeguards, the government has broadened the grounds for inclusion on the No Fly List at least twice: in February 2008 and again in May 2010, according to an audit report published in March 2014 by the Office of the Inspector General of the United States Department of Justice (the "OIG Report").

47.    Despite the narrow purpose intended for the No Fly List, it has grown significantly in recent years.  Upon information and belief, in 2009, there were approximately 3,400 individuals on the No Fly List and by February 2012, over 21,000 people were on it. Moreover, on information and belief, the TSC rarely rejects any of the names proposed for the TSDB.  The entire TSDB reportedly contained 875,000 names as of May 2013.

48.    According to the OIG Report, the TSC itself has found that shortly after the attempted attack on a Northwest Airlines flight on December 25, 2009, many individuals were temporarily placed on the No Fly List who did not qualify for inclusion on it.

49.    It is unknown how many of the approximately 21,000 individuals on the No Fly List have been added in error.  In a recent case, a federal district court found that a professor was added to the No Fly List because an FBI agent checked the wrong boxes on the nominating form. *Ibrahim v. Dep't of Homeland Security*, No. 3:06-cv-0545 (WHA), *Notice of Compliance with Court's February 3, 2014 Order* (attaching *Findings of Fact, Conclusions of Law, and Order for Relief*), at 9 (N.D. Cal. Feb. 6, 2014).  Despite this

13

admitted ministerial mistake, the government refused to confirm that the professor had been removed from the List until being ordered to do so by the court eight years later.

50.     When the TSC provides the No Fly List to the TSA for use in pre-screening airline passengers on commercial flights, the TSA receives certain identifying information for individuals on the No Fly List, including name and date of birth, but not any of the information based upon which that person's name was included on the No Fly List.

51.     The fact that an individual is on the No Fly List is provided to, or accessible by, airline personnel who process an individual's request for a boarding pass.

52.     The TSA screens travelers by conducting a name-based search of a passenger prior to boarding.  This search is conducted when an individual attempts to obtain a boarding pass, not when the individual purchases a ticket.  If an individual is on the No Fly List, he or she will be allowed to purchase a ticket but then will be denied boarding.

53.     Upon information and belief, airlines generally do not provide refunds or reimbursement for tickets when a purchaser is denied boarding because of their inclusion on the No Fly List.

**Waivers and Redress Process**

54.     No one—not even United States citizens or lawful permanent or temporary alien residents—receives notice when they are added to the TSDB or the No Fly List. Individuals effectively learn of their placement on the No Fly List when they are denied a boarding pass at the airport by airline representatives who, after identifying an individual's name on the No Fly List, are frequently joined by TSA agents or other airport security or law enforcement personnel.

55.     There is no formal process for seeking a waiver to allow an individual on the No Fly List to fly but, upon information and belief, occasionally after being denied the right to board a flight, United States citizens and lawful permanent residents stranded abroad have been granted permission to board a single flight to the United States.  These waivers are typically obtained after the individual who is on the No Fly List reaches out to legal counsel, consular officers or other United States government officials for assistance after being prevented from boarding their flight back to the United States from a foreign country.

56.     The OIG Report found that a host of challenges—including poor recordkeeping practices and the complex, multiparty nature of the No Fly List's administration—makes ensuring the removal of individuals from the No Fly List extremely difficult.

57.     Individuals added to the No Fly List have no procedurally adequate notice and opportunity to be heard or to challenge their placement.  The only avenue available to individuals who have been barred from flying is the TRIP program.  DHS is responsible for the TRIP procedures and the administrative appeals from such determinations.

58.     If the name of the individual seeking redress is an exact or near match to a name on the No Fly List, DHS submits the TRIP inquiry to the TSC, which makes the final decision as to whether any action should be taken.  The TSC's process for making this determination is entirely secret.  There is no hearing or other opportunity for the aggrieved individual to participate.  The TSC has refused to provide any information about the standards it uses or how it makes such decisions, other than to state that during its review the TSC "coordinates with" the agency that originally nominated the individual to be included in

the TSDB.  Once the TSC makes a final determination regarding a particular individual's status on the No Fly List, the TSC advises DHS of its decision.

59.     DHS will neither confirm nor deny the existence of any No Fly List records relating to an individual.  Instead, DHS sends a letter to the TRIP applicant stating whether or not any such records related to the individual have been "modified."  The letter does not state how the government has resolved the complaint and does not state whether an individual remains on the No Fly List or will be permitted to fly in the future.

60.     Appeal from the TRIP determination is a similarly secret process and, in the end, the appellant is still not told whether they remain on the No Fly List.  Thus, the only "process" available to individuals who are prohibited from boarding commercial flights is to submit their names and other identifying information and hope that an unspecified government agency corrects an error or changes its mind.  Because the TRIP process never clearly informs the individual of the outcome, they only learn if they are still on the No Fly List by purchasing another airline ticket and trying to travel again.

61.     After the TRIP administrative appellate process is complete, there is no way to request a reassessment of the basis for inclusion on the No Fly List nor, upon information and belief, is there any automatic periodic review process to reassess whether any changed circumstances warrant removal of an individual from the No Fly List.

62.     As a general matter of policy, the United States government will never voluntarily confirm in writing that a person is on or off the No Fly List, even if individual federal officers or airline employees have told an individual that they cannot board a flight because they are on the List.

**Abuse of the No Fly List to Pressure Individuals to Become Informants**

63.    The processes related to the No Fly List promulgated and maintained by the Agency

Defendants—from "nomination" to implementation to redress—are shrouded in secrecy

and ripe for abuse.

64.    The Special Agent Defendants have exploited these flaws and used the No Fly List to

coerce Plaintiffs to become informants for the FBI, not for the stated purpose of keeping

extremely dangerous individuals from flying on commercial airlines.  This impermissible

abuse of the No Fly List has forced Plaintiffs to choose between their constitutionally-

protected right to travel, on the one hand, and their First Amendment rights on the other.

65.    Many American Muslims, like many other Americans, and many followers of other

religions, have sincerely held religious and other objections against becoming informants

in their own communities, particularly when they are asked to inform on the communities

as a whole rather than specific individuals reasonably suspected of wrongdoing.  Acting

as an informant would require them to lie and would interfere with their ability to

associate with other members of their communities on their own terms.  For these

American Muslims, the exercise of Islamic tenets precludes spying on the private lives of

others in their communities.

66.    The FBI uses the No Fly List to coerce American Muslims into becoming informants and

to retaliate against them when they exercise constitutionally protected rights.

67.    Upon information and belief, the Agency Defendants promulgated, encouraged and

tolerated a pattern and practice of aggressively recruiting and deploying informants in

American Muslim communities, which the Special Agent Defendants implemented by

17

exploiting the unarticulated and vague standards and the lack of procedural safeguards pertaining to the No Fly List.

**Plaintiff Muhammad Tanvir**

68.   Plaintiff Muhammad Tanvir is a lawful permanent resident of the United States whose most recent residence in the United States was in Corona, Queens, New York.  He has been married since March 2, 2006.  Mr. Tanvir's wife, son, and parents live in Pakistan. Mr. Tanvir has never been convicted of a crime or arrested.  Mr. Tanvir does not pose, has never posed, and has never been accused of posing, a threat to aviation safety.

69.   In early February 2007, Mr. Tanvir was approached by the FBI at his workplace, a 99-cents store in the Bronx.  FBI Special Agent Defendant FNU Tanzin and another FBI agent, Defendant "John Doe #1," questioned Mr. Tanvir there for approximately thirty minutes.  They asked him about an old acquaintance whom the FBI agents believed had attempted to enter the United States illegally.

70.   Two days later, Mr. Tanvir received a phone call from Agent Tanzin.  He was asked what people in the Muslim community generally discussed, and whether there was anything that he knew about within the American Muslim community that he "could share" with the FBI.  Mr. Tanvir said that he did not know of anything that would concern law enforcement.

71.   In July 2008, Mr. Tanvir visited his wife and family in Pakistan.  In late December 2008, Mr. Tanvir returned to New York.  At the airport, Mr. Tanvir was escorted by United States government agents off the airplane.  Mr. Tanvir's baggage was searched, and he was escorted by the agents to a waiting room where he waited for five hours before the agents confiscated his passport.  Mr. Tanvir was eventually allowed to enter the United

States, but the government officials retained his passport and gave him a January 28, 2009 appointment with DHS to pick it up.

72.   Shortly after this experience, FBI agents resumed their attempts to recruit Mr. Tanvir to work for them as an informant.

73.   On January 26, 2009, a few days before Mr. Tanvir was scheduled to pick up his passport from DHS, Agent Tanzin and another FBI Special Agent, Defendant "John Doe #2," came to see Mr. Tanvir at his new workplace, a different store in Queens.  The FBI agents asked Mr. Tanvir to come with them to Manhattan.

74.   Mr. Tanvir agreed to accompany the agents, and was driven by the agents from Queens to the FBI's New York offices at 26 Federal Plaza in Manhattan.

75.   At 26 Federal Plaza, Mr. Tanvir was brought into an interrogation room and questioned for approximately an hour.  The FBI agents asked Mr. Tanvir about terrorist training camps near the village where he was raised, and whether he had any Taliban training.  The agents also referred to the fact that at his previous job as a construction worker, Tanvir would rappel from higher floors while other workers would cheer him on.  They asked him where he learned how to climb ropes.  Mr. Tanvir responded that he never attended any training camps and did not know the whereabouts of any such camps.  He also explained to the FBI agents that he grew up in a rural area, where he regularly climbed trees and developed rope-climbing skills.

76.   Towards the end of the interrogation, the FBI agents told Mr. Tanvir they recognized that he was "special," "honest," and "a hardworking person." They told him that they wanted him to work for them as an informant.  In particular, the agents asked him to travel to Pakistan and work as an informant.  The agents offered Mr. Tanvir incentives for his

compliance with their requests, such as facilitating his wife's and family's visits from Pakistan to the United States, financially assisting his aging parents in Pakistan to go on religious pilgrimage to Saudi Arabia, and providing him with money.

77.  The incentives did not sway Mr. Tanvir, who reiterated—again—that he did not want to become an informant.  In response, the FBI agents threatened Mr. Tanvir, warning him that if he declined to work as an informant, then he would not receive his passport and that if he tried to pick up his passport at the airport he would be deported to Pakistan.

78.  Mr. Tanvir was terrified by the agents' threats.  He cried and pleaded with the FBI agents not to deport him because his family depended on him financially.  He also told them he had not done anything wrong and was afraid to work in Pakistan as a United States government informant as it seemed like it would be a very dangerous undertaking. The FBI agents replied that they were willing to send him to Afghanistan instead. Mr. Tanvir explained that he was similarly concerned about his safety if he were to become an informant in Afghanistan.  The FBI agents instructed him to think about it and cautioned him not to repeat their discussion with anyone.

79.  The next day, Agent Tanzin called Mr. Tanvir and asked him whether he had thought more about becoming an informant. Agent Tanzin then threatened Mr. Tanvir, telling him that he would authorize the release of Mr. Tanvir's passport if Mr. Tanvir agreed to become an informant, but if he did not, Mr. Tanvir would be deported if he went to the airport to pick up his passport.  Mr. Tanvir told Agent Tanzin that nothing had changed since they last spoke, and again declined to work as an informant.

80.  On January 28, 2009, Mr. Tanvir nevertheless headed to John F. Kennedy International Airport to pick up his passport, accompanied by his relatives.  The DHS officials were

asked why they withheld his passport, and they replied that it was due to an investigation that had since been cleared.

81.    The next day, Agent Tanzin called Mr. Tanvir and told him that he had facilitated the release of Mr. Tanvir's passport, having told "them" to release his passport because Mr. Tanvir was "cooperative" with the FBI.

82.    Mr. Tanvir's repeated and consistent refusal to work as an FBI informant did not stop the agents from continuing to try to pressure him into becoming an informant.  Over the course of the next three to four weeks, Mr. Tanvir received multiple phone calls and visits from Agent Tanzin and Agent John Doe #1 at his workplace.  At times, the agents would call from their car outside Mr. Tanvir's workplace and ask him to meet them in the car.

83.    Mr. Tanvir left work and entered the agents' car the first three times he received their calls.  The FBI agents repeatedly asked whether he had decided to work for them as an informant, or whether he had obtained any information for them.  The agents told Mr. Tanvir that they wanted him to gather information, and that they were specifically interested in people from the "Desi" (South Asian) communities.

84.    Mr. Tanvir repeatedly told the FBI agents that if he knew of any criminal activity he would tell them, but that he would not become an informant or seek out such information proactively.  Mr. Tanvir did not wish to work as an informant, in part, because he had sincerely held religious and personal objections to spying on innocent members of his community.  Mr. Tanvir believed that if he agreed to become an informant, he would be expected to engage with people within his community in a deceptive manner, monitor, and potentially entrap innocent people, and that those actions would interfere with the relationships he had developed with those community members.  Through their repeated

visits and calls, the FBI agents harassed and intimidated Mr. Tanvir due to his refusal to become an informant.  The FBI agents placed significant pressure on Mr. Tanvir to violate his sincerely held religious beliefs, substantially burdening his exercise of religion.

85.   Mr. Tanvir eventually reached out to a relative for advice, and was told that, in the United States, he was under no obligation to speak to the government.  Relieved to learn that he was not required to speak with the FBI agents every time that they contacted him, Mr. Tanvir stopped answering the agents' phone calls.

86.   Eventually, Agent Tanzin and Agent John Doe #2 again visited Mr. Tanvir at his workplace and asked him why he was no longer answering their phone calls.  Mr. Tanvir explained that he had answered all of their questions on multiple occasions, that he no longer had anything to tell them, and that he was busy with work and did not wish to speak with them.

87.   Despite Mr. Tanvir's clear refusal to speak to them, the FBI agents then asked Mr. Tanvir to take a polygraph test.  Mr. Tanvir declined to submit to the test, prompting the FBI agents to threaten to arrest him.  Mr. Tanvir responded that if they arrested him, he would obtain an attorney.  The agents left without arresting Mr. Tanvir.

88.   In July 2009, Mr. Tanvir traveled to Pakistan to visit his wife and parents.  While Mr. Tanvir was abroad, Special Agents Tanzin and Defendant "John Doe #3" visited his sister at her workplace in Queens and questioned her about Mr. Tanvir's travel.  The FBI agents wanted to know why Mr. Tanvir had flown on Kuwait Airways instead of Pakistan International Airlines.  Mr. Tanvir's sister replied that Kuwait Airways was less expensive, and told the FBI agents that she was uncomfortable speaking with them.

89.   Mr. Tanvir subsequently returned to the United States in January 2010 and took a job as a truck driver.  Even though it required significant travel, this work paid better than Mr. Tanvir's previous jobs.  Mr. Tanvir's new job required him to drive trucks for long distances across the United States and take flights back to New York after completing the deliveries.

90.   Upon information and belief, Mr. Tanvir was placed on the No Fly List by Agents Tanzin and/or Defendants John Does #1–3 at some time during or before October 2010 because he refused to become an informant against his community and refused to speak or associate further with the agents.

91.   In October 2010, while Mr. Tanvir was in Atlanta for work, he received word that his mother was visiting New York from Pakistan.  Mr. Tanvir made plans to fly from Atlanta to New York City.  When he arrived at the check-in counter at the Atlanta airport, airline officials told him that he was not allowed to fly.  Two unknown FBI agents then approached Mr. Tanvir at the airport and told him that he should contact the FBI agents in New York with whom Mr. Tanvir had originally spoken.  The two unknown FBI agents then drove Mr. Tanvir to a nearby bus station where he boarded a bus bound for New York City.

92.   While waiting in Atlanta for the bus, Mr. Tanvir called Agent Tanzin, who told Mr. Tanvir that he was no longer assigned to Mr. Tanvir.  Agent Tanzin told Mr. Tanvir to "cooperate" with the FBI agent who would be contacting him soon.

93.   Mr. Tanvir traveled by bus from Atlanta to his home in New York.  This trip took him approximately 24 hours.

94.     Two days after Mr. Tanvir returned to New York City by bus, FBI Special Agent Sanya Garcia called Mr. Tanvir and told him that she wanted to speak with him.  Agent Garcia stated that she could help him get off the No Fly List if he met with her and answered her questions.  Mr. Tanvir told Agent Garcia that he had answered the FBI's questions on multiple occasions and that he would not answer additional questions or meet with her.

95.     Mr. Tanvir subsequently quit his job as a truck driver, in part because he was unable to fly back to New York after completing long-distance, one-way deliveries, as the job required.

96.     Upon information and belief, Agent Garcia knew about the prior failed attempts by her colleagues, Special Agents Tanzin and Defendants John Doe #1-3, to recruit Mr. Tanvir as an informant, and their subsequent placement of Mr. Tanvir on the No Fly List in retaliation for his decision not to become an informant.

97.     Mr. Tanvir filed a TRIP complaint on September 27, 2011.

98.     In October 2011, Mr. Tanvir purchased plane tickets to Pakistan for himself and his wife for travel on November 3, 2011.

99.     On November 2, 2011, the day before Mr. Tanvir and his wife were scheduled to fly, Agent Garcia called Mr. Tanvir.  She told him that he would not be allowed to fly the next day.  When Mr. Tanvir asked why, Agent Garcia told him that it was because he hung up on her the last time she had tried to question him by phone, and she told him that she still wanted to meet with him.

100.    Agent Garcia told Mr. Tanvir that she would only allow him to fly to Pakistan if he met with her and answered her questions.  Because Mr. Tanvir wanted to fly to Pakistan to visit his ailing mother, he agreed to meet her and another FBI Special Agent, Defendant John LNU, at a restaurant in Corona, Queens.

101.   At the restaurant, Special Agents Garcia and Defendant John LNU asked Mr. Tanvir the same questions that Agents Tanzin, Defendants John Doe #1, John Doe #2 and John Doe #3 had already asked him on multiple occasions.  These included questions about his family and about his religious and political beliefs.  Mr. Tanvir answered the agents' questions because he believed that he was required to do so in order to be allowed to fly to Pakistan to see his mother.

102.   After the meeting, Special Agents Garcia and John LNU advised Mr. Tanvir that they would try to permit him to fly again by obtaining a one-time waiver that would enable him to visit his ailing mother, but that it would take some weeks for them to process the waiver.  Agent Garcia told Mr. Tanvir that he would only be allowed to fly on Delta Airlines.  When Mr. Tanvir asked if he could keep his ticket on Pakistan International Airlines, Agent Garcia told him that would take her more time to process.  Agent Garcia also told Mr. Tanvir that he would only be allowed to fly to Pakistan if he agreed to meet with and speak to her upon his return to the United States.

103.   Mr. Tanvir begged Agents Garcia and John LNU to let him fly the next day with his wife.  Agent Garcia stated that he might be allowed to take the flight, but that an FBI agent would have to accompany him.

104.   The next day, however, Agent Garcia called Mr. Tanvir and told him that he would not be permitted to fly.  She further stated that Mr. Tanvir would not be allowed to fly in the future until he agreed to come to FBI headquarters and submit to a polygraph test.  As a result, Mr. Tanvir had to cancel his flight, obtaining only partial credit from the airline for the ticket's price, and his wife traveled alone to Pakistan.

105.   At that point, Mr. Tanvir decided to retain counsel to represent him in his interactions with the FBI.

106.   Mr. Tanvir's counsel reached out to Agents Garcia and John LNU in the hope of facilitating the removal of Mr. Tanvir's name from the No Fly List, but the agents refused to speak with counsel.

107.   The agents directed Mr. Tanvir's counsel to legal counsel at the FBI's New York office. Mr. Tanvir's counsel spoke to counsel from that office, who pointed them to the TRIP process.  Mr. Tanvir had already submitted a TRIP complaint, and it had not led to any redress.

108.   Mr. Tanvir was not and is not a "known or suspected terrorist" or a potential or actual threat to civil aviation.  The Special Agent Defendants who dealt with Mr. Tanvir, including Agent Tanzin and Agent Garcia, had no basis to believe that Mr. Tanvir was a "known or suspected terrorist" or potential or actual threat to civil aviation.  Had Mr. Tanvir actually presented a threat to aviation safety, Agent Garcia would not, and could not, have offered to remove Mr. Tanvir from the List merely in exchange for his willingness to become an informant.  Yet, knowing that Mr. Tanvir was wrongfully placed on the No Fly List for his prior refusals to become an informant, Agent Garcia kept him on the No Fly List to retaliate against Mr. Tanvir's exercise of his constitutionally protected rights and to coerce him into serving as an informant.

109.   Mr. Tanvir again purchased a ticket to fly to Pakistan on December 10, 2011 in the hope of visiting his mother, whose health continued to deteriorate, but was again denied boarding at the airport and was told that he was on the No Fly List.

110.   On April 16, 2012, Mr. Tanvir received a response to his TRIP complaint.  The letter did

not confirm that Mr. Tanvir was on the No Fly List, nor did it offer any justification for

Mr. Tanvir's placement on the No Fly List.  The letter simply noted, in part, that "no

changes or corrections are warranted at this time."

111.   On May 17, 2012, Mr. Tanvir's counsel wrote to FBI counsel again.  The letter described

Mr. Tanvir's predicament and the FBI's retaliatory actions.  It also stated that Mr. Tanvir

was prepared to take legal action.  To date, neither Mr. Tanvir nor his counsel have

received a response to that letter from the FBI.

112.   On May 23, 2012, Mr. Tanvir appealed his TRIP determination.  Mr. Tanvir also

requested the releasable materials upon which his TRIP determination was based.

113.   In November 2012, Mr. Tanvir purchased another ticket from Saudi Arabian Airlines to

visit his sick mother in Pakistan.  He was again denied boarding at JFK airport on the day

of his flight.  FBI Special Agent Janet Ambrisco approached Mr. Tanvir and his counsel at

the check-in area and informed them that Mr. Tanvir would not be removed from the No

Fly List until he met with Agent Garcia.  Agent Ambrisco directed Tanvir to call Agent

Garcia, telling him that she was waiting for his call.

114.   On March 28, 2013, Mr. Tanvir received a letter from DHS which noted that it

superseded the April 16, 2012 TRIP response.  The letter stated, in part, that Mr. Tanvir's

experience "was most likely caused by a misidentification against a government record or

by random selection," and that the United States government had "made updates" to its

records.  As a result, the letter stated, Mr. Tanvir's request for releasable materials was

moot and would not be processed by DHS.  The DHS letter did not state whether Mr.

Tanvir had been removed from the No Fly List or whether he would now be permitted to

board flights.  DHS's letter offered no clarification on whether he had been granted a temporary waiver permitting his travel on only a single occasion.  Mr. Tanvir decided to try to attempt to travel once more and purchased another ticket.

115.    On June 27, 2013, Mr. Tanvir boarded a flight and flew to Pakistan on Pakistan International Airlines.  Mr. Tanvir does not know whether he was able to fly to Pakistan due to a one-time waiver by the agents or whether they have finally removed him from the No Fly List.  Absent confirmation that he has been removed from the No Fly List, Mr. Tanvir believes that his name remains on it.

116.    Mr. Tanvir's placement on the No Fly List caused him to quit his job as a truck driver and prevented him from visiting his sick mother in Pakistan.  He continues to fear harassment by FBI agents in the United States, which causes him and his family great distress.

117.    Mr. Tanvir also suffered economic loss because of his placement on the No Fly List, including but not limited to loss of income and expenses and fees related to the purchase of airline tickets.

**Plaintiff Jameel Algibhah**

118.    Plaintiff Jameel Algibhah is a United States citizen who resides in the Bronx, New York. He has lived in the United States since 1996, when he was fourteen years old.  He has been married since 2001.  His wife and three daughters, ages eleven, eight, and six, live in Yemen.  Prior to being placed on the No Fly List in approximately 2010, Mr. Algibhah visited them at least once every year for several months.  Mr. Algibhah does not pose, has never posed, and has never been accused of posing, a threat to aviation safety.

119.   On or around December 17, 2009, FBI Special Agents Francisco "Frank" Artousa and Defendant "John Doe #4" came to Mr. Algibhah's uncle's store, where Mr. Algibhah used to work, and asked for Mr. Algibhah.

120.   Mr. Algibhah came to the store to meet the agents, and at their request he accompanied them to their van, where they proceeded to ask him questions about his friends, his acquaintances, other Muslim students who attended his college, and the names of Muslim friends with whom he worked at a hospital library, one of several jobs he held as a college student.  The agents also asked Mr. Algibhah where he worships on Fridays, and asked for additional personal information.  Despite being deeply uncomfortable with the FBI agents' questions, Mr. Algibhah answered them to the best of his ability.

121.   The agents then asked Mr. Algibhah if he would work for them as an informant.  The agents first asked Mr. Algibhah if he would become an informant for the FBI, and infiltrate a mosque in Queens.  When Mr. Algibhah declined to do so, the agents then asked Mr. Algibhah to participate in certain online Islamic forums and "act like an extremist."  When Mr. Algibhah again declined, the agents asked Mr. Algibhah to inform on his community in his neighborhood.  The FBI agents offered Mr. Algibhah money and told him that they could bring his family from Yemen to the United States very quickly if he became an informant.  Mr. Algibhah again told the FBI agents that he would not become an informant.

122.   Mr. Algibhah declined to work as an informant because he believed that it was dangerous, and because it violated his sincerely held personal and religious beliefs.  Mr. Algibhah was morally and religiously opposed to conducting surveillance and reporting to the authorities on the innocent activities of people in his American Muslim community.   Mr.

Algibhah believed that if he agreed to become an informant, he would be expected to engage with his community members in a deceptive manner, monitor, and entrap innocent people, and that those actions would interfere with the relationships he had developed with those community members. The FBI agents placed significant pressure on Mr. Algibhah to violate his sincerely held religious beliefs, substantially burdening his exercise of religion.

123.  Despite Mr. Algibhah's refusal, Agent Artousa gave Mr. Algibhah his card, and told him to "think about it some more."

124.  Upon information and belief, Mr. Algibhah was placed on the No Fly List by Agents Artousa and Defendant John Doe #4 at some time after he was first contacted by these FBI agents, because he declined to become an informant against his community and declined to speak or associate further with the agents.

125.  The first time Mr. Algibhah tried to travel by air after he refused the FBI's efforts to recruit him as an informant, he was denied boarding. On May 4, 2010, Mr. Algibhah learned that he had been placed on the No Fly List when he went to John F. Kennedy International Airport to check in with a travel companion for a flight to Yemen on Emirates Airlines. Mr. Algibhah intended to visit his wife and three daughters in Yemen. At the Emirates Airlines check-in counter, he was denied boarding by airline personnel. Shortly thereafter, numerous government officials came to the check-in area and surrounded him. The officials questioned Mr. Algibhah about his travels to Yemen. Despite Mr. Algibhah's cooperation, and without informing him of any basis for his interrogation, the officials told Mr. Algibhah that he would not be able to board, and directed him to the TRIP complaint process. The person with whom Mr. Algibhah was

traveling has since distanced himself from Mr. Algibhah as a direct result of the incident at the airport.

126.    Shortly after the incident at the airport, Mr. Algibhah filed a TRIP complaint.

127.    Mr. Algibhah repeatedly followed up with the DHS, calling the designated TRIP hotline several times over the next months.  After receiving no response for several months, missing his wife and children, Mr. Algibhah purchased another ticket for a flight to Yemen on Emirates Airlines on September 19, 2010.  Again, he was prevented from boarding the flight when he arrived at the airport, and was not provided with any reason.

128.    DHS responded to Mr. Algibhah's TRIP complaint in a letter dated October 28, 2010. The letter stated that a review has been performed and that "it has been determined that no changes or corrections are warranted at this time."  The letter did not provide Mr. Algibhah with any information about whether or not he was on the No Fly List, or what basis existed for such a restriction on his constitutional right to travel.

129.    On November 12, 2010, Mr. Algibhah submitted a request for the releasable materials upon which his TRIP determination was made in order to enable him to file an appeal.

130.    After submitting this request, Mr. Algibhah did not hear back from DHS.  Mr. Algibhah sent several letters to officials at DHS, but did not receive a response.  In January 2012, frustrated by the lack of response from the authorities through the TRIP process and by his continued inability to fly, Mr. Algibhah sought help from his elected representatives. The offices of United States Congressman Jose E. Serrano and Senator Charles Schumer each reached out to the TSA on Mr. Algibhah's behalf.  As of the date of this Amended Complaint, Mr. Algibhah has not yet received a response from TRIP regarding his request.

131.  In June 2012, Agent Artousa and a new FBI agent, Defendant "John Doe #5," stopped Mr. Algibhah while he was driving his car told him they wanted to speak with him.  Mr. Algibhah told Agent Artousa that after the last time that Agent Artousa questioned him, Mr. Algibhah had been placed on the No Fly List.  Agent Artousa denied placing Mr. Algibhah on the No Fly List, but informed Mr. Algibhah that he would take Mr. Algibhah off of the No Fly List in one week's time should their present conversation "go well" and should Mr. Algibhah work for them.   John Doe #5 told Mr. Algibhah that "the Congressmen can't do shit for you; we're the only ones who can take you off the list."

132.  Mr. Algibhah answered the agents' questions because he believed he was required to do so in order to have his name removed from the No Fly List.  Agents Artousa and John Doe #5 asked Mr. Algibhah questions about his religious practices, his community, his family, his political beliefs, and the names of websites he visited.  They asked him where he went to mosque and asked him about the types of people who go to his mosque.  They also asked him specific information, such as whether he knew people from the region of Hadhramut in Yemen.

133.  After this interrogation, the FBI agents again told Mr. Algibhah that they wanted him to access some Islamic websites for them.  They asked for his e-mail address and told him that they would provide him with the names of websites, and that he would need to access them and "act extremist."   Mr. Algibhah understood these requests to be conditions that he needed to satisfy to have his name removed from the No Fly List.

134.  In order to end the lengthy and intimidating interaction with the FBI agents, Mr. Algibhah told the agents that he needed time to consider their request that he work as an informant.  Mr. Algibhah did not want to become an informant, but in the hope of being removed

from the No Fly List, he assured the agents that he would work for them as soon as they took him off the No Fly List.  Agent Artousa responded that he "didn't need to worry," removing his name would only take one week.  Approximately ten days later, Agent Artousa called Mr. Algibhah and told him that he was working on removing Mr. Algibhah's name from the No Fly List, but that it would take a month or more to do so and that he would have to meet with Mr. Algibhah one more time.  Agent Artousa reiterated that it would be very helpful if Mr. Algibhah decided to become an informant. Agent Artousa also told Mr. Algibhah that only the FBI could remove his name from the No Fly List.  Mr. Algibhah told Agent Artousa to call before he came, but Agent Artousa neither called nor ever came.

135.  Mr. Algibhah was not and is not a "known or suspected terrorist" or a potential or actual threat to civil aviation.  The Special Agent Defendants who dealt with Mr. Algibhah, including Artousa and John Doe #5, had no basis to believe that Mr. Algibhah was a "known or suspected terrorist" or potential or actual threat to civil aviation.  Had Mr. Algibhah actually presented a threat to aviation safety, Agents Artousa and John Doe #5 would not, and could not, have offered to remove Mr. Algibhah from the List merely in exchange for his willingness to become an informant.  Yet, knowing that Mr. Algibhah was wrongfully placed on the No Fly List, Agents Artousa and Defendant John Doe #5, kept him on the No Fly List to retaliate against Mr. Algibhah's exercise of his constitutionally protected rights and to coerce him into becoming an informant.

136.  After this third attempt by the FBI agents to use the No Fly List to coerce him into becoming an informant, Mr. Algibhah retained legal counsel in late June 2012.  His counsel spoke to Agent Artousa that month, who confirmed that the FBI could be "of

assistance" in removing Mr. Algibhah from the No Fly List, and mentioned again that he wanted Mr. Algibhah to go on Islamic websites, looking for "radical, extremist types of discussions," and "perhaps more aggressive information gathering."

137.   On or about August 28, 2012, Mr. Algibhah's neighbor was visited by the FBI and asked about Mr. Algibhah.  FBI agents also went to two stores in his neighborhood asking about Mr. Algibhah.

138.   In November 2012, Mr. Algibhah, through his counsel, informed Agent Artousa that he would only speak with the FBI on the condition that he be removed from the No Fly List and allowed to travel to Yemen.  In response, Agent Artousa said that he would speak with his supervisors to look into this possibility and would inform Mr. Algibhah's counsel of their response.

139.   FBI Agent Artousa did not immediately respond to Mr. Algibhah's request via his counsel.  Mr. Algibhah did not hear from the FBI for approximately six to seven months. On or about May 29, 2013, Agent Artousa again reached out to Mr. Algibhah, telling him that Agent Artousa was still interested in helping Mr. Algibhah get off the No Fly List and that he wanted to meet with him.  Mr. Algibhah told Agent Artousa that he should contact Mr. Algibhah's counsel about the matter.

140.   That same day, Mr. Algibhah's counsel reached out to Agent Artousa, who informed counsel that he was simply reaching out to Mr. Algibhah to "touch base" regarding the matters he had previously discussed with him.   Agent Artousa stated he was still interested in speaking with Mr. Algibhah.   Counsel asked Agent Artousa whether there were any developments on Mr. Algibhah's case that triggered this renewed attempt at

questioning.  The agent replied that there was none, reiterating that Mr. Algibhah was not in any trouble, and that he was trying to bring the matter to a conclusion.

141.    Mr. Algibhah has not heard from Agent Artousa since.  Mr. Algibhah believes that he remains on the No Fly List.

142.    On multiple occasions over the course of the past few years, Mr. Algibhah's American Muslim relatives and acquaintances have reported to him that they have been approached by government agents, including FBI agents, at their places of work or at the airport, and extensively questioned about Mr. Algibhah.  This has caused Mr. Algibhah to be viewed in his community as someone targeted by law enforcement, resulting in his alienation, stigmatization, and loss of employment.  Since the FBI's attempts to recruit Mr. Algibhah as an informant, members of Mr. Algibhah's community have taken to distancing themselves from him.  In turn, Mr. Algibhah has also distanced himself from Muslim organizations, from his mosque and from many in his community.  He no longer speaks with people in his mosque or his community because he is worried that they will report what he says to the FBI.

143.    Mr. Algibhah, who is very close to his daughters and wife, typically visited them in Yemen at least once every year.  Mr. Algibhah has not seen his family since April or May 2009, the last time he was able to travel to Yemen successfully.  He has attempted to fly to Yemen two times since then, and has been denied boarding each time.  Upon information and belief, Mr. Algibhah remains on the No Fly List.

144.    Mr. Algibhah's placement on the No Fly List has caused him severe emotional distress.  Mr. Algibhah has also suffered economic loss because of his placement on the No Fly

List, including but not limited to loss of income and expenses and fees related to the purchase of airline tickets.

**Plaintiff Naveed Shinwari**

145. Plaintiff Naveed Shinwari is a lawful permanent resident of the United States and has lived in the United States since 1998, when he was 14 years old.  He currently lives in West Haven, Connecticut.  Mr. Shinwari has been married since January 2012.  His wife resides in Afghanistan.  Mr. Shinwari earned a Bachelor of Science degree from Southern Connecticut State University in Public Health in May 2008.  He has worked for a temp agency, placed on assignment in North Haven, Connecticut, since April 2013.   Mr. Shinwari has never been convicted of a crime or arrested.  Mr. Shinwari does not pose, has never posed, and has never been accused of posing, a threat to aviation safety.

146. On February 26, 2012, after getting married in Afghanistan, Mr. Shinwari was traveling with his mother, who is a United States citizen, back home to the United States.  They flew from Kabul, Afghanistan to Dubai, United Arab Emirates en route to Omaha, Nebraska, where they were residing at the time.  They flew from Kabul to Dubai but were then prevented from boarding their connecting Emirates Airlines flight to Houston, Texas. Airport security officials confiscated Mr. Shinwari's Afghan passport and instructed him to wait in the terminal.  After several hours of waiting, airport security officials returned the passport and told Mr. Shinwari that he needed to visit the United States embassy before he would be allowed to fly.

147. That night, after Mr. Shinwari and his mother obtained temporary visas to stay in the United Arab Emirates and checked into a Dubai hotel, Mr. Shinwari received a phone call

from FBI Special Agent Steven LNU.  Agent Steven LNU told Mr. Shinwari to meet him the next day at the United States consulate in Dubai.

148.   The next day, February 27, 2012, Mr. Shinwari went to the consulate.  When he arrived, Agent Steven LNU and FBI Special Agent John C. Harley III took Mr. Shinwari into an interrogation room, and instructed Mr. Shinwari to "tell [them] everything."   Mr. Shinwari replied he had no idea why he had been prevented from flying.  Agents Harley and Steven LNU proceeded to interrogate Mr. Shinwari for three to four hours.  Agents Harley and Steven LNU asked Mr. Shinwari whether he had associated with any "bad guys" while in Afghanistan, whether he had visited any training camps, where he had stayed during his trip, and whether he had traveled to Pakistan.  The agents also asked Mr. Shinwari about his religious activities, including which mosque he attends, and more general questions about his origin and background.  During the interrogation, the agents sometimes used language that Mr. Shinwari found threatening, and at times Mr. Shinwari felt coerced to speak.  Believing that he had to provide the agents information in order to return to the United States, Mr. Shinwari answered all of the agents' questions.  Mr. Shinwari provided documents to Agents Harley and Steven LNU, including his driver's license and other identification papers, which the agents photocopied.

149.   At several points during the interrogation, Agents Harley and Steven LNU asked Mr. Shinwari to take a lie detector test.  They said that if he took the test, it would help him to be able to return home to the United States.  Mr. Shinwari declined to take the test, believing he had already been truthful in his answers.

150.   At the end of the interrogation, Agents Harley and Steven LNU said they needed to confer with "higher-ups in [Washington] D.C." before allowing Mr. Shinwari to fly back

to the United States.  Mr. Shinwari returned to his hotel, where he faxed and e-mailed the agents several more documents that they had requested, including his marriage certificate, information about the group of people with whom he had traveled, and the locations where he stayed during his trip to Afghanistan.

151.    Mr. Shinwari and his mother waited in Dubai for two more days, not knowing if they would be permitted to return home.  Finally, on February 29, 2012, Agent Harley e-mailed Mr. Shinwari to inform him that they had received the "go-ahead" for him to fly home to the United States, but only if he flew on a United States-based airline.  That day, Mr. Shinwari was able to purchase a ticket and, on March 1, 2012, he boarded an American Airlines flight from Dubai to the United States with his mother.

152.    When Mr. Shinwari and his mother arrived at Dulles International Airport, in Virginia, United States Customs and Border Protection agents thoroughly searched his bags and belongings.  Following this additional screening, two FBI special agents from the FBI's Omaha field office—Michael LNU and Gregg Grossoehmig—approached Mr. Shinwari at Dulles International Airport and escorted him to an interrogation room.

153.    Mr. Shinwari was then subjected to additional interrogation.  Agents Michael LNU and Grossoehmig interrogated Mr. Shinwari for two hours at Dulles.  The FBI agents asked Mr. Shinwari substantially the same questions that he was asked in Dubai by Agents Harley and Steven LNU.  Specifically, Agents Michael LNU and Grossoehmig said that they wanted to "verify" everything that he told Agents Harley and Steven LNU in Dubai. The agents told Mr. Shinwari that FBI agents would visit him when he returned to Omaha.

154. As a result of these interrogations by Agents Harley, Steven LNU, Michael LNU and Gregg Grossoehmig, Mr. Shinwari and his mother arrived in Omaha on March 2, 2012, six days later than expected, having missed the flights for which they had paid. Mr. Shinwari has not been reimbursed for the cost of booking these additional flights.

155. Approximately one week after he returned home to Omaha, Agent Michael LNU, the same agent who interrogated Mr. Shinwari at Dulles International Airport, and FBI Special Agent John Doe #6, appeared at Mr. Shinwari's home. Over the course of an hour, they subjected him to questions similar to the ones posed in his prior interrogations. Mr. Shinwari truthfully answered these questions again.

156. In addition to questioning Mr. Shinwari, Agents Michael LNU and John Doe #6 said that they knew Mr. Shinwari was unemployed and would pay him if he became an informant for the FBI. Mr. Shinwari understood from the context of the questioning that the agents wanted him to inform on the American Muslim community in Omaha, American Muslim communities in other parts of the United States, and Muslims in other countries. Mr. Shinwari told the agents that he would not act as an informant.

157. Mr. Shinwari declined to work as an informant because he believed that it was dangerous, and because it violated his sincerely held personal and religious beliefs. Mr. Shinwari was morally and religiously opposed to conducting surveillance and reporting to the authorities on the innocent activities of people in his American Muslim community. Mr. Shinwari believed that if he agreed to become an informant, he would be expected to engage with his community members in a deceptive manner, monitor, and entrap innocent people, and that those actions would interfere with the relationships he had developed with those community members. The FBI agents placed significant pressure

39

on Mr. Shinwari to violate his sincerely held religious beliefs, substantially burdening his exercise of religion.

158.     On March 11, 2012, Mr. Shinwari attempted to obtain a boarding pass at Eppley Airfield for a flight from Omaha to Orlando, where he had obtained a temporary job, but was told by an airline agent that his ticket could not be processed.  Police officers then approached Mr. Shinwari while he was standing at the ticket counter and told him that he was on the No Fly List.  The officers then escorted Mr. Shinwari out of the airport.

159.     Upon information and belief, Mr. Shinwari was placed and/or maintained on the No Fly List because he refused the FBI's requests to work as an informant for them against members of his community.

160.     Mr. Shinwari's placement on the No Fly List greatly distressed him and upended his life. Mr. Shinwari was unable to take the job in Orlando, and consequently was unable to pay his bills.  In addition, Mr. Shinwari's placement on the No Fly List meant that he could no longer visit his wife and extended family—grandparents, seven uncles, six aunts, cousins, and in-laws—in Afghanistan, nor his father, who suffers from heart disease, in Virginia.

161.     On March 12, 2012, Mr. Shinwari sent an e-mail to Agent Harley seeking help in getting removed from the No Fly List.  Agent Harley did not respond.  The following day, March 13, 2012, Agents Michael LNU and John Doe #6 again visited Mr. Shinwari at his home in Omaha.  Mr. Shinwari again understood the FBI agents to be asking him to become a confidential FBI informant, and again offering him financial compensation.  Agents Michael LNU and John Doe #6 also offered to "help" Mr. Shinwari if he agreed to become an informant, stating in words or substance: "The more you help us, the more we can help you."  Mr. Shinwari understood the agents were suggesting that, in exchange for

agreeing to become an informant, they would remove him from the No Fly List.  Despite being mired in financial difficulties and wanting to be removed from the No Fly List, Mr. Shinwari would not agree to become an informant.  He told the agents that he believed becoming an informant would put his family in danger.  Mr. Shinwari also told the agents that if he had any knowledge about dangerous individuals, he would report that to the FBI and did not need any financial incentives to do so.

162.    Following this encounter, Mr. Shinwari contacted counsel in Omaha for help in getting off of the No Fly List.  On or about March 21, 2012, Mr. Shinwari and his counsel met with Special Agent in Charge Weysan Dun and Assistant Special Agent in Charge James C. Langenberg at the FBI's Omaha Division.

163.    Agents Dun and Langenberg began the meeting by asking Mr. Shinwari to think about the reasons why he may have been placed on a watch list.  Mr. Shinwari said that he did not know.  The agents then asked Mr. Shinwari about videos of religious sermons that he had watched on the internet.  Mr. Shinwari responded that he watched the videos to educate himself about his faith.

164.    Following this line of questioning, Agents Dun and Langenberg refused to confirm or deny his No Fly List status but told him that he could potentially get a one-time waiver to travel in an emergency.  Mr. Shinwari believed the agents offered him the waiver in exchange for all of the information he had provided them about himself.  Mr. Shinwari believed the offer of a waiver was provided as a "reward" for his agreement to submit to questioning and to encourage him to provide more information.

165.    On March 18, 2013, Mr. Shinwari sent Agent Langenberg an e-mail asking about whether he could obtain a waiver to fly to Afghanistan.  Agent Langenberg never replied.

166.   Mr. Shinwari was not and is not a "known or suspected terrorist" or a potential or actual threat to civil aviation.  The Special Agents who dealt with Mr. Shinwari had no basis to believe that Mr. Shinwari was a "known or suspected terrorist" or potential or actual threat to civil aviation.  Had Mr. Shinwari actually presented a threat to aviation safety, Agents Michael LNU and John Doe #6 would not, and could not, have offered to remove Mr. Shinwari from the List merely in exchange for his willingness to become an informant.  Yet, knowing that Mr. Shinwari was wrongfully placed on the No Fly List, the Special Agents who interacted with Mr. Shinwari kept him on the No Fly List in order to retaliate against Mr. Shinwari's exercise of his constitutionally protected rights and to coerce him into becoming an informant.

167.   Mr. Shinwari filed a TRIP complaint on February 26, 2012.  DHS responded to Mr. Shinwari's TRIP complaint almost fifteen months later in a letter dated June 4, 2013.  The letter did not confirm that Mr. Shinwari was on the No Fly List, nor did it offer any justification for Mr. Shinwari's placement on the No Fly List.  The letter stated, in part, that "no changes or corrections are warranted at this time."

168.   Mr. Shinwari filed a second TRIP complaint on December 9, 2013.  DHS responded to Mr. Shinwari's TRIP complaint in a letter dated December 24, 2013.  The letter stated, in part, that Mr. Shinwari's experience "was most likely caused by a misidentification against a government record or by random selection," and that the United States government had "made updates" to its records.  The DHS letter did not state whether Mr. Shinwari had been removed from the No Fly List or whether he would now be permitted to board flights.  DHS's letter offered no clarification on whether he had been granted a temporary waiver permitting his travel on only a single occasion.

169.   On March 19, 2014, for the first time since returning to the United States from Kabul, Afghanistan in March 2012, Mr. Shinwari was able to board a flight, and he flew from Hartford, Connecticut to Omaha, Nebraska and returned on March 31.  This is the first time Mr. Shinwari had attempted to fly since being denied a boarding pass on March 11, 2012.  Mr. Shinwari does not know whether he remains on the No Fly List and he fears further harassment and retaliation by government agents.  Absent confirmation that he has been removed from the No Fly List, Mr. Shinwari believes that his name remains on it.

170.   Mr. Shinwari's placement on the No Fly List prevented him from visiting his wife, grandparents, uncle and extended family in Afghanistan since February 2012, causing him great personal distress and emotional trauma.  Mr. Shinwari's placement on the List also made it difficult for him to travel to Virginia to visit his father, who suffers from heart disease.  Finally, his placement on the No Fly List prevented Mr. Shinwari from obtaining employment in Orlando.

171.   Mr. Shinwari suffered economic loss because of his placement on the No Fly List, including but not limited to the loss of expected employment income from his job in Orlando, and approximately $4,000 in expenses and fees related to the purchase of airline tickets and booking of hotel rooms.  In addition, because of the harassment and retaliation he has suffered at the hands of government agents, Mr. Shinwari is reluctant to attend religious services, attending his local mosque less frequently, and to share his religious and political views with others.

**Plaintiff Awais Sajjad**

172.  Plaintiff Awais Sajjad is a lawful permanent resident of the United States, and has resided in the United States in Brooklyn, New York since May 2009 and sometimes stays at his sister's home in New Jersey to be closer to work.  Upon arriving in the United States, Mr. Sajjad obtained a certificate in medical assistance.  He now works twelve-hour shifts at a convenience store while also caring for his brother-in law, a cancer patient.  Mr. Sajjad has never been convicted of a crime or arrested.  He does not pose, has never posed, and has never been accused of posing, a threat to aviation safety.

173.  On September 14, 2012, Mr. Sajjad attempted to board a Pakistan International Airlines flight from John F. Kennedy International Airport in order to visit his ailing father and his 91-year old grandmother in Pakistan.  At the check-in counter, the airline official spoke with someone on the phone and provided Mr. Sajjad's passport information and description.   Shortly thereafter, two FBI agents, John Doe #7 and John Doe #8 approached Mr. Sajjad at the counter.

174.  Mr. Sajjad felt embarrassed and ashamed because the other passengers could see that he was the subject of law enforcement attention.  He felt that they were staring at him.

175.  Agents Doe #7 and Doe #8 asked Mr. Sajjad to accompany them to a small, windowless interrogation room.  They told him that if he spoke with their supervisor, he might allow Mr. Sajjad to board his flight as there was still some time before the flight's departure. The agents assured Mr. Sajjad that they would try to help him if he went with them.

176.  In the back room, Mr. Sajjad was introduced to a plainclothes FBI supervisory special agent, John Doe #9, and a uniformed DHS special agent, John Doe #10.  Agent John Doe #9 informed Mr. Sajjad that he would not be allowed to travel because he was on the No-

Fly List.  The FBI supervisory special agent, John Doe #9, questioned Mr. Sajjad extensively about his background, friends, and family.  They asked Mr. Sajjad who accompanied him to the airport that day, and asked for their phone numbers.  They asked him for his best friends' names, and whether he had any girlfriends.  He was asked whether he had any military training or ever sought to enlist for terrorism training.  Mr. Sajjad answered all of their questions truthfully.  He told them he had never had any kind of training and had never been in trouble with the law.  Mr. Sajjad was then told that if he wished to have his name removed from the No Fly List, he would have to file a TRIP complaint.

177.   During the interrogation, Agents John Doe #7-10 repeatedly reassured Mr. Sajjad that they would be willing to help him get off the No Fly List and gave him the impression that such assistance would be provided if he agreed to their requests.

178.   On September 14, 2012, the same day that he was denied boarding, Mr. Sajjad filed a TRIP complaint.

179.   On approximately October 24, 2012, Defendant FBI Agent Michael Rutkowski, accompanied by Agent "John Doe #11" and an interpreter, visited Mr. Sajjad's sister's house in New Jersey, when Mr. Sajjad returned from work.  The FBI agents said that they were following up on Mr. Sajjad's TRIP complaint.  Mr. Sajjad was relieved, believing that he would be removed from the No Fly List.  Mr. Sajjad allowed the agents to enter his home.  Once inside Mr. Sajjad's home, the agents asked Mr. Sajjad many questions, including questions about his last trip to Pakistan in 2011, why he went and which cities he visited on that trip.  Mr. Sajjad replied that he went to Pakistan to attend his brother's wedding.

180. While still at Mr. Sajjad's house, Agents Rutkowski and John Doe #11 told Mr. Sajjad that because he was a good man from a good family, they wanted him to work for them, in exchange for which they could provide him with United States citizenship and a salary. Mr. Sajjad declined their offer to work for the FBI, replying that he did not need any assistance from the FBI—he had a job that paid him enough and would soon be eligible for citizenship.

181. Mr. Sajjad understood that Agents Rutkowski and John Doe #11 were asking him to work as an informant for the FBI, and declined to do so because he believed it was dangerous and because he was opposed to conducting surveillance on the innocent activities of people in his American Muslim community and reporting that information to the authorities. Mr. Sajjad believed that if he agreed to work for the FBI, he would be expected to act as an informant in his community and engage with others in a deceptive manner to monitor and entrap them and that those actions would interfere with the relationships that he had developed with those community members.

182. Agents Rutkowski and John Doe #11 then asked Mr. Sajjad to go with them to the FBI headquarters in Newark, New Jersey to undergo a polygraph test. The agents assured Mr. Sajjad that taking the polygraph test would help remove his name from the No Fly List. Although he did not know what a polygraph test was, Mr. Sajjad agreed to accompany the agents because he believed that the polygraph test was part of their investigation into his TRIP complaint and completing it was necessary to have his name removed from the No Fly List.

183. Agents Rutkowski and John Doe #11 drove Mr. Sajjad to the FBI headquarters in Newark. On the way, they asked Sajjad whether he had watched bomb-making videos on

46

YouTube, to which he replied that he had not, that he only watches movies and music videos. The agents also asked Mr. Sajjad questions about his job and salary, and whether Mr. Sajjad believed he made enough money.

184. At the FBI headquarters, another FBI agent, "John Doe #12," conducted the polygraph examination on Mr. Sajjad through a translator. Mr. Sajjad was very frightened. He did not know what a polygraph test was. They attached multiple wires to different parts of his body. He was told to remain very still and not even move his eyes, and to answer their questions. They then asked him many questions, including whether he loved the United States of America, whether he loved Pakistan and whether he would ever do anything that might bring shame to his family. They also asked whether he had signed up for or taken military training in Pakistan and whether he had ever used any guns. Mr. Sajjad replied, truthfully, that he had never done so.

185. After an hour of questions, Agent John Doe #12 stepped out of the room and returned with Agents Rutkowski and John Doe #11. They told Mr. Sajjad that the machine detected that he was lying. Mr. Sajjad replied that he was not lying. Agent John Doe #11 responded that if Mr. Sajjad did not provide answers, they would be forced to "use alternative methods." Mr. Sajjad replied that his answers were truthful and would not change no matter what methods the agents used.

186. Agent Rutkowski and Agent John Doe #11 proceeded to interrogate Mr. Sajjad for approximately three more hours.

187. The agents then drove Mr. Sajjad to his sister's home in New Jersey. In the car, Agent Rutkowski apologized for taking Mr. Sajjad's time and engaged him in conversation, but also continued to question him, including inquiries about his religious practices, what

mosque he attends, and whether the United States or Pakistan would win if the two countries competed in cricket or soccer.

188.   At some time over the next several weeks, Agent Rutkowski and an unidentified FBI agent went to Mr. Sajjad's sister's home in Jersey City and questioned her about Mr. Sajjad.   In addition, unknown agents from the United States Embassy in Islamabad contacted Mr. Sajjad's father in Pakistan and asked that he come to the embassy to answer questions about Mr. Sajjad.  Mr. Sajjad's father declined.   Mr. Sajjad's father was told that he would be questioned once he arrived in the United States.  Mr. Sajjad's father arrived at John F. Kennedy airport on November 2, 2013.  Approximately 15 days later, Agent Rutkowski and an unidentified FBI agent came to Mr. Sajjad's sister's house to question Mr. Sajjad's father.

189.   On December 5, 2012, Mr. Sajjad received a response to his TRIP complaint.   The response stated that after consulting with other federal agencies "no changes or corrections [in his status] are warranted at this time."

190.   In January 2013, Mr. Sajjad retained counsel to represent him in his interactions with the FBI and to assist him in clearing his name from the No Fly List.  On February 8, 2013, through counsel, Mr. Sajjad filed a TRIP appeal.

191.   On March 13, 2013, Mr. Sajjad's counsel called Agent Rutkowski.  Agent Rutkowski said that if Mr. Sajjad wanted the FBI to help him get off the No Fly List, he would have to answer the FBI's questions, including the ones Mr. Sajjad allegedly failed on the polygraph exam, but he would not specify which questions those were.   Mr. Sajjad declined to submit to additional questioning.   On May 6, 2013, Mr. Sajjad's counsel spoke to FBI Agent Rutkowski's supervisor, William Gale, over the phone.  When asked

if the agency was contacting Mr. Sajjad because they wanted to recruit him as an informant, Agent Gale responded that he "would not get into it over the phone," and that should not be construed as a "yes" or a "no."

192.   On April 4, 2014, FBI Agent Rutkowski and an unknown agent "John Doe #13" approached Mr. Sajjad while he was standing outside his sister's home in New Jersey, and asked Mr. Sajjad to accompany them to a nearby diner in their car.  The agents told Mr. Sajjad that they were here to help him and talk about his situation.  Taken by surprise, Mr. Sajjad felt pressured to comply.  At the diner, the agents told Mr. Sajjad that they wanted to help him travel to Pakistan, but that unless he helped them, they could not do anything for him.  They asked him hypothetical questions regarding what he would do if he were to find out that any of his relatives or friends were involved in a terrorist attack. When Mr. Sajjad responded that he would inform the police, they accused him of only telling them what he thought they wanted to hear.  Agent John Doe #13 told Mr. Sajjad to "shut up" and said he did not believe what Mr. Sajjad was saying.  The agents also questioned Mr. Sajjad about his religious practices, asking him where he prays, whether his father is religious, whether his deceased mother was religious, and whether Mr. Sajjad considered himself to be a Wahhabi Muslim.

193.   The agents repeatedly insisted that the only way Mr. Sajjad would get off the No Fly List and be able to travel to Pakistan was if he answered all of the agents' questions, and they reminded him that they had the power to decide if he was on the No Fly List.  Mr. Sajjad said that he was trying to be helpful by coming with the agents.  Agent John Doe #13 told Mr. Sajjad that he had no choice but to come with the agents when they asked.  Finally, the agents told Mr. Sajjad that they would return on the following Monday to subject him

to another polygraph examination, and that in the meantime, they expected him to ask his friends and relatives if any of them had an affiliation with a Pakistani organization that the United States had designated as a foreign terrorist group.  During the conversation, Agent John Doe #13 told Mr. Sajjad that he had been watching Mr. Sajjad for the last two years and knew that Mr. Sajjad did not do anything wrong and was not a "terrorist" or a threat to America.

194.   During this lengthy encounter, Mr. Sajjad answered the agents' questions because he felt obligated to do so.   Mr. Sajjad was frightened by the agents, and told them so.

195.   Mr. Sajjad was not and is not a "known or suspected terrorist" or a potential or actual threat to civil aviation.  Agents Rutkowski and John Does #7-13 had no basis to believe that Mr. Sajjad was a "known or suspected terrorist" or a potential or actual threat to civil aviation.  Had Mr. Sajjad actually presented a grave threat to aviation safety, Agents Rutkowski and John Does #7-13 would not, and could not, have offered to remove him from the List merely in exchange for his taking and passing a polygraph test and working as an FBI informant.  Yet, knowing that Mr. Sajjad was wrongfully placed on the No Fly List, Agents Rutkowski and John Does #7-13 kept him on the No Fly List in order to pressure and coerce Mr. Sajjad to become an FBI informant and, when he refused, used the No Fly List to retaliate against Mr. Sajjad's exercise of his constitutionally protected rights.  Upon information and belief, Mr. Sajjad remains on the No Fly List.

196.   Since Mr. Sajjad's placement on the No Fly List, he has been unable to visit his family, including his 93-year old grandmother who raised him after his mother passed away, and with whom he is very close.  Because of his brother-in-law's serious illness, Mr. Sajjad needs to be able to travel to assist with the family's affairs.  The FBI agents' ongoing

attempts to question Mr. Sajjad, combined with his continued placement on the No Fly List have caused Mr. Sajjad significant and ongoing anxiety and distress.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

#### Retaliation in Violation of Plaintiffs' First Amendment Rights

**(Against Agency Defendants in their official capacities and Special Agent Defendants in their individual capacities and official capacities)**

197.   Plaintiffs Muhammad Tanvir, Jameel Algibhah, Naveed Shinwari, and Awais Sajjad incorporate by reference each and every allegation contained in the paragraphs above.

198.   Plaintiffs are present or have the legal right to be present in the United States.

199.   Plaintiffs each met with Special Agent Defendants in the hope of being removed from the No Fly List and Special Agent Defendants used the No Fly List to attempt to pressure Plaintiffs to sacrifice their First Amendment rights.  When Special Agent Defendants asked Plaintiffs to become informants, Plaintiffs refused.

200.   By declining to act as informants within their communities, Plaintiffs repeatedly and validly exercised their First Amendment rights to freedom of speech and association.  By declining to become informants on the basis of deeply held religious beliefs, Plaintiffs Tanvir, Algibhah, and Shinwari repeatedly and validly exercised their First Amendment right to freedom of religion.

201.   Rather than using the No Fly List as they were authorized to do—to restrict the travel of individuals who are a genuine threat to aviation safety—Special Agent Defendants knowingly, intentionally, and unlawfully placed Plaintiffs on the No Fly List, or maintained Plaintiffs on the No Fly List, because Plaintiffs refused to act as informants. In doing that, Defendants forced Plaintiffs to choose between their First Amendment

rights and their liberty interest in travel.   Special Agent Defendants knowingly, intentionally, and unlawfully retaliated against Plaintiffs, and continue to retaliate against Plaintiffs for their exercise of their constitutional rights to freedom of speech, association, and religion, in violation of Plaintiffs' First Amendment rights under the United States Constitution.

202.    Agency Defendants, acting in their official capacity and under color of authority, were and remain responsible for promulgating, implementing, maintaining, administering, supervising, compiling, or correcting the No Fly List.  Agency Defendants are tolerating and failing to remedy a pattern and practice among Special Agent Defendants of using the No Fly List to unlawfully retaliate against Plaintiffs for the exercise of their constitutionally protected rights, in violation of the First Amendment to the United States Constitution.

203.    Upon information and belief, Plaintiffs remain on the No Fly List.  Plaintiffs' continued presence on the No Fly List is a result of their exercise of their First Amendment rights. By maintaining each Plaintiff's name on the No Fly List, Defendants continue to retaliate against Plaintiffs for the exercise of their First Amendment rights.  Absent injunctive relief, upon information and belief, Plaintiffs will continue to suffer from this retaliatory placement on the No Fly List, and Agency Defendants will continue to maintain a pattern and practice that permits Special Agent Defendants' use of the No Fly List to retaliate against Plaintiffs' exercise of their First Amendment rights.

204.    Defendants' unlawful actions are imposing an immediate and ongoing harm on Plaintiffs and have caused Plaintiffs deprivation of their constitutional rights, emotional distress, damage to their reputation, and material and economic loss.

## SECOND CLAIM FOR RELIEF

### Violation of the Religious Freedom Restoration Act (RFRA)

**(Against Defendants FNU Tanzin, Sanya Garcia, John LNU, Francisco Artousa, John C. Harley III, Steven LNU, Michael LNU, Gregg Grossoehmig, Weysan Dun, James C. Langenberg, John Does #1-6 in their official and individual capacities)**

205.    Plaintiffs Muhammad Tanvir, Jameel Algibhah, and Naveed Shinwari incorporate by reference each and every allegation contained in the paragraphs above.

206.    Plaintiffs are present or have the legal right to be present in the United States.

207.    Plaintiffs sincerely believe that informing to the government on innocent people violates their core religious beliefs, including the proscription on bearing false witness against one's neighbor by engaging in relationships and religious practices under false pretenses, and by betraying the trust and confidence of one's religious community.

208.    These are fundamental and important tenets of Plaintiffs' religious beliefs because of the central roles that trust, honesty, and good faith play in their religious communities.

209.    Defendants instructed and pressured Plaintiffs to infiltrate their religious communities as government informants, to spy and eavesdrop on other Muslims' words and deeds— regardless of whether these people were suspected of wrongdoing—and to report their observations to the FBI.

210.    Defendants forced Plaintiffs into an impermissible choice between, on the one hand, obeying their sincerely held religious beliefs and being subjected to the punishment of placement or retention on the No Fly List, or, on the other hand, violating their sincerely held religious beliefs in order to avoid being placed on the No Fly List or to secure removal from the No Fly List.

211. By forcing Plaintiffs into this impermissible choice between their sincerely held religious beliefs and the threat of retaliation and punishment, Defendants placed a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs in violation of RFRA, 42 U.S.C. § 2000bb-1(a).

212. The United States government has no compelling interest in requiring Plaintiffs to inform on their religious communities.

213. Requiring Plaintiffs to inform on their religious communities is not the least restrictive means of furthering any compelling governmental interest.

214. By attempting to recruit Plaintiffs as confidential government informants by resorting to the retaliatory or coercive use of the No Fly List, the Special Agent Defendants substantially burdened Plaintiffs' sincerely held religious beliefs in violation of RFRA.

215. Defendants' unlawful actions are imposing an immediate and ongoing harm on Plaintiffs and have caused Plaintiffs emotional distress, deprivation of their constitutional and statutory rights, damage to their reputation, and material and economic loss.

**THIRD CLAIM FOR RELIEF**

**<u>Violation of the Fifth Amendment: Procedural Due Process</u>**

**(Against Agency Defendants in their official capacities)**

216. Plaintiffs Muhammad Tanvir, Jameel Algibhah, Naveed Shinwari, and Awais Sajjad incorporate by reference each and every allegation contained in the paragraphs above.

217. Plaintiffs are present or have the legal right to be present in the United States.

218. Plaintiffs have a liberty interest in travel free from unreasonable burdens within, to, and from the United States.

219.  Plaintiffs have a right to be free from being falsely stigmatized as individuals associated with "terrorist" activity and from having these associational falsehoods disseminated widely to government agencies, airline carriers, and foreign governments.

220.  Plaintiffs' placement or continued listing on the No Fly List has adversely affected their liberty interest in travel and their right to be free from false stigmatization by the government.

221.  Defendants, acting in their official capacity and under color of authority, were and remain responsible for promulgating, implementing, maintaining, administering, supervising, compiling, or correcting the No Fly List.

222.  By failing to articulate and publish a clear standard and criteria for inclusion on the No Fly List, to inform Plaintiffs of their placement on the No Fly List and the bases for being on the No Fly List, and to provide Plaintiffs with a meaningful opportunity to challenge their placement on the No Fly List, Agency Defendants facilitated the Special Agent Defendants' abuse of the No Fly List and deprived Plaintiffs of protected liberty interests without affording them due process of law in violation of the Fifth Amendment to the United States Constitution.

223.  Defendants will continue to violate Plaintiffs' rights to due process if Plaintiffs are not afforded the relief demanded below.

224.  Defendants' unlawful actions are imposing an immediate and ongoing harm on Plaintiffs and have caused Plaintiffs emotional distress, deprivation of their constitutional rights, damage to their reputation, and material and economic loss.

## FOURTH CLAIM FOR RELIEF

### <u>Unlawful Agency Action in Violation of the Administrative Procedure Act,</u><br><u>5 U.S.C. §§ 702, 706</u>

### (Against Agency Defendants in their official capacities)

225.   Plaintiffs Muhammad Tanvir, Jameel Algibhah, Naveed Shinwari, and Awais Sajjad incorporate by reference each and every allegation contained in the paragraphs above.

226.   Plaintiffs are present or have the legal right to be present in the United States.

227.   Defendants' failure to provide Plaintiffs with constitutionally adequate notice of the bases for their placement on the No Fly List and a meaningful opportunity to challenge their continued inclusion on the No Fly List is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

228.   Because Plaintiffs do not present, and have never presented, a threat to aviation safety, Defendants' placement and continued inclusion of Plaintiffs on the No Fly List is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

1.  Declaring that the policies, practices, acts, and omissions of Defendants described here are unlawful and violate Plaintiffs' rights under the Constitution of the United States, the Religious Freedom Restoration Act, and the Administrative Procedure Act;

2.  Ordering Defendants to remove Plaintiffs' names from the No Fly List, and to provide Plaintiffs with notice that their names have been removed;

3.  Enjoining Defendants and their agents, employees, successors, and all others acting in concert with them, from subjecting Plaintiffs to the unconstitutional and unlawful practices described in this complaint;

4.  Ordering Defendants sued in their official capacity to provide a constitutionally adequate mechanism affording Plaintiffs with meaningful notice of the standards for inclusion on the No Fly List; meaningful notice of their placement on the No Fly List and of the grounds for their inclusion on the No Fly List, and a meaningful opportunity to contest their placement on the No Fly List before a neutral decision-maker;

5.  Requiring the promulgation of guidelines prohibiting the abuse of the No Fly List for purposes other than the promotion of aviation safety, including for the unlawful purpose of retaliating against or coercively pressuring individuals to become informants;

6.  Awarding Plaintiffs compensatory and punitive damages;

7. Awarding Plaintiffs' counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and disbursements pursuant to 28 U.S.C. § 2412; and

8. Granting such other and further relief as the Court deems just and proper.


Dated:   April 22, 2014

Respectfully submitted,


___/s/ Ramzi Kassem_____               ____/s/ Shayana Kadidal_____
Ramzi Kassem                                 Shayana Kadidal
*Supervising Attorney*                       Susan Hu
Diala Shamas                                 Baher Azmy
*Staff Attorney*                             Omar A. Farah
Nasrin Moznu                                 **Center for Constitutional Rights**
Versely Rosales                              666 Broadway, 7th Floor
*Law Student Interns*                        New York, NY 10012
**CLEAR project**                            (212) 614-6491
**Main Street Legal Services, Inc.**         kadidal@ccrjustice.org
City University of New York School of Law    shu@ccrjustice.org
2 Court Square                               bazmy@ccrjustice.org
Long Island City, NY 11101                   ofarah@ccrjustice.org
(718) 340-4558
ramzi.kassem@law.cuny.edu


___/s/ Robert N. Shwartz_____
**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
Robert N. Shwartz
Jennifer R. Cowan
rnshwartz@debevoise.com
jrcowan@debevoise.com


*Attorneys for Plaintiffs*