UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 09/03/2015

MUHAMMAD TANVIR, JAMEEL
ALGIBHAH, NAVEED SHINWARI, and
AWAIS SAJJAD,

                                  Plaintiffs,

                      v.

LORETTA E. LYNCH, Attorney General,
JEH C. JOHNSON, Secretary of Homeland
Security, JAMES COMEY, Director, Federal
Bureau of Investigation, CHRISTOPHER M.
PIEHOTA, Director, Terrorist Screening
Center, FNU TANZIN, SANYA GARCIA,
FRANCISCO ARTUSA, JOHN LNU,
MICHAEL RUTOWSKI, WILLIAM
GALE, JOHN C. HARLEY III, STEVEN
LNU, MICHAEL LNU, GREGG
GROSSOEHMIG, WEYSAN DUN,
JAMES C. LANGENBERG, and
JOHN DOES 1–13

                                  Defendants.

No. 13-CV-6951 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

        Plaintiffs Muhammad Tanvir, Jameel Algibhah, Naveed Shinwari, and Awais Sajjad bring

this suit to remedy alleged violations of their constitutional and statutory rights.  Each is either a

lawful permanent resident or citizen of the United States, and each is Muslim.  They claim that as

part of the U.S. Government's efforts to bolster its intelligence gathering in the aftermath of the

terrorist attacks of September 11, 2001, they were asked to become informants by agents of the

Federal Bureau of Investigation (FBI).  When they refused because, among other things, serving

as informants would contradict their sincerely held religious beliefs, they say the Government

retaliated against them by placing or maintaining their names on its "No Fly List," even though

they posed no threat to aviation security.  Since then, each Plaintiff claims to have been denied a boarding pass on at least one occasion, leaving him unable to visit loved ones who live abroad.  To redress this alleged violation of their rights, Plaintiffs filed a Complaint against numerous federal officials, including Attorney General Loretta E. Lynch, Secretary of Homeland Security Jeh C. Johnson, FBI Director James B. Comey, and 25 named and unnamed FBI and Homeland Security agents.

Plaintiffs seek relief on two bases.  First, they seek injunctive and declaratory relief against all of the defendants in their official capacities.  These claims arise under the First and Fifth Amendments of the Constitution, the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706, and the Religious Freedom Restoration Act (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.* Plaintiffs assert that these constitutional and statutory provisions entitle them to an order from this Court requiring the Government to halt its alleged investigative tactics and to create fair procedures governing who is placed on the No Fly List and how such individuals may contest their inclusion. Second, Plaintiffs also seek compensatory and punitive damages from each of the individual agent defendants in their personal capacities.  They argue that they are entitled to such monetary relief under the First Amendment and RFRA.

As explained in further detail below, the official capacity claims were stayed at the request of the parties on June 10, 2015, two days after the Government advised Plaintiffs that it knew of "no reason" why they would be unable to fly in the future.  The personal capacity claims, however, remain active.  This opinion concerns only those claims and, more specifically, resolves a motion bought by all but two of the individual agents ("Agents"), who seek to dismiss the personal capacity claims against them.[1]  The Agents argue, among other things, that the remedy Plaintiffs

---

[1] Pursuant to the Stipulation and Order filed July 24, 2014, *see* Dkt. 30, Defendants FNU (*i.e.*, first name unknown) Tanzin, John LNU (*i.e.*, last name unknown), Steven LNU, Michael LNU and John Does 1–6 and 9–13 are

seek from them—money damages from each of the agents personally—is unavailable as a matter of law.  For the reasons that follow, the Court agrees and will grant the Agents' motion.

## BACKGROUND[2]

### A.      Plaintiffs' Factual Allegations

Plaintiffs claim that they are "among the many innocent people" who have been "swept up" in the years since 9/11 by the U.S. Government's "secretive watch list dragnet." ¶ 4.  Although they acknowledge that the No Fly List is a critical national security tool meant to ensure that individuals believed to be threats to aviation security are not allowed to board airplanes, ¶¶ 2, 40, Plaintiffs argue that the process for placing individuals on the No Fly List is "shrouded in secrecy and [thus] ripe for abuse," ¶ 63.  Plaintiffs contend their names are on the No Fly List only because they are the victims of abusive—and illegal—investigative tactics.  And they say that they were unable to do anything about their unjust inclusion because of the pervasive secrecy surrounding the List.

The No Fly List is a database compiled and maintained by the Terrorist Screening Center (TSC), an agency within the FBI.  ¶ 40.  Federal agencies may "nominate" individuals for inclusion in the Government's various terrorist databases, including the No Fly List, if there is a "reasonable suspicion" that they are "known or suspected terrorist[s]."  ¶ 41.  An individual should only be placed on the No Fly List if there is additional "derogatory information" showing that he "pose[s]

---

currently proceeding under the pseudonyms specified in the First Amended Complaint, Dkt. 15.  John Doe 2 is currently proceeding as John Doe 2/3.  This motion is not brought by John Does 7 and 8 because the Government to date has not been able to identify those Defendants and, accordingly, they have not been served.  On December 18, 2014, the Court extended Plaintiffs' time to serve John Does 7 and 8 through 30 days after a decision on this motion. *See* Dkt. 78.

[2] The facts as alleged by Plaintiffs are drawn from their Complaint.  All citations in this opinion preceded by "¶ " or "¶¶ " refer to paragraphs of the Complaint.  For purposes of this motion, the Court must accept Plaintiffs' allegations as true.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

a threat of committing a terrorist act with respect to an aircraft." ¶ 42.  Anyone whose name is on the list is barred from boarding a flight that starts or ends in the United States, or flies over any part of the country.  ¶ 44.  Beyond this, however, little is known about the No Fly List.  ¶ 43. Although they do not have information about its exact size, Plaintiffs assert that the List has grown more than six times over from roughly 3,400 names in 2009 to over 21,000 in 2012.  ¶ 47.  The TSC itself has found that "many" of these thousands of individuals were placed on the No Fly List even though they did not qualify.  ¶ 48.  For example, a federal district court in California recently concluded that a Muslim doctoral student at Stanford was placed on the No Fly List because an FBI agent checked the wrong boxes on a nominating form.  ¶ 49 (*citing Ibrahim v. Dep't of Homeland Sec.*, 62 F.Supp.3d 909, 916 (N.D. Cal. 2014)).

Plaintiffs claim that each of the federal agents named in this suit, instead of utilizing the No Fly List based on legitimate information for legitimate purposes, have "exploited the significant burdens imposed by the No Fly List, its opaque nature and ill-defined standards, as well as its lack of procedural safeguards, in an attempt to coerce Plaintiffs into serving as informants within their American Muslim communities and places of worship." ¶ 8.  Plaintiffs further allege that higher-level officials—including the Attorney General, Secretary of Homeland Security, and Director of the FBI—"promulgated, encouraged and tolerated a pattern and practice of aggressively recruiting and deploying informants in American Muslim communities." ¶ 67.

Although the details of each of the four Plaintiffs' experiences with the No Fly List are different, they follow the same broad contours.  Each man was born into the Islamic faith in a foreign country where at least some of his family members remain.  Each legally immigrated to this country and is now lawfully present here, either as a citizen or permanent resident.  Each claims he was asked to become an informant for the FBI and to share what he learned by, for

example, traveling abroad to Pakistan or Afghanistan, participating in online Islamic forums, or attending certain mosques. Each declined to do so. Each was placed or kept on the No Fly List and thus was unable to fly for sustained periods over several years, unable to see loved ones. Yet each asserts that he does not—and has never—posed a threat to aviation security. Rather, each maintains that the Agents worked together to add or keep his name on the No Fly List because he refused to serve as an informant for the FBI.

In light of the manner in which the Court resolves this motion, the specific details of each Plaintiff's claims need not be discussed in detail. Some discussion, however, is warranted, and Tanvir's story is illustrative. He is a lawful permanent resident who presently lives in Queens, New York. ¶ 68. His wife, son, and parents remain in Pakistan. *Id.* In February 2007, Tanvir alleges that FBI Special Agents FNU Tanzin and John Doe 1 approached him at the dollar store in the Bronx where he then worked. ¶ 69. He was questioned for roughly 30 minutes about an old acquaintance whom the agents believed had entered the country illegally. *Id.* Nothing else about that interaction appears to have been remarkable. Two days later, however, Tanvir heard again from Agent Tanzin, who asked whether there was anything he "could share" with the FBI concerning the American Muslim community. ¶ 70. Tanvir alleges that he told Tanzin that he knew nothing that would be relevant to law enforcement. *Id.*

Fast-forward more than a year later to July 2008. After returning from a trip in Pakistan to visit his family, Tanvir asserts that he was detained for five hours by federal agents at John F. Kennedy International Airport in New York. ¶ 71. Although he was not interviewed, his passport was confiscated and he was given an appointment to pick it up on January 28, 2009, nearly six months later. *Id.* Two days before that appointment—and almost two years since they had last been in contact—Tanvir heard again from Agent Tanzin, this time joined by FBI Special Agent

5

John Doe 2/3,[3] who visited him at his new workplace.  ¶ 73.  The agents asked him to accompany them to the FBI's New York field office in Manhattan.  *Id.*  Tanvir agreed, and once there, he was questioned for about an hour.  ¶¶ 74–75.  Among other things, he was asked about terrorist training camps near the village in Pakistan where he was raised and whether he had any Taliban training.  ¶ 75.  Tanvir denied knowledge of or attendance at any such training camps.  *Id.*

Toward the end of the hour, Agents Tanzin and John Doe 2/3 told Tanvir that they recognized he was "special," "honest," and "hardworking," and that they wanted him to work as an informant for the FBI.  ¶ 76.  Specifically, he asserts that they asked him to travel to Pakistan and report on what he learned.  *Id.*  They offered to facilitate visits to the United States for his family, and to provide financial assistance for his parents in Pakistan to travel to Saudi Arabia for a religious pilgrimage.  *Id.*  Tanvir reiterated his earlier position:  He did not want to work as an informant.  ¶ 77.  But the agents purportedly persisted, warning him that he would not receive his passport and that he would be deported to Pakistan if he failed to cooperate.  *Id.*

Tanvir claims to have pleaded with the agents not to deport him because his family depended on him financially.  ¶ 78.  He also said that he feared for his safety in Pakistan if he went there as an American informant.  *Id.*  When the agents suggested he could work in Afghanistan instead, he responded that that too would be dangerous.  *Id.*  (Although Tanvir also asserts that serving as a government informant would violate the tenets of his Muslim faith, ¶ 84, he does not appear to assert that he said as much to the agents.)  At the conclusion of the meeting, the agents advised Tanvir to keep thinking, and cautioned him not to discuss their conversation with anyone.  ¶ 78.  The next day, Agent Tanzin called Tanvir to ask whether he had changed his mind.  ¶ 79.

---

[3] With respect to John Doe 2/3's pseudonym, *see supra* note 1.

Tanvir claims that Agent Tanzin reiterated that he would be deported if he failed to cooperate.  *Id.*  Tanvir again declined.  *Id.*

On January 28, 2009, Tanvir went to JFK Airport to retrieve his passport, as previously instructed.  ¶ 80.  Department of Homeland Security (DHS) officials advised him that his passport had been withheld for an investigation that had since been completed, and they returned the document to him without incident.  *Id.*  The next day, however, Agent Tanzin called Tanvir and told him that his passport had been returned to him because he—Agent Tanzin—had instructed DHS officials to release the passport in recognition of the fact that Tanvir was being "cooperative" with the FBI.  ¶ 81.

The Complaint alleges that the FBI agents' attempts to persuade Tanvir to become an informant continued over the next three weeks.  He received multiple telephone calls and visits from Agent Tanzin and John Doe 2/3 at his workplace.  ¶¶ 82–83.[4]  Eventually, Tanvir stopped answering their calls, and when Agents Tanzin and John Doe 2/3 visited him at his workplace to ask why, he told them that he no longer wished to speak with them.  ¶ 86.  They then asked him to take a polygraph.  ¶ 87.  When he refused, they threatened to arrest him, but did not do so once Tanvir said he would hire an attorney if they did.  *Id.*  Roughly six months later, in July 2009, Tanvir traveled to Pakistan to visit his wife and parents.  ¶ 88.  While he was abroad, Agents Tanzin and John Doe 2/3 visited his sister at her workplace in Queens and inquired about Tanvir's travel plans.  *Id.*  She was uncomfortable talking to the agents.  *Id.*

Tanvir returned to the United States in January 2010, at which time he took a job as a long-haul trucker.  ¶ 89.  His new job involved driving across the country and then taking a return flight to New York.  *Id.*  In October 2010, while Tanvir was in Atlanta for work, he received word that

---

[4] Plaintiffs advise that the Complaint "may" have incorrectly identified John Doe 2/3 as John Doe 1 in these paragraphs of the Complaint.  *See* Pls. Mem. at 10 n.6.

his mother was visiting New York from Pakistan.  ¶ 91.  He booked a flight back to New York, but was advised by an airline agent at the check-in counter in Atlanta that he was not allowed to fly.  *Id.*  Two unknown FBI agents approached Tanvir at the airport and advised him to contact the agents who had spoken to him in New York.  *Id.*  They then drove him to a nearby bus station.  *Id.*  While waiting for a bus to New York, Tanvir called Agent Tanzin, who advised Tanvir that he was no longer assigned to Tanvir.  ¶ 92.  Agent Tanzin told him, however, that other agents would be contacting him soon and that he should "cooperate."  *Id.*  These interactions led Tanvir to believe that Agents Tanzin and John Doe 1–3 placed him on the No Fly List "at some time during or before October 2010 because he refused to become an informant against his community and refused to speak or associate further with the agents."  ¶ 90.  His bus trip home to New York took approximately 24 hours.  ¶ 93.

Two days after he returned to New York from Atlanta, the Complaint alleges that FBI Special Agent Sanya Garcia contacted Tanvir, telling him that she would assist him in getting off the No Fly List if he met with her and answered her questions.  ¶ 94.  Tanvir told Garcia that he had already answered the FBI's questions and declined to meet with her.  *Id.*  Recognizing that he was still unable to fly, Tanvir eventually quit his job as a truck driver because he could no longer take a flight back to New York after completing his deliveries.  ¶ 95.  On September 27, 2011, he filed a complaint with the DHS Traveler Redress Inquiry Program (TRIP).  ¶ 97.  This program provides an administrative mechanism for removing one's name from the No Fly List.  ¶¶ 21, 57–61.

The month after filing his TRIP complaint, Tanvir purchased tickets for a flight to Pakistan in November 2011.  ¶ 98.  The day before his flight, Agent Garcia called Tanvir and told him he would not be allowed to fly unless he met with her.  ¶ 99.  Tanvir agreed because he needed to

return to Pakistan to visit his ailing mother.  ¶ 100.  At that meeting, he was asked the same questions that Agents Tanzin and John Doe 2/3 had asked previously.  ¶ 101.  He answered them because he wanted to see his mother.  *Id.*  After the meeting, the agents told him that they would obtain a one-time waiver for him to fly, but that it would take several weeks to process.  ¶ 102. Tanvir begged Agent Garcia to let him fly the next day.  ¶ 103.  She said it might be possible, but she changed her mind the next day.  ¶¶ 103–104.  When they spoke the next day, Agent Garcia told Tanvir that he would not be able to fly until he submitted to a polygraph.  ¶ 104.  Tanvir cancelled his flight, obtaining only a partial refund from the airline.  *Id.*  He also hired a lawyer, whom the agents referred to the FBI's lawyers, who in turn told Tanvir's lawyer to contact TRIP. ¶¶ 105, 107.  Tanvir again purchased a flight to Pakistan for travel in December 2011 in the hopes of visiting his mother, whose health continued to deteriorate.  ¶ 109.  He was denied boarding at the airport—the third time he was unable to fly.  *Id.*

On April 16, 2012, Tanvir received a response to his TRIP complaint, about six months after having filed it.  ¶ 110.  The letter did not confirm that he was on the No Fly List, but stated only that "no changes or corrections are warranted at this time."  *Id.*  On May 23, 2012, he appealed that determination and asked the Government to provide him with the information on which it had based the determination that he could not be allowed to fly.  ¶ 112.

In November 2012, Tanvir purchased another ticket to Pakistan and was again denied boarding at JFK Airport—the fourth time he was unable to fly.  ¶ 113. The Complaint alleges that Tanvir and his lawyer, who had accompanied him to the airport, were approached by an FBI agent at the check-in counter, who informed them that Tanvir would not be removed from the No Fly List until he met with Agent Garcia.  *Id.*

On March 28, 2013, ten months after he had filed his TRIP appeal—and well over two years after he was first denied boarding in October 2010—Tanvir received a letter from DHS superseding its initial determination of April 16, 2012.  ¶ 114.  The letter stated, in part, that Tanvir's experience "was most likely caused by a misidentification against a government record or by random selection," and that the Government had "made updates" to its records.  *Id.*  Tanvir decided to try flying again and purchased another ticket.  *Id.*

On June 27, 2013, in what was his fifth attempt to fly since being denied boarding in October 2010, Tanvir successfully boarded a flight and flew to Pakistan.  ¶ 115.  He does not know whether he was able to fly as a result of a one-time waiver provided by the agents or whether he had been removed from the No Fly List.  *Id.*  Tanvir asserts that his placement on the No Fly List forced him to quit his job as a truck driver, prevented him from visiting his sick mother in Pakistan when he wished to, and resulted in financial losses, including lost income and expenses related to airline tickets.  ¶¶ 116–17.  He says that he also continues to fear harassment by the FBI, which causes him and his family great distress.  ¶ 116.

As noted previously, Algibhah's, Shinwari's, and Sajjad's allegations, including the nature of their interactions with the FBI, largely track those of Tanvir.  *See generally* ¶¶ 118–96.  As of the time this action was commenced, Algibhah had not flown since the spring of 2009, which was then the last time he saw his wife and daughters, who live in Yemen.  ¶ 143.  He has attempted to fly home twice since then and was denied boarding each time.  *Id.*  Algibhah asserts that several of the Agents kept his name on the No Fly List even after they determined he posed no threat to aviation security so they could retaliate against him for his refusal to become an informant.  ¶ 135.  Shinwari was able to fly domestically in March 2014 after first being denied boarding in March 2012 while returning from Afghanistan, although he believed his name was still on the No Fly List

until he was advised otherwise in June 2015.  ¶ 169.  He too claims that he was denied the ability

to fly because he refused to become an informant.  ¶ 159.  Sajjad was first denied boarding in

September 2012 while attempting to visit his family in Pakistan and, as of the time this motion

was briefed, had not attempted to fly again since, believing his name remained on the No Fly List.

¶¶ 173, 196.  Sajjad asserts that his name was kept on the No Fly List even after several of the

Agents determined he had been wrongfully included as retaliation for his refusal to serve as an

informant.  ¶ 195.

## B.    Procedural History

Plaintiffs brought this action on October 1, 2013 and filed their operative Complaint on

April 22, 2014.  *See* Dkt. 15.  On July 28, 2014, two separate motions to dismiss were filed.  The

first, on behalf of the Government, sought to dismiss all official capacity claims.  *See* Dkt. 34.[5]

The second, on behalf of the Agents, sought to dismiss all personal capacity claims.  *See* Dkt. 38.

After briefing was completed, oral argument was scheduled for June 12, 2015.

On June 1, 2015, the Government moved to stay the official capacity claims.  *See* Dkt. 89.

As the Government explained, it had revised the redress procedures available through TRIP as a

result of the decision in *Latif v. Holder*, 28 F.Supp.3d 1134 (D. Or. 2014), which held various

aspects of the TRIP process inadequate under the Fifth Amendment's Due Process Clause and the

APA.  *See also Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958 (E.D. Va.

July 16, 2015) (same); Dkt. 85 (notice from Government describing revised TRIP procedures).

Plaintiffs elected to avail themselves of these revised procedures.  And because Plaintiffs did so,

the Government argued a stay of Plaintiffs' official capacity claims was warranted, as those claims,

---

[5] In light of the discussion below regarding the distinction between official and personal capacity claims, *see infra* at 12–14, the Court refers to the defendants sued in their official capacity as "the Government."

which primarily challenge the original TRIP procedures, were or were likely to become moot in light of the revised TRIP procedures.

Plaintiffs initially resisted the Government's request for a stay. *See* Pls. Letter of June 3, 2015, Dkt. 91. But on June 8, 2015—less than a week before oral argument—Plaintiffs each received a letter from DHS advising them that: "At this time the U.S. Government knows of no reason you should be unable to fly. This determination, based on the totality of available information, closes your DHS TRIP inquiry." *See* Pls. Letter of June 10, 2015, Dkt. 92. In light of that development—apparently indicating that Plaintiffs are not now on the No Fly List— Plaintiffs consented to a stay of their official capacity claims. *Id.* The Court ordered such a stay and administratively terminated the official capacity motion to dismiss. *See* Dkt. 93. Only Plaintiffs' claims against the Agents in their personal capacities remain active at this time.

## DISCUSSION

### A.   Introduction

The difference between official capacity claims, which are not at issue in this motion, and personal capacity (sometimes called "individual" capacity claims), which are, has long been a source of confusion, *see generally Kentucky v. Graham*, 473 U.S. 159, 163–68 (1985), and some background is appropriate given the centrality of those distinctions to the claims made here. The starting point is that "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). In other words, the Government cannot be sued without its consent. That rule may bar a suit even when an action is commenced against an individual government official instead of a governmental agency "if the decree would operate against the latter," *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (*per curiam*), as is usually the case when a plaintiff seeks an order in the form of an injunction commanding or

preventing some action.  Such a suit is known as an "official" capacity claim because it is effectively a suit against the Government, regardless of the named party.[6]

In 1976, Congress amended the APA to include a formal waiver of the United States' sovereign immunity from claims "seeking relief other than money damages" against "an agency or an officer or employee thereof … in an official capacity or under color of legal authority."  5 U.S.C. § 702; *see also B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 723–25 (2d Cir. 1983) (describing Congress's intention with the APA amendments to "eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity") (quotation omitted).  As a result, sovereign immunity does not pose a barrier to claims seeking injunctive or declaratory relief against the Government and its officers when they are sued in their official capacities.

Significant for present purposes, however, neither the APA nor any other statute relevant in this context waives the Government's immunity (or the immunity of its officers sued in their official capacity) from damages claims.[7]  There is no disagreement among the parties on this point. *See* Pls. Mem. at 84; Defs. Reply at 1 n.1.  But this is the significance of suits against government officials in their "personal" capacities:  Where an official is sued in his or her personal capacity,

---

[6] The Supreme Court has explained that the Government is the real party in interest "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (quotations omitted).  That approach reflects the commonsensical observation that the Government can act only through agents and thus, for example, "when the agents' actions are restrained, the sovereign itself may, through [the agents], be restrained." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949).  As a result, where the effect of a judgment would operate against the Government, a suit against a named federal officer "is not a suit against the official [personally] but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Because these suits are really suits against the Government, when officials sued in their official capacity die or leave office, their successors automatically assume their roles in the litigation, as Attorney General Loretta E. Lynch did in this case for former Attorney General Eric J. Holder.  *See* Fed. R. Civ. P. 25(d)(1); Dkt. 93 (order substituting Lynch for Holder).

[7] The United States has, however, waived its immunity from damages in other contexts.  *See, e.g.*, the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491 (certain contracts claims); *see also United States v. Mitchell*, 463 U.S. 206, 212–16 (1983) (recounting history of the Federal Government's waiver of immunity from suits for damages).

sovereign immunity does not apply.  Unlike official capacity suits, "[p]ersonal-capacity suits …

seek to impose *individual* liability upon a government officer for actions taken under color of

[federal] law."  *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (emphasis added).  Because any award of

money damages in such a suit (theoretically) comes from the official's own pocket, there is no

concern about sovereign immunity.[8]  The common-law cause of action first recognized in *Bivens*

*v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C.

§ 1983 are two mechanisms that may provide for personal capacity damages actions in the

constitutional context against federal and state officers, respectively, while several federal statutes

may provide for such damages in other contexts.[9]

Here, Plaintiffs seek injunctive and declaratory relief against Defendants sued in their

official capacities and money damages from a subset of Defendants—namely, the Agents—in their

personal capacities.  *See* Pls. Mem. at 49 n.24.  As resolution of the official capacity claims has

been left for another day by consent of the parties, this opinion addresses only whether the specific

theories by which Plaintiffs seek to recover damages from the Agents in their personal capacities

are legally viable. Plaintiffs advance arguments under both *Bivens* and RFRA, a federal statute that

provides for "appropriate relief" in certain situations where an individual's ability to freely

exercise his faith has been substantially burdened by the Government or its agents.  42 U.S.C. §

2000bb-1(c).  For the reasons that follow, neither of these two arguments ultimately succeeds.[10]

---

[8] As a practical matter, the Government almost always indemnifies its officials from such suits and provides representation through lawyers from the Department of Justice.  *See* 28 C.F.R. § 50.15.  Indeed, that is true for the Agents' representation in this case.

[9] For examples of such statutes, *see infra* at 32.

[10] The Agents also argue pursuant to Fed. R. Civ. P. 12(b)(2) that the Court lacks personal jurisdiction over multiple Agents.  *See* Defs. Mem. at 61–66.  After submissions from the parties concerning Plaintiffs' request for limited jurisdictional discovery in order to oppose that aspect of the Agents' motion, the Court accepted the Agents' suggestion to defer consideration of that aspect of their motion to dismiss until the balance of the motion was resolved. *See* 09/16/2014 Tr. 36, Dkt. 69.  Given the holdings in this opinion, the personal jurisdiction arguments are now moot.

**B.**    ***Bivens* Is Unavailable in This Context**

In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).  Although initially predicated on the traditional understanding that the existence of a right must imply a remedy, *see Bivens*, 403 U.S. at 397 (*citing Marbury v. Madison*, 1 Cranch 137, 163 (1803)), the Supreme Court has since "rejected the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court," *Malesko*, 534 U.S. at 69.  Thus, although sometimes described as "the federal analog to suits brought against state officials under [42 U.S.C. § 1983]," *Hartman v. Moore*, 547 U.S. 250, 2545 n.2 (2006), *Bivens* is far more limited than § 1983 because "a *Bivens* remedy is not available for all who allege injury from a federal officer's violation of their constitutional rights," *Turkmen v. Hasty*, 789 F.3d 218, 234 (2d Cir. 2015).  Indeed, a *Bivens* action "is not an automatic entitlement no matter what other means there may be to vindicate a protected interest, and in most instances … a *Bivens* remedy [is] unjustified."  *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

A federal court asked to imply a *Bivens* remedy in 2015 must approach that task with circumspection.  Although the Supreme Court has twice implied *Bivens* actions since *Bivens* itself was decided, *see Davis v. Passman*, 442 U.S. 228 (1979) (employment discrimination in violation of Due Process Clause); *Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment violation by prison officials), in the more than three decades since the last of the *Bivens* trilogy was decided, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants," *Malesko*, 534 U.S. at 68; *accord Arar v. Ashcroft*, 585 F.3d 559, 571 (2d

---

Finally, the Agents have argued that the claims against John Does 1 and 2/3 are time-barred.  *See* Defs. Mem. at 66–69.  The Court need not reach that argument in light of its conclusion that no relief is available against them.

Cir. 2009) (*en banc*) ("[T]he *Bivens* remedy is an extraordinary thing that should rarely if ever be applied in new contexts.") (internal quotation marks omitted).

The Supreme Court's refusal to recognize a new *Bivens* action since 1980 is not for want of opportunity.  *See, e.g.*, *Bush v. Lucas*, 462 U.S. 367 (1983) (federal employee's claim that his federal employer dismissed him in violation of the First Amendment); *Chappell v. Wallace*, 462 U.S. 296 (1983) (claim by military personnel that military superiors violated various constitutional provisions); *United States v. Stanley*, 483 U.S. 669 (1987) (similar); *Schweiker v. Chilicky*, 487 U.S. 412 (1988) (claim by recipients of Social Security disability benefits that benefits had been denied in violation of the Fifth Amendment); *Meyer*, 510 U.S. 471 (former bank employee's suit against a federal banking agency, claiming that he lost his job due to agency action that violated the Fifth Amendment's Due Process Clause); *Malesko*, 534 U.S. 61 (prisoner's Eighth Amendment-based suit against a private corporation that managed a federal prison); *Wilkie*, 551 U.S. 537 (ranch owner's claim for harassment and intimidation against federal land management officials under Fourth and Fifth Amendments); *Minneci v. Pollard*, 132 S. Ct. 617 (2012) (prisoner's Eighth Amendment-based claim against employees of privately-operated federal prison).

Although the Court has on each of these occasions explained its refusal to extend *Bivens* with reasons specific to the particular context, this generation of *Bivens* jurisprudence appears rooted in the more fundamental judgment that "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." *Wilkie*, 551 U.S. at 562 (*quoting Bush*, 462 U.S. at 389); *see also* E. Chemerinsky, Federal Jurisdiction § 9.1, p. 633 (6th ed. 2011) ("There is no way to understand the law concerning *Bivens* suits except in the context of how the Court's attitudes toward such claims has changed.").  Indeed,

16

one Justice has observed that it is "doubtless correct that a broad interpretation of [*Bivens'*] rationale *would* logically produce [its] application [in more contexts]," but noted that he was "not inclined (and the Court has not been inclined) to construe *Bivens* broadly." *Malesko*, 534 U.S. at 75 (Scalia, J., concurring) (emphasis in original). As a consequence, "[w]hatever presumption in favor of a *Bivens*-like remedy may once have existed has long since been abrogated." *Vance v. Rumsfeld*, 701 F.3d 193, 198 (7th Cir. 2012) (*en banc*).

Against that background, the Second Circuit's recent decision in *Turkmen*, which was handed down only days after oral argument on this motion, is instructive—and, indeed, dispositive. As in this case, *Turkmen* raised "a difficult and delicate set of legal issues concerning individuals who were caught up in the post–9/11 investigation even though they were unquestionably never involved in terrorist activity." 789 F.3d at 224. The plaintiffs in *Turkmen* were eight Muslim or Arab non-citizens who were detained by the federal government in the aftermath of 9/11. *Id.* While detained, they were, among other things, allegedly subjected to frequent physical and verbal abuse, denied copies of the Koran for weeks or months after requesting them, denied the Halal food required by their Muslim faith, and mocked by prison officials while they prayed. *Id.* at 227–28. For these alleged injuries, the plaintiffs sought, among other things, a *Bivens* remedy against various government officials under the First, Fourth, and Fifth Amendments. *Id.* at 225.

In light of the Supreme Court's—and the Second Circuit's—repeated admonitions against extending *Bivens* to new contexts, *Turkmen* carefully analyzed the context of the claims asserted by the plaintiffs there. The panel majority looked to "both the rights injured and the mechanism of the injury." *Id.* at 234; *accord Arar*, 585 F.3d at 572 (defining context as "a potentially recurring scenario that has similar legal and factual components"). It explained that the rights injured were those secured by the First Amendment's Free Exercise Clause, the Fifth Amendment's Due

17

Process Clause, and the Fourth Amendment's prohibition against unreasonable searches, *id.* at 235–37, while the mechanism of injury involved "punitive conditions [of confinement in a federal facility in the custody of federal officials] without sufficient cause," *id.* at 235.   Significant for present purposes, although the panel determined that the combination of rights injured and mechanism of injury "st[ood] firmly within a familiar *Bivens* context" with respect to the *Turkmen* plaintiffs' Fourth and Fifth Amendment claims, *see id.* at 235, 237 (collecting cases), that was not so with respect to their First Amendment claim.   With respect to that claim, "it [was] the right injured—Plaintiffs' free exercise right—and not the mechanism of injury that place[d] Plaintiffs' claims in a new *Bivens* context." *Id.* at 236.   As the panel majority explained, "the Supreme Court has 'not found an implied damages remedy under the Free Exercise Clause' and has 'declined to extend *Bivens* to a claim sounding in the First Amendment.'" *Id.* (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)); *accord id.* at 268 n.3 (Raggi, J., concurring in part and dissenting in part) ("[T]he Supreme Court [has] consistently declined to extend a *Bivens* remedy to a First Amendment claim in *any* context.") (emphasis in original); *Reichle v. Howards*, 132 S. Ct. 2088, 2093, n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.").   Indeed, *Turkmen* leaves no doubt that recognizing a "free exercise claim would require extending *Bivens* to a new context"—"a move [the panel] decline[d] to make absent guidance from the Supreme Court." 789 F.3d at 237.   In so concluding, the panel explicitly reversed the holding of the district court.   *See Turkmen v. Ashcroft*, 915 F.Supp.2d 314, 352 (E.D.N.Y. 2013) ("*Bivens* should be extended to afford the plaintiffs a damages remedy if they prove the alleged violation of their free exercise rights.").

In supplemental briefing, Plaintiffs seek to distinguish *Turkmen* by arguing that its holding is limited to free exercise claims, not the panoply of other rights under the First Amendment. *See*

Pls. Letter of July 14, 2015 at 1–2, Dkt. 97.  To that end, Plaintiffs assert that their *Bivens* claim is grounded not merely in the Free Exercise Clause, but in several other First Amendment rights, including "the freedom of speech … and the closely-intertwined right of free association."  *Id.* at 2.[11]  Although Plaintiffs are no doubt correct that the *Turkmen* plaintiffs' First Amendment claim was limited to the Free Exercise Clause, they overlook the fact that *Turkmen* itself is unambiguously predicated on the understanding that the Supreme Court has never recognized a *Bivens* claim in the First Amendment context at all.  *See* 789 F.3d at 236 (noting the Supreme Court has "'declined to extend *Bivens* to a claim sounding in the First Amendment'" (*quoting Iqbal*, 556 U.S. at 675).  That understanding is sufficient to conclude that the relief Plaintiffs seek here requires extending *Bivens* to a new context, whether the right injured is freedom of speech, religion, or association.  In other words, while *Turkmen* plainly forecloses a *Bivens* remedy for free exercise claims, the decision at a minimum also reiterates the Supreme Court's own pronouncements that *any* claim sounding in the First Amendment would require extending *Bivens* to a new context.[12]

---

[11] Although the First Amendment's text explicitly safeguards the freedom to speak and to worship ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech …"), the Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  Whether Plaintiffs' allegations sufficiently make out a First Amendment retaliation claim—under free exercise, speech, or association theories, *see* ¶¶ 200–01, 203—is an important question that the Court need not, and does not, reach in light of its conclusion that *Bivens* is unavailable in this context and the fact that the Agents have not raised the issue here.  Indeed, the Agents do not argue that Plaintiffs fail to state a First Amendment claim because, for example, Plaintiffs' refusal to cooperate is not protected speech or protected associational activity under the First Amendment, or that the Agents' alleged conduct could not infringe Plaintiffs' free exercise rights.  Rather, their argument appears to be limited to the claim that "Plaintiffs fail to allege that each Agent defendant was a proximate cause of, or personally involved in, Plaintiffs' alleged inclusion on the No Fly List," Defs. Mem. at 39, and that  "the alleged First Amendment rights at issue were not clearly established," *id.* at 51; *see also* Defs. Reply at 34–37.  *But see Ayala v. Harden*, No. 1:12-CV-00281-AWI, 2012 WL 4981269, at *2 (E.D. Cal. Oct. 17, 2012) (concluding in summary fashion that "[r]efusal to become an informant is not a protected First Amendment activity").

[12] Although Plaintiffs cannot be faulted for pointing to a sentence in the Supreme Court's decision in *Hartman* suggesting the availability of a *Bivens* remedy in the anti-retaliation context, *see* Pls. Mem. at 39–40, the Court has resolved any ambiguity created by *Hartman* in subsequent decisions by at least twice reiterating that it has never recognized a *Bivens* claim in the First Amendment context.  *See Iqbal*, 556 U.S. at 675 ("[W]e have declined to extend

Even assuming, however, that the right at issue did not place Plaintiffs' claims in a new context, the mechanism of injury in this case surely does. Although Plaintiffs argue that the FBI agents' use of the No Fly List to retaliate against them merely represents "a new tool [that] does not transform a familiar pattern of misconduct into a novel context for purposes of recognizing a *Bivens* claim," Pls. Mem. at 43, *Turkmen* makes plain that this view is mistaken. A distinct mechanism of injury—such as the extraordinary rendition alleged in *Arar*—can "present[] a new

---

*Bivens* to a claim sounding in the First Amendment."); *Reichle*, 132 S. Ct. at 2093 n.4 ("We have never held that *Bivens* extends to First Amendment claims.")

The Supreme Court granted certiorari in *Hartman* to determine whether plaintiffs in retaliatory-prosecution suits bear the burden of showing a lack of probable cause. *See* 547 U.S. at 255–56. At the time, the D.C. Circuit, from where *Hartman* emerged, had long recognized a *Bivens* action in the First Amendment context, *see, e.g.*, *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977) (*Bivens* available for false arrest of Vietnam War protestors on U.S. Capitol steps), and specifically for retaliatory prosecution, *see, e.g.*, *Haynesworth v. Miller*, 820 F.2d 1245, 1274 (D.C. Cir. 1987). The petitioners in *Hartman* did not seek review—nor did the Supreme Court grant review—on the predicate question of whether *Bivens* was available for First Amendment retaliation. It was against that background that Justice Souter, in an introductory paragraph of his opinion, observed that "[w]hen the vengeful [prosecutor] is [a] federal [officer], he is subject to an action for damages on the authority of *Bivens*," and cited *Bivens* without further analysis. *Id.* at 256.

But in light of *Hartman*'s posture—and the careful consideration that the Supreme Court has given to the availability of *Bivens* in each context where it has recognized *Bivens*' availability—that single sentence simply cannot bear the weight Plaintiffs would put on it. *Bivens*' availability "was not at issue" in *Hartman*, "the point … was not then fully argued," and the Court "did not canvas the considerations" it invariably does in such cases. *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1368 (2013). As such, *Hartman* is better read as assuming—not deciding—the question of *Bivens*' availability in the First Amendment retaliation context. *See, e.g.*, *Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014) (observing eight years after *Hartman* was decided that "we have several times assumed without deciding that *Bivens* extends to First Amendment claims"). Indeed, *Iqbal* explicitly noted that "[t]he legal issue decided in *Hartman* concerned the elements a plaintiff 'must plead and prove in order to win' a First Amendment retaliation claim." *Iqbal*, 556 U.S. at 673 (*quoting Hartman*, 547 U.S. at 257 n.5). And while the Court has cited *Hartman* on five occasions—including significant discussions in *Iqbal* and *Reichle*—not once has it suggested *Hartman* decided the availability of a *Bivens* remedy for First Amendment retaliation.

Plaintiffs also correctly note that the Second Circuit once described *Hartman* as "reiterat[ing] the general availability of a *Bivens* action to sue federal officials for First Amendment retaliation." *See M.E.S., Inc. v. Snell*, 712 F.3d 666, 675 (2d Cir. 2013). But even assuming that is a fair characterization of *Hartman*, *Snell* distinguished *Hartman* and declined to imply a *Bivens* remedy for alleged First Amendment retaliation, *id.*; no other decision of the Second Circuit has relied on *Snell* or *Hartman* for the proposition that *Bivens* is available for a First Amendment anti-retaliation claim; and the author of the *Snell* opinion was a member of the more recent *Turkmen* panel and agreed with the panel majority that "the Supreme Court [has] consistently declined to extend a *Bivens* remedy to a First Amendment claim in *any* context," 789 F.3d at 268 n.3 (Raggi, J., concurring in part and dissenting in part) (emphasis in original). As such, *Snell* offers Plaintiffs little support for the proposition that a *Bivens* claim already exists for anti-retaliation claims. The other out-of-circuit cases cited by Plaintiffs overread *Hartman* for the reasons discussed above. *See, e.g.*, *George v. Rehiel*, 738 F.3d 562, 585 n.24 (3d Cir. 2013).

context for *Bivens*-based claims." *Turkmen*, 789 F.3d at 234.[13]  Here, Plaintiffs cannot point to any case recognizing a *Bivens* remedy for a federal officer's retaliation against an individual by placing or maintaining that individual's name on the No Fly List or, more generally, any government watch list.  Nor can Plaintiffs point to a case recognizing a *Bivens* action where the mechanism of injury was the imposition of a substantial burden on an individual's ability to travel.  Thus, whether viewed through the lens of the rights injured or the mechanism of injury, Plaintiffs ask this Court to extend *Bivens* to a new context.

Given the current state of *Bivens* jurisprudence, the conclusion that Plaintiffs seek to extend *Bivens* to a new context could end the inquiry.  Indeed, in *Turkmen*, the court declined to "extend[] *Bivens* to a new context … absent guidance from the Supreme Court," without undertaking any additional analysis of whether *Bivens* might be appropriate in that context.  *Id.* at 237; *see also Iqbal*, 556 U.S. at 675 (observing that the Court's "reluctance [to extend *Bivens* since 1980] might well have disposed of respondent's First Amendment claim of religious discrimination").  That said, after concluding a given claim involves extending *Bivens* to a new context, a court should generally consider "(a) whether there is an alternative remedial scheme available to the plaintiff, and, even if there is not, (b) whether special factors counsel hesitation in creating a *Bivens* remedy."  *Turkmen*, 789 F.3d at 234 (quotations omitted).  The Court will do so here.

---

[13] *Turkmen* emphasizes the right at issue *and* the mechanism of injury in determining whether a claim presents a new context.  When confronted with a new *Bivens* context, a court must assess whether an alternative remedial scheme exists before recognizing a *Bivens* remedy.  *Turkmen*, 789 F.3d at 234 (*citing Arar*, 585 F.3d. at 572).  That inquiry ensures, among other things, that a court does not imply a remedy for an injury when an alternative scheme to remedy that injury already exists.  A court need not consider alternative remedial schemes, however, where a claim arises in an existing context, since the determination of whether or not *Bivens* is available in that context—and whether an alternate remedial scheme is available—has already been made.  *Id.* at 237 n.17.  Taking these two rules together makes clear that a failure to also consider the injury in determining whether a claim presents a new context would short-circuit the *Bivens* analysis because it risks ignoring a remedial scheme addressing *that very injury*.  Thus, the upshot of Plaintiffs' favored approach, which would appear to ignore the particular form of injury as nothing more than a "new tool," would be the expansion of *Bivens* based solely on the right at issue without regard for remedial schemes that may exist—a result plainly contrary to the Supreme Court's contemporary *Bivens* jurisprudence.

The existence of a system of administrative and judicial remedies for individuals who have been improperly included on the No Fly List—the precise mechanism of injury in this case—is sufficient to conclude that *Bivens* should not be extended to this context.  Specifically, Congress has directed the TSA to "establish a timely and fair process for individuals identified [under the TSA's passenger prescreening function] to appeal to the [TSA] and correct any erroneous information."  49 U.S.C. § 44903(j)(2)(G)(i).  The TSA is also required to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system."  § 44903(j)(2)(C)(iii)(I).  Congress also mandated that "[t]he Secretary of Homeland Security shall establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the [TSA]," § 44926(a), and that the Secretary "shall establish" procedures "to implement, coordinate, and execute the process" for redress, § 44926(b)(1).  These legislative directives have resulted in the DHS TRIP program.  *See* 49 C.F.R. § 1560.201 *et seq.*  The TSA is also required to maintain records for individuals whose information has been corrected through its redress process.  *See* §§ 44903(j)(2)(G)(ii), 44926(b)(2).  Finally, Congress has provided for judicial review of orders pertaining "to security duties and powers designated to be carried out by" the TSA. § 46110(a).  The bottom line, then, is that Congress has crafted a remedial scheme for individuals to challenge their inclusion on the No Fly List and to judicially appeal an adverse determination.[14]

---

[14] In their official capacity claims, Plaintiffs argue that this scheme of judicial review is not exclusive and that they have recourse in this Court under the APA for their claims concerning "the constitutional 'adequacy' of No Fly List placement, redress, and removal procedures."  Pls. Mem. at 25.  Two courts of appeal have agreed with this argument, albeit in the context of the original TRIP regime, not the revised one.  *See Ibrahim v. Dep't of Homeland*

Plaintiffs respond that this remedial scheme does not provide for damages from the Agents personally and, "[a]s such, TRIP and § 46110 are incapable of providing remedies for the constitutional violations that the Special Agent Defendants committed." Pls. Mem. at 45. The remedies Congress has chosen to provide, however, "need not be perfectly congruent," *Minneci*, 132 S. Ct. at 625, and they need not even "provide complete relief," *Bush*, 462 U.S. at 388. Indeed, although there can be no dispute here that the scheme created by Congress does not provide relief in the form of compensatory or punitive damages from the Government or the Agents, "[i]t does not matter that the creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go unredressed." *Hudson Valley Black Press v. I.R.S.*, 409 F.3d 106, 110 (2d Cir. 2005) (quotation marks and alterations omitted). "That a particular plaintiff might suffer 'unredressed' injuries were a court not to recognize a new type of *Bivens* action may be a hard truth but it is a truth nonetheless and one to which the Supreme Court has alerted potential litigants." *Aryai v. Forfeiture Support Associates*, 25 F.Supp.3d 376, 395 (S.D.N.Y. 2012) (Preska, C.J.). The Court's jurisprudence instructs that the salient point, rather, is that Congress has provided "what *it* considers adequate" for the relevant injury. *Chilicky*, 487 U.S. at 431 (1988) (emphasis added).[15] "So long as the plaintiff[s] ha[ve] an avenue for *some* redress, bedrock

---

*Sec.*, 538 F.3d 1250 (9th Cir. 2008); *Latif v. Holder*, 686 F.3d 1122 (9th Cir. 2012); *Arjmand v. U.S. Dep't of Homeland Sec.*, 745 F.3d 1300 (9th Cir. 2014); *Ege v. U.S. Dep't of Homeland Sec.*, 784 F.3d 791 (D.C. Cir. 2015). The Fourth Circuit has also adopted that reasoning in an unpublished opinion. *See Mohamed v. Holder*, No. 11-1924, slip op. at 4–6 (4th Cir. May 28, 2013). Were the official capacity claims to proceed and were this Court to accept Plaintiffs' argument, Plaintiffs would thus have a further remedial path that may be sufficient to preclude the availability of a *Bivens* remedy. *See, e.g.*, *Western Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) ("[T]he APA leaves no room for *Bivens* claims based on agency action or inaction."); *Sinclair v. Hawke*, 314 F.3d 934, 940 (8th Cir. 2003) ("[T]he existence of a right to judicial review under the Administrative Procedure Act is sufficient to preclude a *Bivens* action."); *Miller v. U.S. Dep't of Agr. Farm Servs. Agency*, 143 F.3d 1413, 1416 (11th Cir. 1998) ("[T]he existence of a right to judicial review under the APA is, alone, sufficient to preclude a federal employee from bringing a *Bivens* action.").

[15] Analysis at this stage "include[s] an appropriate judicial deference to indications that congressional inaction has not been inadvertent." *Chilicky*, 487 U.S. at 423. And as Plaintiffs' themselves concede, "[t]he legislative history of the No Fly List remedial scheme shows that Congress considered, and struck down, an amendment that would create a civil remedy against the Government if, following the TRIP review process, the TSC decided not to remove the complainant from the No Fly List." Pls. Mem. at 47 n.3. *See* H.R. Rep. No. 108-724, pt. 5, at 270–71

principles of separation of powers foreclose[] judicial imposition of a new substantive liability." *Malesko*, 534 U.S. at 69 (emphasis added). Indeed, it appears that the alternative remedial scheme here is far more comprehensive—and effective—than that available to the *Turkmen* plaintiffs. *Cf.* *Turkmen*, 915 F.Supp.2d at 353.

Nor is it relevant that Congress may not have had constitutional violations of the sort alleged here—as opposed to administrative errors—in mind when crafting the administrative and judicial review scheme it did. *See* Pls. Mem. at 44. The Supreme Court has explicitly rejected the argument that a remedy is inadequate because claimants "merely received that to which they would have been entitled had there been no constitutional violation." *Chilicky*, 487 U.S. at 427. In both *Bush* and *Chilicky*, the Court rejected claims that a *Bivens* remedy was necessary because the statutory schemes did not provide for relief specifically intended to compensate a constitutional violation (First Amendment retaliation and Due Process violations, respectively) as opposed to the denial of a statutory right. "In neither case … [did] the presence of alleged unconstitutional conduct that is not *separately* remedied under the statutory scheme imply that the statute has provided 'no remedy' for the constitutional wrong at issue." *Id.* at 427–28 (emphasis in original). As Justice O'Connor explained in *Chilicky*, "the harm resulting from the alleged constitutional violation can in neither case be separated from the harm resulting from the denial of the statutory right." *Id.* at 428. The same is true here. The crux of Plaintiffs' injury is their improper inclusion on the No Fly List as a result of the Agents' alleged retaliation. And whether that injury resulted

---

(2004). Plaintiffs seek to sidestep this legislative history because it concerns "a remedy against the Government, not individual nominating agents." Pls. Mem. at 47 n.3. But nowhere has the Supreme Court suggested that courts should look only to whether Congress has considered the specific question of damages against federal officers in their personal capacity. Here, Plaintiffs agree that Congress considered the question of what remedies would be appropriate in the context of the No Fly List and specifically rejected the option of a civil remedy. "Congress's pronouncements in the relevant context [thus] signal that it would not support … a damages claim," *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012) (Wilkerson, J.), and reinforce the conclusion that a *Bivens* remedy is inappropriate here.

from administrative error, a constitutional violation, or both, the dispositive point is that Congress' remedial scheme addresses precisely that injury.

In concluding that the remedial scheme crafted by Congress forecloses the recognition of a *Bivens* action, the Court does not overlook the fact that Plaintiffs in their official capacity claims challenge the procedural adequacy of that scheme. This Court does not today consider whether the TRIP process is constitutionally or otherwise deficient. Because the official capacity claims are now stayed, the procedural adequacy of that scheme, including the TRIP process, is a question for another day. For purposes of assessing the viability of a *Bivens* claim, however, it is enough to recognize that an alternative remedial process is available. Indeed, Plaintiffs have availed themselves of that process and now have assurances from the Government that they are not presently on the No Fly List. That is more than enough to conclude that the creation of a *Bivens* remedy is inappropriate in these circumstances. [16]

## C.  RFRA Does Not Provide for Damages Against The Agents

Plaintiffs also seek damages against the Agents pursuant to RFRA. Section 3 of that statute, which creates a private right of action and provides for judicial remedies to enforce that right, states, in pertinent part, that:

> A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

---

[16] Because an alternative remedial scheme is available in this context, the Court need not proceed to the second stage of inquiry and consider the applicability of any additional special factors, including the parties' divergent arguments concerning the national security implications of recognizing a *Bivens* action in this context. *See* Defs. Mem. at 18–22; Pls. Mem. at 48–52.

42 U.S.C. § 2000bb-1(c).  The principal question that divides the parties here is the meaning of "appropriate relief."  Specifically, does the notion of "appropriate relief" encompass money damages against government officials in their personal capacities?[17]

"Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well."  *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003).  This is not the usual case, however, because the plain text of RFRA merely raises, rather than answers, the critical question.  As the Supreme Court has recognized with respect to RFRA's companion statute, which includes identical language in this respect, the phrase "'appropriate relief' is open-ended and ambiguous about what types of relief it includes."  *Sossamon v. Texas*, 131 S. Ct. 1651 (2011).[18]  Indeed, "[f]ar from clearly identifying money damages, the word 'appropriate' is inherently context-dependent."  *Id.*  "In some contexts, 'appropriate relief' might include damages."  *Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006).  But "another plausible reading is that 'appropriate relief' covers equitable relief but not damages."  *Id.*  While the Supreme Court has acknowledged the availability of injunctive relief under RFRA, *see Gonzales v. O Centro*

---

[17] The parties also dispute whether federal officials in their personal capacities are included within RFRA's definition of "government" and thus amenable to suit under the statute at all.  At least two courts appear to have concluded that RFRA applies to personal capacity claims against federal officials.  *See United Elmaghraby v. Ashcroft*, No. 04-CV-1809 (JG), 2005 WL 2375202, at *30 n.27 (E.D.N.Y. Sept. 27, 2005), *aff'd in part, rev'd in part and remanded sub nom.*, *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), *rev'd and remanded sub nom.*, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Solomon v. Chin*, No. 96-CIV-2619 (DC), 1997 WL 160643, at *5 (S.D.N.Y. Apr. 7, 1997).  At least one other court, however, has expressed some doubts about such a conclusion, at least in the national security context.  *See Lebron*, 670 F.3d at 557.  This Court need not address the issue, however, in light of its conclusion that money damages are unavailable under RFRA because, even assuming the Agents may be sued in their personal capacities, Plaintiffs' RFRA claim against the Agents in their personal capacities here is limited to money damages.  *See* Pls. Mem. at 49 n.24.

[18] When the Supreme Court held RFRA unconstitutional as applied to state and local governments because it exceeded Congress' power under § 5 of the Fourteenth Amendment, *see City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) ("Congress does not enforce a constitutional right by changing what that right is."), Congress responded by enacting the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U.S.C. § 2000cc *et seq.*, pursuant to its Spending Clause and Commerce Clause authority.  *See Sossamon*, 131 S. Ct. at 1656.  "RLUIPA borrows important elements from RFRA … includ[ing] an express private cause of action that is taken from RFRA."  *Id.* at 1656.  For that reason, courts often apply "case law decided under RFRA to issues that arise under RLUIPA" and vice-versa.  *Redd v. Wright*, 597 F.3d 532, 535 n.2 (2d Cir. 2010).

*Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 425–30 (2006), neither the Supreme Court nor any of the thirteen courts of appeals has held that RFRA provides for money damages.[19] The question, then, remains: Does "appropriate relief" in the context of RFRA encompass such damages? The answer is no.

Although the statute's plain text is wanting in clarity, "[t]he purpose and history of the statute elucidate the meaning of this ambiguous phrase." *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1736 (2011) (Sotomayor, J., concurring); *see also King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan."). Indeed, Congress included detailed findings and an unambiguous statement of the law's purpose in the statute itself. Section 2 of RFRA, codified at § 2000bb(b), provides that:

> The purposes of this Act are—
>
> (1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

---

[19] Three courts of appeals have held that RFRA does not provide for money damages against the United States (or its agents acting in their official capacities) on the basis that "appropriate relief" cannot include damages because the language does not amount to an unambiguous waiver of sovereign immunity. *See Webman*, 441 F.3d at 1026; *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 841 (9th Cir. 2012); *Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015). Although the Second Circuit has not addressed the issue, Plaintiffs agree with that conclusion, *see* Pls. Mem. at 84, and instead bring this case focusing on the remaining gap in the RFRA jurisprudence: whether a damages action exists against federal officials in their personal capacities. Because these decisions (and *Sossamon*) are grounded in principles of sovereign immunity, they are of limited assistance in addressing the question of damages against those who "come to court as individuals," *Hafer*, 502 U.S. at 27. At most, they may counsel caution in concluding that the same term—even one as malleable as "appropriate relief"—can include damages as applied to one class of defendants but not another.

The Court has also considered the Agents' argument concerning *Washington v. Gonyea*, 731 F.3d 143 (2d Cir. 2013), which held that RLUIPA does not provide for damages against state officials in their personal capacities. As the panel explained, RLUIPA "was enacted pursuant to Congress' spending power, *see* 42 U.S.C. § 2000cc–1(b)(1), which allows the imposition of conditions, such as individual liability, only on those parties actually receiving the state funds." *Id.* at 145. Because the parties receiving the federal funds were state prison institutions, not state prison officials, *Gonyea* concluded "as a matter of statutory interpretation and following the principle of constitutional avoidance" that RLUIPA did not create a personal capacity damages action. *Id.* at 146. RFRA, by contrast, "was authorized by the Necessary and Proper Clause." *Hankins v. Lyght*, 441 F.3d 96, 106 (2d Cir. 2006). As such, the doctrinal concerns underlying the conclusion in *Gonyea* do not assist here.

> (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

RFRA was enacted three years after the Supreme Court's watershed decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), which, as the Act itself recounts, "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." § 2000bb(a)(4).  Prior to *Smith*, the Supreme Court had employed a balancing test that took into account whether the challenged state action imposed a substantial burden on the right to free exercise of religion, and if it did, whether that action was necessary to serve a compelling government interest.  Applying this test, the Court held in *Sherbert* that an employee who was fired for refusing to work on her Sabbath could not be denied unemployment benefits.  374 U.S. at 408–409.  And applying a similar approach, the Court held in *Yoder* that Amish children could not be required by state law to remain in school until the age of 16 over the objection of their parents, who viewed such education "as an impermissible exposure of their children to a 'wordly' influence in conflict with their beliefs." 406 U.S. at 210–211, 234–236.

The plaintiffs in *Smith* were two individuals who had been fired from their jobs at a drug rehabilitation center because they had ingested peyote as part of a religious ceremony of the Native American Church, of which they were both members.  494 U.S. at 874.  They were subsequently denied state unemployment benefits after being found ineligible because of their discharge for work-related "misconduct." *Id.*  Citing Supreme Court precedent, including *Sherbert*, the Oregon Supreme Court concluded that "the state could not, consistent with the First Amendment, deny unemployment compensation to petitioners." *Smith v. Employment Div.*, 307 Or. 68, 71 (1988). The Supreme Court reversed.

In his opinion for the closely divided Court, Justice Scalia noted that its decisions "have consistently held that the right of free exercise does not relieve an individual of the obligation to

comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Smith*, 494 U.S. at 879 (quotation omitted). Indeed, *Smith* cautioned that "a private right to ignore generally applicable laws" would prove "a constitutional anomaly." *Id.* at 886. In so concluding, *Smith* distinguished the Court's earlier decisions in *Sherbert* and *Yoder*, confining the former to its facts, *see id.* at 884–85, and holding that the latter involved more than just the free exercise of religion, *see id.* at 881 (discussing "the Free Exercise Clause in conjunction with other constitutional protections," such as the right of parents to direct the education of their children). Notable for present purposes, *Smith* did not change the remedies available for a successful claim under the Free Exercise Clause. Indeed, it says nothing about remedies at all.

Congress responded to *Smith* by affording greater statutory protection than the Court in *Smith* had held the Constitution offered.[20] Specifically, it concluded that "the compelling interest test as set forth in prior Federal court rulings"—that is, in *Sherbert* and *Yoder*—offered "a workable test for striking sensible balances between religious liberty and competing prior governmental interests." § 2000bb(a)(5). As a result, in enacting RFRA, Congress sought "to restore the compelling interest test as set forth" in those earlier cases. § 2000bb(b). The Act thus

---

[20] While some have spoken of RFRA "overturning" *Smith*, "a statute cannot either enlarge or contract the Constitution." *Mack v. O'Leary*, 80 F.3d 1175, 1181 (7th Cir. 1996), *vacated on other grounds*, 522 U.S. 801 (1997). That Congress would seek to create a new statutory right that exceeded constitutional baselines, however, is not remarkable. "Indeed, Congress has often provided statutory protection of individual liberties that exceed the Supreme Court's interpretation of constitutional protection." *Hankins*, 441 F.3d at 107 (quotation omitted). In that respect, one aspect of RFRA's test is significant. As noted in *City of Boerne*, "the Act imposes in every case a least restrictive means requirement—a requirement that was not used in the pre-*Smith* jurisprudence RFRA purported to codify." 521 U.S. at 535. "On this understanding of [the Supreme Court's] pre-*Smith* cases, RFRA did more than merely restore the balancing test used in the *Sherbert* line of cases; it provided even broader protection for religious liberty than was available under those decisions." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 n.3 (2014). As discussed below, however, that breadth did not include expanding the scope of remedies available as compared with those previously available for constitutional violations.

created a new statutory right beyond the constitutional baseline articulated in *Smith* by providing that:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

§ 2000bb–1.   In order to ensure that this new statutory right (albeit one based in erstwhile constitutional doctrine) could be vindicated in the courts, Congress also created a private right of action in § 3 providing for "appropriate relief" against the Government.

Plaintiffs, however, see something more ambitious in RFRA.   In addition to restoring the *standard* by which free exercise claims were adjudicated, Plaintiffs appear to argue the language in § 3 demonstrates Congress' intent to expand the scope of *remedies* available where an individual's religious freedom is abridged.   But as Judge Posner persuasively noted shortly after RFRA became law, since the statute "says very little about remedies … it is unlikely that Congress intended it to displace the existing remedial system for constitutional violations."   *Mack v. O'Leary*, 80 F.3d 1175, 1181 (7th Cir. 1996), *vacated on other grounds*, 522 U.S. 801 (1997). Indeed, nothing in the Act's Congressional findings or statements of purpose says anything about changing the remedial scheme applicable to free exercise claims.   And nothing on the face of the Act's substantive provisions outwardly suggests they do anything other than carry out the law's stated purpose—namely, restoring the compelling interest test as it existed before *Smith*.   As noted in the discussion of official and personal capacity claims above, *see supra* 12–14, a *Bivens* action would have provided the only potential path for an individual seeking personal capacity damages

from a federal official for violation of the Free Exercise Clause at the time of RFRA's enactment. And as also discussed at length above, the Supreme Court has never recognized a *Bivens* remedy for violations of the Free Exercise Clause. *See supra* at 17–20. As a consequence, to interpret RFRA's reference to "appropriate relief" as contemplating a remedy then unknown to the law is, at the least, a stretch. Rather, the plain language of the statute read in the light of its stated purpose suggests the law changed the standard applicable to free exercise claims while retaining all remedies that were understood as "appropriate" for claims under the Free Exercise Clause—and nothing more.

The conclusion that RFRA did not displace the existing remedial scheme—whether by adding to or removing from it—is reinforced by the statute's legislative history. Indeed, both House and Senate committee reports, which are regarded as "the most authoritative and reliable materials of legislative history," *Disabled in Action of Metro. New York v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000), evidence concern about the potential misinterpretation of RFRA's impact on existing law. For example, the Senate Judiciary Committee's report states that "[a]lthough the purpose of this act is only to overturn the Supreme Court's decision in *Smith*, concerns have been raised that the act could have unintended consequences and unsettle other areas of the law." S. Rep. No. 103–111 ("S. Rep.") at 12; *see also* H.R. Rep. No. 103–88 ("H.R. Rep.") at 8 (including essentially identical language). In particular, the legislative history includes discussion of the bill's potential impact on abortion rights, the ability of religious organizations to participate in publicly funded social welfare and educational programs, and the availability of tax emptions for such organizations. *See* S. Rep. at 12; H.R. Rep. at 8. Thus, the Senate Judiciary Committee's report states that:

> To be absolutely clear, the act does not expand, contract or alter the
> ability of a claimant to obtain relief in a manner consistent with the

> Supreme Courts's [*sic*] free exercise jurisprudence under the
> compelling governmental interest test prior to *Smith*.

S. Rep. at 12; *see also* H.R. Rep. at 8 (including essentially identical language).  In view of such

an understanding—and against a backdrop where the Supreme Court has never recognized a

*Bivens* remedy under the Free Exercise Clause, whether before or after *Smith*—it would seem

strange indeed for Congress to have employed a phrase as ambiguous as "appropriate relief" to

*create* such a remedy where one was not previously recognized.

The contrast between the language in RFRA's remedial provision and every other federal

statute identified by Plaintiffs as recognizing a personal capacity damages action against federal

officers also points away from the conclusion they urge.  Indeed, each of these four statutes

includes specific reference to the availability of damages.  Section 1985's remedial clause speaks

of "an action for the recovery of damages."  42 U.S.C. § 1985.  The Foreign Intelligence

Surveillance Act permits "recover[y] … [of] actual damages … [and] punitive damages."  50

U.S.C. § 1810.  The Telecommunication Acts provides that a court "may award damages."  47

U.S.C. § 605(e)(3).  And although the Federal Wiretap Act provides for "appropriate relief," that

term is specifically defined to include "damages … and punitive damages in appropriate cases."

18 U.S.C. § 2520(b).  Because Congress knows how to create a personal capacity damages remedy

(and because Plaintiffs have not pointed to a single statute where "appropriate relief" was

interpreted to include such a remedy without an explicit definition to that effect), one might

reasonably expect such language if Congress in fact intended to depart from the pre-*Smith* world

in such a significant way.[21]

---

[21] Plaintiffs correctly observe that 42 U.S.C. § 1983, although usually concerned with the activities of state officials, also provides for damages against a federal official in his personal capacity where "state and federal defendants conspire[] under color of state law to deprive plaintiff[s] of federally guaranteed rights."  *See Kletschka v. Driver*, 411 F.2d 436, 442, 448–49 (2d Cir. 1969).  Even § 1983, however, is clear that appropriate relief under that

Nonetheless, Plaintiffs contend that Congress's reference to "appropriate relief" in RFRA's private right of action triggers the "ordinary convention" recognized in *Franklin v. Gwinnett Cnty. Pub. Sch.*, whereby courts "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." 503 U.S. 60, 76, 66 (1992); *see also Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."). But whatever force of that rule in some contexts, it lacks any here. As noted in *Sossamon*, which interpreted this very statutory provision as borrowed in RFRA's companion statute,[22] *Franklin* required the Supreme Court to interpret the scope of an *implied* statutory right of action. "With no statutory text to interpret, the Court 'presume[d] the availability of all appropriate remedies unless Congress ha[d] expressly indicated otherwise.'" *Sossamon*, 131 S. Ct. at 1660 (*quoting Franklin*, 503 U.S. at 66); *accord Landgraf v. USI Film Products*, 511 U.S. 244, 285 n.38 (1994). That is not the case here, however, as Congress has created "an express private cause of action" that provides for "appropriate relief." *Sossamon*, 131 S. Ct. at 1656. The *Franklin* presumption is thus inapplicable, and the meaning of "appropriate relief" must be discerned using the traditional tools of statutory construction. Those tools, as noted above, point

---

statute includes "an action at law," which is to say, damages. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710–11 (1999).

Plaintiffs also note that Congress has sometimes specifically excluded damages from their definitions of "appropriate relief" and that "numerous" federal statutes specifically include injunctive and other equitable relief within their definitions of "appropriate relief." *See* Pls. Mem. at 83–84 (*citing* 5 U.S.C. § 702; 42 U.S.C. § 6395(e)(1); 15 U.S.C. § 797(b)(5); 16 U.S.C. § 973i(e); 2 U.S.C. § 437g(a)(6)(A); 8 U.S.C. § 1324a(f)(2); 12 U.S.C. § 1715z–4a(b); 15 U.S.C. § 6309(a)). None of these statutes, however, concerns the creation of a damages remedy against federal officers in their personal capacities and, as such, the value of Plaintiffs' analogy is diminished. In any event, the Supreme Court has "several times affirmed that identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute." *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015) (collecting cases).

[22] *See supra* note 18.

to the conclusion that Congress did not intend to create a *Bivens*-type action with the language of "appropriate relief."

Plaintiffs also seek support in *Jama v. U.S.I.N.S.*, 343 F.Supp.2d 338 (D.N.J. 2004), where the court determined that RFRA provides for personal capacity damages against federal officers. But that decision, and subsequent district court opinions adopting its reasoning,[23] rest on a crucial yet flawed premise—that "[c]ourts have *always* recognized § 1983 and *Bivens* claims for money damages against officials for violation of the Free Exercise Clause." *Id.* at 374 (emphasis added). Setting aside the § 1983 cases, which have no bearing on whether a claim exists under *Bivens*, there is no question—in light of *Iqbal*, *Reichle*, and, most recently, *Turkmen*—that the Supreme Court has never recognized a *Bivens* remedy for violations of the Free Exercise Clause. *See supra* at 17–21.[24] Indeed, before RFRA was enacted in 1993, the Supreme Court's only *Bivens* case in the First Amendment context came in the form of its refusal to recognize such an action in *Bush*— decided a full decade before RFRA became law.

---

[23] *See Lepp v. Gonzales*, No. C-05-0566 (VRW), 2005 WL 1867723, at *8 (N.D. Cal. Aug. 2, 2005); *Padilla v. Yoo*, 633 F.Supp.2d 1005, 1039 (N.D. Cal. 2009), *as amended*, (June 18, 2009), *rev'd on other grounds*, 678 F.3d 748 (9th Cir. 2012);

[24] *Jama*'s (and Plaintiffs') sole citation to contrary authority is a single decision of the Sixth Circuit concerning a prisoner's free exercise claim. In that case, *Jihaad v. O'Brien*, 645 F.2d 556 (6th Cir. 1981), the court adopted the holding of an earlier panel extending *Bivens* to the First Amendment as a whole—not merely to Free Exercise Clause, *see id.* at 558 n.1. That prior panel's reasoning on this point was as follows: "We recognize that *Bivens* dealt with a Fourth Amendment violation, but its logic appears to us to be equally applicable to a First Amendment violation." *Yiamouyiannis v. Chem. Abstracts Serv.*, 521 F.2d 1392, 1393 (6th Cir. 1975). Although such reasoning may have seemed perfectly reasonable in 1975 (shortly after *Bivens* was decided), it has become untenable in the years after 1980, as cases such as *Turkmen* ably demonstrate. Indeed, the Sixth Circuit itself recently expressed doubts about the availability of *Bivens* in the free exercise context, notwithstanding its earlier holdings in *Yiamouyiannis* and *Jihaad*. *See Meeks v. Larsen*, No. 14-1381, ___ F.App'x. ___, 2015 WL 2056346, at *9 (6th Cir. May 5, 2015) (observing that "there is a dearth of precedent applying *Bivens* to free-exercise claims" and quoting the Eighth Circuit's conclusion that *Bivens*' availability in such contexts is "doubtful").

Plaintiffs also point to *Mack* for the proposition that at least one court of appeal has concluded that "appropriate relief" includes personal capacity damages. *See* Pls. Mem. at 85. But such reliance is difficult to justify because defendants there did not contest the availability of damages. As Judge Posner's opinion in that case observed, they "d[id] not question the propriety of damages as a remedy for violations of the Act, even though [RFRA] says nothing about remedies except that a person whose rights under the Act are violated 'may assert that violation as a claim or defense in a judicial proceeding and obtain *appropriate* relief against a government.'" 80 F.3d at 1177 (*citing* § 2000bb–1(c), emphasis added in *Mack*).

In the end, "the fundamental task for the judge is to determine what Congress was trying to do in passing the law." R. Katzmann, *Judging Statutes* 31 (2014); *see also Lehigh Valley Coal Co. v. Yensavage*, 218 F. 547, 553 (2d Cir. 1914) (Hand, J.) ("[S]tatutes … should be construed, not as theorems of Euclid, but with some imagination of the purposes which lie behind them.") As explained, Congress' intent in enacting RFRA could not be clearer: It was to restore Congress' understanding of the compelling interest test as it existed before *Smith*—no more, no less. And "[b]ecause Congress enacted RFRA to return to a pre-*Smith* world, a world in which damages were unavailable against the government, 'appropriate relief' is most naturally read to exclude damages against the government." *Webman*, 441 F.3d at 1028 (Tatel, J., concurring).[25] Plaintiffs' argument to the contrary thus fails.[26]

## CONCLUSION

Although federal law imposes limits on the investigative tactics federal officials may employ in seeking to keep this nation safe, it also establishes limits on the manner in which an individual may vindicate his rights should those tactics cross the line. For the reasons stated, the law does not permit Plaintiffs to seek damages against the Agents in their personal capacities either under *Bivens* or RFRA. Accordingly, the Agents' motion to dismiss is GRANTED and the claims

---

[25] RFRA provides only for relief "against the government," which is defined to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb–2(1). As noted above, *see supra* note 17, the Court need not address the predicate question of whether "the government" includes federal officials sued in their personal capacity in light of its conclusion that "appropriate relief" does not encompass damages in any event.

[26] Plaintiffs' argument might carry more weight were the Supreme Court eventually to recognize a *Bivens* remedy in the First Amendment context. The Supreme Court has observed, in a related context, that "[t]he meaning of the word 'appropriate' permits its scope to expand to include … remedies that were not appropriate before …, but in light of legal change … are appropriate now." *West v. Gibson*, 527 U.S. 212, 218 (1999) (holding that Title VII's reference to "appropriate remedies" as passed in 1972 should be interpreted to include compensatory damages in light of subsequent legal developments in 1991). Thus, were the Supreme Court to recognize a *Bivens* remedy under the Free Exercise Clause, it might well be that "appropriate relief" under RFRA would be held to encompass personal capacity damages.

against FNU Tanzin, Sanya Garcia, Francisco Artusa, John LNU, Michael Rutowski, William Gale, John C. Harley III, Steven LNU, Michael LNU, Gregg Grossoehmig, Weysan Dun, James C. Langenberg, John Does 1–6 and 9–13 in their personal capacities are dismissed. The Court on its own motion also dismisses all personal capacity claims against John Does 7 and 8. *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.6 (2d Cir. 1990). As previously noted, this opinion does not address the viability of Plaintiffs' official capacity claims and thus expresses no opinion on the merits of their arguments concerning the manner in which individuals are added to the No Fly List or the mechanisms for challenging such inclusion. The parties are directed to submit a joint letter to the Court within 30 days advising how they wish to proceed with respect to those claims.

SO ORDERED.

Dated:     September 3, 2015
           New York, New York

Ronnie Abrams
United States District Judge