UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MUHAMMAD TANVIR, JAMEEL
ALGIBHAH, and NAVEED SHINWARI,

Plaintiffs,

v.

FNU TANZIN, *et al.*

Defendants.

13 Civ. 6951 (RA)

**ECF CASE**

---

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS

Ramzi Kassem
Naz Ahmad
Princess Masulingan
Mudassar Toppa
CLEAR PROJECT
Main Street Legal Services, Inc.
City University of New York School of Law
2 Court Square
Long Island City, NY 11101

Baher Azmy
Shayana Kadidal
Diala Shamas
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012

Jennifer R. Cowan
Erol N. Gulay
Christopher S. Ford
William C. Mattessich
Ryan C. Mullally
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL ALLEGATIONS ......................................................................................................2

    A.    Plaintiff Muhammad Tanvir ..................................................................................3

    B.    Plaintiff Jameel Algibhah ......................................................................................6

    C.    Plaintiff Naveed Shinwari .....................................................................................9

PROCEDURAL HISTORY .......................................................................................................12

LEGAL ARGUMENT ...............................................................................................................13

I.       RESOLUTION OF DEFENDANTS' QUALIFIED IMMUNITY DEFENSE
        WOULD BE PREMATURE ..........................................................................................13

II.     THE COURT SHOULD ADDRESS BOTH PRONGS OF THE QUALIFIED
        IMMUNITY ANALYSIS ..............................................................................................15

    A.    Addressing the First Prong of the Qualified Immunity Test Is Necessary to
         Aid in the Development of Law and Limit Abuses .................................................15

    B.    Lack of Oversight Has Made the No Fly List Ripe for Persistent Abuse .................17

    C.    The FBI Has Not Been Held Accountable for Targeting and Pressuring
         Muslims to Become Informants ...............................................................................18

III.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ......................21

    A.    Defendants Deprived Plaintiffs of the Right to Be Free of Substantial Burdens
         on Religion ...............................................................................................................24

          1.    Defendants Collectively Imposed the Substantial Burden .............................26

          2.    Defendants Violated Plaintiffs' Rights by Forcing Them to Choose
              Between their Religious Exercise and Their Ability to Travel.......................28

          3.    The TSC's Involvement Does Not Break the Causal Chain Between
              Defendants' Coercion and Plaintiffs' Burden................................................32

    B.    Defendants Violated a Clearly Established Right ....................................................35

1.    Plaintiffs' Right to Participate in their Religious Community and to Refrain from Acting Deceptively Free from Coercion was Clearly Established ....................................................................................36

2.    Defendants Define the Relevant Right Too Narrowly ...................................38

IV.   PLAINTIFFS HAVE STATED A CLAIM AGAINST EACH INDIVIDUAL DEFENDANT FOR VIOLATING RFRA BY SUBSTANTIALLY BURDENING PLAINTIFFS' EXERCISE OF RELIGION ....................................................................39

A.    Defendants FNU Tanzin, Garcia, John LNU, and John Does #1–3 Substantially Burdened Plaintiff Tanvir's Religious Exercise ...................................41

B.    Defendants Artousa and John Does #4–5 Substantially Burdened Plaintiff Algibhah's Religious Exercise ...................................................................42

C.    Defendants Steven LNU, Harley, Michael LNU, Grossoehmig, Dun, Langenberg, and John Doe #6 Substantially Burdened Plaintiff Shinwari's Religious Exercise ....................................................................43

V.    PLAINTIFFS REQUIRE LIMITED DISCOVERY TO ESTABLISH PERSONAL JURISDICTION OVER DEFENDANTS STEVEN LNU AND MICHAEL LNU; AGENTS HARLEY, GROSSOEHMIG, DUN, AND LANGENBERG; AND JOHN DOE 6 ....................................................................45

A.    Allegations of Coordination Establish a Prima Facie Case That This Court Has Jurisdiction Over Defendants ....................................................................45

B.    Defendants' Use of Declarations Underscores the Need to Allow Plaintiffs' Jurisdictional Discovery ....................................................................48

CONCLUSION....................................................................49

# TABLE OF AUTHORITIES

**CASES**

*Allaire Corp. v. Okumus,*
433 F.3d 248 (2d Cir. 2006) ................................................................42

*Anderson v. Creighton,*
483 U.S. 635 (1987)................................................................................22

*APWU v. Potter,*
343 F.3d 619 (2d Cir. 2003) ................................................................46

*Ashcroft v. Al-Kidd,*
563 U.S. 731 (2011)................................................................................36

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) ....................................................................23, 27

*Attkisson v. Holder,*
925 F.3d 606 (4th Cir. 2019) ................................................................14

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)..........................................................................23, 24

*Bracken v. MH Pillars Inc.,*
No. 15-CV-7302 (RA), 2016 WL 7496735 (S.D.N.Y. Dec. 29, 2016) ......................................47

*Burns v. Martuscello,*
890 F.3d 77 (2d Cir. 2018) ................................................................40

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014)..........................................................................26, 37

*Camreta v. Greene,*
563 U.S. 692 (2011)................................................................................16

*Chebli v. Kable,*
No. 1:21-cv-0937 (D.D.C. Apr. 6, 2021) ................................................................21

*Chirag v. MT Marida Marguerite Schiffahrts,*
604 F. App'x 16 (2d Cir. 2015) ................................................................46

*City of Boerne v. Flores,*
521 U.S. 507 (1997)..........................................................................24, 39

*Conner v. Reinhard,*

847 F.2d 384 (7th Cir. 1988) ................................................................................27

*DeStefano v. Emergency Hous. Grp., Inc.,*
247 F.3d 397 (2d Cir. 2001) .......................................................................... 30, 37

*Deutsche Bank Securities Inc. v. Mont. Bd. of Investment,*
7 N.Y.3d 65 (N.Y. 2006) ................................................................................47

*Dodds v. Richardson,*
614 F.3d 1185 (10th Cir. 2010) .......................................................................27

*Duffelmeyer v. Marshall,*
No. 07CV2807, 2008 WL 11517823 (S.D.N.Y. Mar. 24, 2008)...............................23

*El Ali v. Barr,*
473 F. Supp. 479 (D. Md. 2020) ................................................................... 32, 33

*Elhady v. Kable,*
391 F. Supp. 3d. 562 (E.D. Va. 2019) ............................................................ 17, 18

*Espinoza v. Mont. Dep't of Revenue,*
140 S. Ct. 2246 (2020) ....................................................................................29

*Fazaga v. Fed. Bureau of Investigation,*
965 F.3d 1015 (2020) ............................................................................ 17, 29, 41

*Fikre v. Fed. Bureau of Investigation,*
No. 313-cv-00899, 2019 WL2038724 (D. Or. May 8, 2019)....................................21

*Fogarty v. Gallegos,*
523 F.3d 1147 (10th Cir. 2008) .......................................................................27

*Garcia v. Does,*
779 F.3d 84 (2d Cir. 2015) ..............................................................................23

*Gonzales v. O Centro Espírita Beneficente* União,
546 U.S. 418 (2006)........................................................................................24

*GTFM Inc. v. Int'l Basic Source, Inc.,*
No. 01 Civ. 6203, 2002 WL 42884 (S.D.N.Y. Jan. 11, 2002) ..................................49

*Gualandi v. Adams,*
385 F.3d 236 (2d Cir. 2004) ............................................................................46

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982)........................................................................................22

*Harrison v. Machotosh,*
No. CV-91-2417, 1992 WL 135028 (E.D.N.Y. May 28, 1992) ................................................. 27

*Hope v. Pelzer,*
536 U.S. 730 (2002) ................................................................................................... 36, 38

*Horn v. Stephenson,*
11 F.4th 163 (2d Cir. 2021) .......................................................................................... 14, 24

*Hunter v. Bryant,*
502 U.S. 224 (1991) .......................................................................................................... 14

*Husain v. Springer,*
494 F.3d 108 (2d Cir. 2007) .............................................................................................. 40

*Ibrahim v. U.S. Dep't of Homeland Sec.,*
912 F.3d 1147 (9th Cir. 2019) ...................................................................................... 18, 19

*Jazini v. Nissan Motor Co., Ltd.,*
148 F.3d 181 (2d Cir. 1998) .............................................................................................. 46

*Johnson v. Newburgh Enlarged Sch. Dist.,*
239 F.3d 246 (2d Cir. 2001) .............................................................................................. 39

*Jolly v. Coughlin,*
76 F.3d 468 (2d Cir. 1996) ........................................................................................... 29, 41

*Kaplan v. Cty of Orange,*
528 F. Supp. 3d 141 (S.D.N.Y. 2021) ................................................................................ 13

*Kerman v. City of N.Y.,*
374 F.3d 93 (2d Cir. 2004) ................................................................................................ 33

*King v. Simpson,*
189 F.3d 284 (2d Cir. 1999) .............................................................................................. 13

*Kreutter v. McFadden Oil Corp.,*
71 N.Y.2d 460 (N.Y. 1988) ............................................................................................... 47

*Kronisch v. United States,*
150 F.3d 112 (2d Cir. 1998) ......................................................................................... 47, 49

*LaBounty v. Coughlin,*
137 F.3d 68 (2d Cir. 1998) ................................................................................................ 39

*Lee v. Weisman,*

505 U.S. 577 (1992) ............................................................................................... 30, 37

*Lombard v. Booz-Allen & Hamilton, Inc.*,
280 F.3d 209 (2d Cir. 2002) ........................................................................................28

*Malley v. Briggs*,
475 U.S. 335 (1986) ....................................................................................................34

*Maniar v. Wolf*,
Civ. A. No. 18-1362, 2020 WL 1821113 (D.D.C. April 10, 2020) ............................21

*Martinez v. City of Clovis*,
943 F.3d 1260 (9th Cir. 2019) ....................................................................................17

*McKenna v. Wright*,
386 F.3d 432 (2d Cir. 2004) ........................................................................................23

*Messerschmidt v. Millender*,
132 S.Ct. 1235 (2012) .................................................................................................22

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996) ..........................................................................................46

*Mirabella v. Villard*,
853 F.3d 641 (3d Cir. 2017) ........................................................................................16

*Mockaitis v. Harcleroad*,
104 F.3d 1522 (9th Cir. 1997) ....................................................................................31

*Mohamed v. Holder*,
995 F. Supp. 2d 520 (E.D. Va. 2014) ..........................................................................18

*Morrison v. LeFevre*,
592 F.Supp. 1052 (S.D.N.Y. 1984) .............................................................................27

*Myers v. Cty. of Orange*,
157 F.3d 66 (2d Cir. 1998) ..........................................................................................34

*NetSoc, LLC v. Chegg Inc.*,
No. 18-CV-10262 (RA), 2019 WL 4857340 (S.D.N.Y. Oct. 2, 2019) ......................46

*Okin v. Village of Cornwall-On-Hudson Police Dep't.*,
577 F.3d 415 (2d Cir. 2009) ........................................................................................37

*Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U, Will Cty., Ill.*,

46 F.3d 682 (7th Cir. 1995) ........................................................................................................ 14

*Pearson v. Callahan*,
555 U.S. 223 (2009) ........................................................................................................... 15, 16

*Phoenix Consulting, Inc. v. Republic of Angola*,
216 F.3d 36 (D.C. Cir. 2000) .................................................................................................. 46

*Plumhoff v. Rickard*,
572 U.S. 765 (2014) ................................................................................................................ 16

*Provost v. City of Newburgh*,
262 F.3d 146 (2d Cir. 2001) ................................................................................................... 27

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
141 S.Ct. 63, 208 L. Ed. 2d 206 (2021) ................................................................................. 31

*Ross v. Lichtenfeld*,
755 F. Supp. 2d 467 (S.D.N.Y. 2010), ................................................................................... 34

*Saucier v. Katz*,
533 U.S. 194 (2001) ......................................................................................... 15, 16, 17, 25, 36

*Sullivan v. Ringling Coll. of Art & Design, Inc.*,
No. 19-CV-1302 (RA), 2019 WL 6529823 (S.D.N.Y. Dec. 4, 2019) ..................................... 46

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) .................................................................................................. 23

*Tandon v. Newsom*,
141 S.Ct. 1294  (2021) ............................................................................................................ 31

*Tanvir v. Tanzin*,
894 F.3d 449 (2nd Cir. 2018) ................................................................................................. 39

*Tanzin v. Tanvir*,
141 S. Ct. 486 (2020) ........................................................................................................ 16, 17

*Taylor v. Brentwood Union Free Sch. Dist.*,
143 F.3d 679 (2d Cir. 1998) ................................................................................................... 33

*Taylor v. Riojas*,
141 S. Ct. 52 (2020) ................................................................................................................ 36

*Terebesi v. Torreso*,

764 F.3d 217 (2d Cir. 2014) ...................................................................................................... 26

*Thomas v. Review Bd. of the Ind. Emp. Sec. Div.,*
450 U.S. 707 (1981) ...................................................................................................... 29, 41

*Torcivia v. Suffolk Cty,*
17 F.4th 342 (2d Cir. 2021) ................................................................................................. 15

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
137 S. Ct. 2012 (2017) ......................................................................................................... 29

*U.S. v. Lanier,*
520 U.S. 259 (1997) ...................................................................................................... 22, 36

*Universal Trading & Inv. Co. v. Credit Suisse (Guernsey) Ltd.,*
560 F. App'x 52 (2d Cir. 2014) ........................................................................................... 47

*Veeder v. Nutting,*
No. 1:10-CV-665 MAD/CFH, 2013 WL 1337752 (N.D.N.Y. Mar. 29, 2013) ........................... 27

*Vega v. Semple,*
963 F.3d 259 (2d Cir. 2020) ........................................................................................ 22, 38

*Walden v. Fiore,*
571 U.S. 277 (2014) ............................................................................................................ 47

*Walker v. Schult,*
717 F.3d 119 (2d Cir. 2013) ................................................................................................ 13

*Warner v. Orange Cty. Dep't of Prob.,*
115 F.3d 1068 (2d Cir. 1997) ...................................................................................... 33, 34

*Wash. v. Gonyea,*
538 F. App'x 23 (2d Cir. 2013) ........................................................................................... 37

*White v. Pauly,*
137 S. Ct. 548 (2017) .......................................................................................................... 15

*Wis. v. Yoder,*
406 U.S. 205 (1972) ...................................................................................................... 30, 37

*Wood v. Moss,*
572 U.S.744 (2014) ............................................................................................................. 14

*Zahrey v. Coffey,*

221 F.3d 342 (2d Cir. 2000) .................................................................................33

STATUTES

42 U.S.C. § 2000bb-1 ...............................................................................23, 39

42 U.S.C. §§ 2000bb-1(a)–(b) ............................................................................24

42 U.S.C. § 2000cc ....................................................................................24, 39

U.S. Const. amend. I ...........................................................14, 16, 22, 30, 34, 37

U.S. Const. amend. IV ....................................................................................16

U.S. Const. amend. VIII .................................................................................22

RULES

Federal Rule of Civil Procedure 12(b)(6) ..........................................................23, 40

Federal Rule of Civil Procedure Rule 12(b)(b) .........................................................13

REGULATIONS

Fed. Bureau of Investigation, U.S. Dep't of Justice, 0667DPG, Domestic
    Investigations and Operations Guide, §5.6.3.4.8 (J) (2013) ..............................43, 45

Nat'l Counterterrorism Ctr., Watchlisting Guidance 34 (2013) ..................................18

OTHER AUTHORITIES

Brief for Jeffrey D. Kahn as Amicus Curiae Supporting Respondents ("Kahn
    Amicus Brief"), *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) (No. 19-71) ...................17

Charlie Savage, *Judge Rules Terrorism Watchlist Violates Constitutional Rights*,
    N.Y. Times (Sept. 4, 2019) ...............................................................................19

Dec. of Jason Herring ¶ 5, Moharam v. FBI, No. 21-cv-02607 (D.D.C. Jan. 18,
    2022), ECF No 20-53) ......................................................................................35

Homa Khaleeli, *The Perils of 'Flying While Muslim'*, The Guardian (Aug. 8,
    2016) ..............................................................................................................19

Janet Reitman, *I Helped Destroy People*, N.Y. Times (Sept 9, 2021) ........................19

Jeremy Scahill and Ryan Devreaux, *The Secret Government Rulebook for
    Labeling You a Terrorist,* The Intercept (Jul. 23, 2014) .......................................18

Jeremy Scahill & Ryan Devereaux, *Watch Commander: Barack Obama's Secret
    Terrorist-Tracking System by the Numbers*, The Intercept (Aug. 5, 2014) ...............20

Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L. J. 1 (2017) ............................24

*Model Partnership: New York Joint Terrorism Task Force Celebrates 35 Years*, F.B.I. News (Dec. 8, 2015) ............................................................................................49

Murtaza Hussain, *One Man's No-Fly List Nightmare*, The Intercept (May 30, 2021) ..................................................................................................................................20

Murtaza Hussain, *The Pariah: He Declined FBI Informant Offer, Then His Life Was Ruined*, The Intercept (Nov. 30, 2021, 7:00 a.m.) .......................................................20

Nat'l Counterterrorism Ctr., Watchlisting Guidance 34 (2013) ...................................................18

Shirin Sinnar, *Separate and Unequal: The Law of "Domestic" and "International" Terrorism*, 117 Mich. L. Rev. 1333 (2019)..................................................19

Defendant federal agents FNU Tanzin, Sanya Garcia, Francisco Artousa, John LNU, Steven LNU, John C. Harley III, Michael LNU, Gregg Grossoehmig, Weysan Dun, James C. Langenberg and John Does 1-6 ("Defendants") have filed a motion to dismiss the claims under the Religious Freedom Restoration Act ("RFRA") in the Amended Complaint, dated April 22, 2014 ("Am. Compl."), filed by Plaintiffs Muhammad Tanvir, Jameel Algibhah and Naveed Shinwari (collectively "Plaintiffs")[1] against Defendants in their personal capacity. Plaintiffs oppose that motion, for the reasons which follow.

## PRELIMINARY STATEMENT

Almost nine years after Mr. Tanvir, Mr. Algibhah, and Mr. Shinwari filed this litigation, Plaintiffs continue to seek damages for the harms they suffered from Defendants' interference with their right to freely exercise their religion. Defendants violated that right by exploiting the opaque system of the No Fly List to pressure Plaintiffs into acting as informants in their religious communities. This pressure was part of a national, well-documented FBI effort to aggressively recruit American Muslims to become informants on their own communities. Defendants' actions imposed a price on Plaintiffs' religious exercise—they were faced with the impermissible choice of either violating their religious beliefs to appease Defendants, or being unable to fly. Defendants' conduct also chilled Plaintiffs from freely practicing their faith. Although, through this suit, Plaintiffs won removal from the No Fly List after many years, they still have not been made whole for the disruptions to their lives, their economic loss, and the great distress caused by separation from their families. Plaintiffs' only avenue for complete relief is this action for damages against Defendants in their personal capacity. For the reasons that follow, Defendants' motion to dismiss the Amended Complaint is without merit and should be denied.

---

[1] Former Plaintiff Awais Sajjad did not file RFRA claims and is no longer a plaintiff.

*First,* resolution of Defendants' assertion of qualified immunity is not appropriate at this stage as the allegations at issue are best considered after the development of a factual record. *Second,* if the Court does choose to decide qualified immunity as part of a motion to dismiss, it should fully address both prongs of the qualified immunity test in order to give guidance to other federal officials and develop precedent. *Third,* Defendants are not entitled to qualified immunity as their collective action substantially burdened Plaintiffs' exercise of religion in clear violation of RFRA. *Fourth*, Plaintiffs have properly alleged the personal involvement of each individual Defendant in the actions which violated Plaintiffs' rights. *Finally,* before considering the motion to dismiss claims against certain Defendants for lack of personal jurisdiction, Plaintiffs should be granted limited discovery so that the motion can be considered on an appropriate factual record.

## FACTUAL ALLEGATIONS

As alleged in the Amended Complaint, Defendants, individual agents working for the Federal Bureau of Investigation ("FBI"), improperly used the No Fly List (the "List") to coerce law-abiding American Muslims into spying on their religious communities. Plaintiffs Muhammad Tanvir, Jameel Algibhah, and Naveed Shinwari are all United States citizens or lawful permanent residents. Each is a practicing Muslim. None poses, has ever posed, or has ever been accused of posing a threat to aviation security. Nevertheless, each was either placed or kept on the List when he refused to become an informant for the FBI against fellow American Muslims. Each declined to act as an FBI informant on Muslim communities because to do so would violate his sincerely held religious beliefs. Each plaintiff suffered monetary losses and emotional distress as a result of his placement on the No Fly List. All were removed from the List after they brought this action.

A.      **Plaintiff Muhammad Tanvir**

Starting in 2007, the FBI began a years-long coordinated effort to pressure Mr. Tanvir to serve as an informant on his Muslim community. Although he sat for interviews and answered the FBI's questions on several occasions, Mr. Tanvir declined to work as an informant, in part because of his sincerely held religious views, including his unwillingness to engage with his community in a deceptive manner. Am. Compl. ¶ 84. In retaliation for his refusal to serve as an informant for the FBI, and in a bid to coerce him to reconsider, Mr. Tanvir was threatened with deportation, *id.* ¶ 77, as well as arrest, *id.* ¶ 87, and was eventually placed and kept on the No Fly List, *id.* ¶ 90. As a result, Mr. Tanvir was forced to quit a good job as a trucker that required him to fly, *id.* ¶ 95, and he suffered other economic hardships. He was also prevented from seeing his ailing mother in Pakistan, and consequently separated from his wife who had to travel to Pakistan without him in order to provide his mother with care—all of which caused him and his family great distress. *Id.* ¶¶ 104,109.

In February 2007, Defendants Tanzin and John Doe 1 arrived, unannounced, at Mr. Tanvir's workplace to ask about an old acquaintance and then, days later, Agent Tanzin called Mr. Tanvir to ask general questions about what people in the Muslim community discussed. *Id.* ¶¶ 69–70. In December 2008, when he returned to New York after visiting his wife and family in Pakistan, U.S. government agents escorted Mr. Tanvir off the plane and confiscated his passport. *Id.* ¶ 71. During this incident, he was detained for five hours at the airport. *Id.* Agents Tanzin and John Doe 2[2] subsequently came to Mr. Tanvir's workplace and brought him to the FBI's offices in Manhattan where they questioned him for around an hour about terrorist training camps near the village where he was raised and whether he had any Taliban training, and asked

---

[2]      The Amended Complaint incorrectly identified this Defendant as John Doe 1. *See* Am. Compl. ¶ 82 and n. 11 below.

him to work as a government informant in Pakistan or Afghanistan. *Id.* ¶¶ 73–78. The agents told

Mr. Tanvir that he was "honest" and a "hardworking person." *Id.* ¶ 76. Mr. Tanvir told the

agents that he did not want to become a government informant and, in response, the agents

threatened him with deportation if he tried to pick up his passport. *Id.* ¶¶ 77–79.

Mr. Tanvir nevertheless made the appointment to pick up his passport, after which Agent

Tanzin told Mr. Tanvir that he (Agent Tanzin) had authorized the release of Mr. Tanvir's

passport because of his cooperation with the FBI. *Id.* ¶¶ 80–81. In the weeks that followed,

Agents Tanzin and John Doe 2 repeatedly called Mr. Tanvir to pressure him into becoming an

FBI informant—despite Mr. Tanvir's repeated and consistent refusal to do so. *Id.* ¶¶ 82–84.

In the years following these interactions, Mr. Tanvir discovered that he had been placed

on the List. In October 2010, In October 2010, while Mr. Tanvir was in Atlanta for work, he

received word that hismother was visiting New York from Pakistan. *Id.* ¶ 91. Mr. Tanvir made

plans to fly from Atlanta to New York City, but an airline employee at the Atlanta airport

informed him that he was unable to fly when he tried to board a flight to New York to visit his

mother. *Id.* Two unknown FBI agents approached him at the airport and instructed him to contact

the agents in New York to whom Mr. Tanvir had originally spoken*Id.* After calling Agent

Tanzin, Agent Tanzin explained that he was no longer assigned to his case but that soon other

FBI agents from New York would contact him. *Id.* ¶ 92. Unable to fly, the two unknown FBI

agents escorted Mr. Tanvir from the airport to the bus station in Atlanta, and he took a 24-hour

bus ride to New York. *Id.* ¶ 93.

Two days after Mr. Tanvir returned to New York, Defendant FBI Agent Sanya Garcia

called him, and said she could help him have his name removed from the List if he spoke with

her and answered her questions. Mr. Tanvir told her that he had already repeatedly answered the FBI's questions and did not want to speak to the FBI. *Id.* ¶ 94.

In the fall of 2011, Mr. Tanvir purchased tickets for a flight from New York to Pakistan for himself and his wife, so that they could visit Mr. Tanvir's sick mother. *Id.* ¶ 98–100. On November 2, 2011, however, Agent Garcia called Mr. Tanvir, telling him he would not be allowed to fly the next day because he had "hung up on her" 13 months earlier, and telling him he would not be able to fly without answering her questions. *Id.*

Anxious to see his ailing mother, Mr. Tanvir met Agents Garcia and John LNU at a restaurant in Queens. *Id.* There, Agents Garcia and John LNU repeated the questions that Agents Tanzin, Doe 1, and Doe 2 had already asked him many times, including questions about his family, religion and politics. Mr. Tanvir answered their questions because he believed he needed to do so to be able to fly to Pakistan to see his mother. *Id.* ¶ 101. Agent Garcia told Mr. Tanvir that because he had answered their questions, she would try to obtain a one-time waiver to allow him to fly to Pakistan, but that Mr. Tanvir would be required to speak with Agent Garcia again upon his return to the United States. *Id.* ¶ 102. The next day, when he was scheduled to depart, Mr. Tanvir received a call from Agent Garcia informing him that he would not be permitted to fly that day, and her prior offer about a one-time waiver was now contingent on Mr. Tanvir coming to FBI headquarters and taking a polygraph examination. *Id.* ¶ 104. Mr. Tanvir cancelled his flight and his wife flew to Pakistan alone. *Id.*

Mr. Tanvir then engaged counsel to assist him and filed a Traveler Redress Inquiry Program ("TRIP") complaint. In December 2011, Mr. Tanvir again bought a ticket to see his mother in Pakistan and was again denied boarding and told he was on the No Fly List. *Id.* ¶ 109.

Mr. Tanvir received a response to his TRIP complaint that said no changes or corrections would be made to the List. He appealed that determination. *Id.* ¶ 110, 112.

In November 2012, Mr. Tanvir purchased another ticket to Pakistan from New York to Pakistan. *Id.* ¶ 113. Once again, however, Mr. Tanvir was denied boarding at Kennedy Airport. *Id.* Another FBI agent then approached Mr. Tanvir, telling him and his counsel that he had to meet with Agent Garcia in order to be removed from the List. *Id.*

On March 28, 2013, Mr. Tanvir received a letter in response to his TRIP appeal, which did not confirm or deny that Mr. Tanvir was on the List, and which stated without explanation that the Government had "made updates" to its records based on his appeal. *Id.* ¶ 114. Hoping that this meant that he had at least received the one-time waiver Agent Garcia had discussed, Mr. Tanvir purchased another ticket from New York to Pakistan, and flew to Pakistan on June 27, 2013. *Id.* ¶ 115. Mr. Tanvir did not receive official confirmation of his removal from the No Fly List until June 2015, after filing suit. Dkt. 92, Letter Withdrawing Opp'n to Def. Mot. to Stay.

### B.    Plaintiff Jameel Algibhah

In 2009, the FBI began trying to recruit Mr. Algibhah as an informant in Muslim communities, including in his own neighborhood. *Id.* ¶ 121. Mr. Algibhah refused because doing so violated his sincerely held personal and religious beliefs and would require him to act in a deceptive manner in his community. *Id.* ¶ 122. In retaliation for his refusal to become an informant, and to pressure him to reconsider, FBI agents placed Mr. Algibhah on the No Fly List. As a result, he suffered economic losses and was unable to see his wife and children for six years. *Id.* ¶ 144.

Defendants Francisco Artusa and John Doe 4 first approached Mr. Algibhah in December 2009, when they arrived unannounced at Mr. Algibhah's workplace. *Id.* ¶ 119. Agents Artusa

and Doe 4 escorted Mr. Algibhah to their van, where they questioned him about his Muslim friends and acquaintances, as well as his religious practices and work history. *Id.* ¶ 120. After Mr. Algibhah answered their questions, Agents Artusa and Doe 4 asked him to work for the FBI as an informant, specifically requesting that Mr. Algibhah infiltrate a mosque in Queens and act like an "extremist" in online Islamic forums. *Id.* ¶ 121. Mr. Algibhah declined, because doing so would have violated his sincerely held personal and religious beliefs and would have required him to act in a deceptive manner in his community. *Id.* ¶¶ 121–22. The agents did not accept his refusal, and pressed Mr. Algibhah to inform on members of his community, and offering him money and assistance with bringing his family in Yemen to the United States. *Id.* Mr. Algibhah again told Agents Artusa and Doe 4 that he would not work as an informant for the FBI. *Id.* Mr. Albighah believes that he was placed on the No Fly List shortly after this encounter. *Id.* ¶ 124.

In May 2010, Mr. Algibhah went to Kennedy Airport to fly to Yemen to visit his wife and daughters, but airline personnel refused to give him a boarding pass. *Id.* ¶ 125. Shortly thereafter, a group of government officials surrounded him, and told him he would not be permitted to fly. *Id.*

At the direction of those officials, Mr. Algibhah filed a TRIP complaint. After having no response for several months, Mr. Algibhah purchased another ticket to Yemen for September 2010, but was again denied boarding. *Id.* ¶¶ 126–27. His TRIP complaint was subsequently denied, and he requested the materials to appeal the determination. *Id.* ¶ 128.

In June 2012, after Mr. Algibhah asked his elected representatives for help, Agents Artusa and John Doe 5 stopped Mr. Algibhah in his car and told him that "Congressmen can't do shit for you; we're the only ones who can take you off the list." *Id.* ¶ 131. Agent Artusa told Mr. Algibhah that he would have to answer additional questions and, if he cooperated, he would be

taken off the List. *Id.* Believing that he had to answer these questions to be removed from the List, Mr. Algibhah answered Agent Artusa and Doe 5's questions about his family, community, religious practices, and politics. *Id.* ¶ 132.

After posing their questions, Agents Artusa and Doe 5 renewed their demand that Mr. Algibhah work for them as an informant, telling him that they wanted him to go on Islamic websites and "act extremist." *Id.* ¶ 133. Mr. Algibhah, understanding this to be part of an essential condition for his removal from the List, told Agents Artusa and Doe 5 that he needed time to consider whether he could work for them as an informant, and asked to be taken off the List. *Id.* ¶ 134. Agent Artusa told Mr. Algibhah that he could be removed from the List in as little as a week. *Id.* In a call ten days later, Agent Artusa said that he was working on removing Mr. Algibhah from the List, but it would take a month or more to do so, and reiterated that only the FBI could remove his name from the List. *Id.*

After this recruitment attempt, Mr. Algibhah decided to retain counsel, who contacted Agent Artusa. *Id.* ¶ 136. Agent Artusa confirmed to Mr. Algibhah's counsel that he could assist in removing Mr. Algibhah's name from the List, but said that he wanted Mr. Algibhah to go on Islamic websites to look for "extremist" discussions, and perhaps undertake more "aggressive information gathering." *Id.*

In May 2013, Agent Artusa called Mr. Algibhah directly to ask for a meeting about getting off the List. *Id.* ¶ 139. Mr. Algibhah directed Agent Artusa to his counsel, who reached out to Agent Artusa that same day. *Id.* ¶¶ 139–40. Agent Artusa told counsel that he still wanted to speak to Mr. Algibhah, but Mr. Algibhah was not in any trouble. *Id.* ¶ 140. Mr. Algibhah did not wish to speak to Agent Artusa and so did not follow up on his counsel's call. Neither Mr. Algibhah nor his counsel heard from Agent Artusa after that time. *Id.* ¶ 141. Mr. Algibhah did

not receive official confirmation of his removal from the List until June 2015, after filing suit. Dkt. 92, Letter Withdrawing Opp'n to Def. Mot. to Stay.

### C.   Plaintiff Naveed Shinwari

In 2012, the FBI tried to recruit Mr. Shinwari to be an informant on Muslim communities. *Id.* ¶¶ 147–156. He refused because, among other things, becoming an informant would violate his sincerely held personal and religious beliefs and would require him to act in a deceptive manner in his own community. *Id.* ¶ 157. FBI agents placed or maintained Mr. Shinwari on the No Fly List in retaliation for his refusal to become an informant, and to pressure him to reconsider. As a result, he was prevented from seeing his wife and family in Afghanistan, lost a job, was caused serious economic and emotional distress, and became reluctant to attend religious services. *Id.* ¶ 170–71.

In February 2012, Mr. Shinwari and his mother were travelling from Kabul, Afghanistan to Omaha, Nebraska, where he was living at the time. *Id.* ¶ 146. While in transit in Dubai, United Arab Emirates, they were prevented from boarding their flight to Houston, Texas. *Id.* Airport security officials in Dubai confiscated Mr. Shinwari's passport, made him wait for several hours, and then returned his passport and informed him that he would need to contact the United States embassy before he could fly. *Id.*

While waiting in a hotel, Mr. Shinwari received a call from Agent Steven LNU, who asked Mr. Shinwari to come to the United States consulate in Dubai the next day. *Id.* ¶ 147. Mr. Shinwari did so, and met with Agents Steven LNU and John C. Harley III. *Id.* ¶ 148. The agents took Mr. Shinwari into an interrogation room and questioned him for over three hours, asking whether he had visited any training camps during his trip to Afghanistan and whether he was associated with any "bad guys." *Id.*

Agents Steven LNU and Harley also asked Mr. Shinwari questions about the mosque he attended, his religious activities and his personal background. *Id.* The agents repeatedly asked Mr. Shinwari to take a polygraph test, saying that doing so would help him return home to the United States; Mr. Shinwari declined, as he was telling the truth. *Id.* ¶ 149.

At the end of their interrogation, Agents Steven LNU and Harley told Mr. Shinwari they would need to speak to "higher-ups" in Washington, D.C. before allowing him to fly. *Id.* ¶ 150. After waiting in Dubai for days, Mr. Shinwari and his mother were allowed to fly to the United States so long as they purchased new tickets on a U.S.-based airline. They flew from Dubai to Virginia on March 1, 2012. *Id.*

When they landed at Dulles International Airport in Virginia, Mr. Shinwari was met by Defendants FBI Agents Michael LNU and Gregg Grossoehmig, who escorted Mr. Shinwari to an interrogation room at that airport. *Id.* ¶ 152. Agents Michael LNU and Grossoehmig questioned Mr. Shinwari for two hours, telling him they needed to "verify" everything Mr. Shinwari had previously told Agents Steven LNU and Harley in Dubai. *Id.* ¶ 153. Mr. Shinwari again answered the agents' questions truthfully, but was told that FBI agents would visit him at home in Omaha. *Id.* Mr. Shinwari was released, and flew home to Omaha with his mother, arriving six days later than planned and having been forced to purchase a new set of tickets. *Id.* ¶ 154.

In mid-March 2012, Agents Michael LNU and John Doe 6 appeared without warning at Mr. Shinwari's home. *Id.* ¶ 155. They questioned him again about the same topics that had been raised in prior interrogations—Mr. Shinwari's religion and personal background. *Id.* Mr. Shinwari again answered the questions truthfully. *Id.*

During this third interrogation, Agents Michael LNU and Doe 6 told Mr. Shinwari that they knew that he was unemployed and that they were willing to pay him to be an informant for

the FBI. *Id.* ¶ 156. Mr. Shinwari declined based on his personal and religious objections. *Id.* ¶¶ 156–57.

Later that month, Mr. Shinwari attempted to board a flight from Omaha to Orlando, where he had obtained temporary employment, but was denied a boarding pass at the airport. *Id.* ¶ 158. An airline agent told Mr. Shinwari that his ticket could not be processed, and police officers then approached Mr. Shinwari at the ticket counter and told him that he was on the No Fly List. *Id.*

Mr. Shinwari's placement on the No Fly List meant that he could not take the job in Orlando, causing him significant financial hardship. It also meant he was unable to visit his wife and family in Afghanistan or his father in Virginia. *Id.* ¶ 160. Greatly distressed, Mr. Shinwari emailed Agent Harley on March 12, 2012, and asked for help. *Id.* ¶ 161. Agent Harley did not respond, but the next day, Agents Michael LNU and Doe 6 returned unannounced to Mr. Shinwari's home, and again asked Mr. Shinwari to become an FBI informant. *Id.* The agents offered Mr. Shinwari both financial compensation and other assistance, telling Mr. Shinwari that if he helped the FBI, the FBI could help him. *Id.* Mr. Shinwari again declined, even though he understood the agents to be offering to remove him from the List. *Id.*

Mr. Shinwari retained counsel and they met with Agents Dun and Langenberg. They asked Mr. Shinwari a number of questions, and Mr. Shinwari answered their questions truthfully. *Id.* ¶ 163. The FBI agents refused to confirm or deny that Mr. Shinwari was on the List, but did ask him why he might have been placed on a watch list. *Id.* ¶ 164. They also told Mr. Shinwari that the agents might be able to get him a one-time waiver to fly in case of an emergency. *Id.*

On March 18, 2013, Mr. Shinwari emailed Agent Langenberg to inquire about obtaining a one-time waiver to fly to Afghanistan. *Id.* ¶ 165. Agent Langenberg never replied, *id.*, and Mr.

Shinwari submitted two TRIP complaints, ultimately receiving a response stating only that the Government had "made updates" to its records. *Id.* ¶ 168. In March 2014, Mr. Shinwari purchased a round-trip ticket to Connecticut and flew there and back. *Id.* ¶ 169. Mr. Shinwari did not receive official confirmation of his removal from the No Fly List until June 2015, after filing suit. Dkt. 92, Letter Withdrawing Opp'n to Def. Mot. to Stay.

**PROCEDURAL HISTORY**

Plaintiffs and Awais Sajjad filed the Amended Complaint in April 2014 against a number of senior government officials and the individual FBI agents with whom they interacted, seeking removal from the List and monetary damages under the Religious Freedom Restoration Act, among other forms of relief. Dkt. 15, Am. Compl. Shortly before oral argument on the defendants' motion to dismiss, each plaintiff received a letter from the government stating that the government "kn[ew] of no reason they should be unable to fly." Dkt. 92, Letter Withdrawing Opp'n to Def. Mot. to Stay. For that reason, Plaintiffs ultimately agreed to dismiss their official capacity claims for injunctive relief regarding their placement on the List, leaving, in relevant part here, the claims for monetary damages against defendants in their individual capacities under the Religious Freedom Restoration Act. Dkt. 105, Letter Dismissing Claims. The Court granted Defendants' motion to dismiss those claims on the ground that RFRA did not permit monetary damages. Dkt. 104, Order Granting Mot. to Dismiss Am. Compl. Plaintiffs appealed that decision, the Second Circuit reversed, and Defendants sought and obtained certiorari from the Supreme Court. In December 2020, the Supreme Court ruled unanimously that monetary damages were permitted under RFRA and remanded the case for further proceedings. Defendants subsequently filed the instant motion to dismiss, asserting qualified immunity, lack of personal jurisdiction and, a failure to state a claim under Federal Rule of Civil Procedures 12(b)(6).

**LEGAL ARGUMENT**

**I.   RESOLUTION OF DEFENDANTS' QUALIFIED IMMUNITY DEFENSE WOULD BE PREMATURE**

Qualified immunity is more appropriately addressed at the summary judgment stage when the Court will have the benefit of a developed factual record. Because Plaintiffs have alleged complex coordination among Defendants and other FBI agents as to each Plaintiff, fact development is necessary to assess the merits of the defense. While a qualified immunity defense can be asserted in a Rule 12(b)(6) motion, qualified immunity is "often best decided" at that later stage of litigation because "the details of the alleged deprivations are more fully developed" on a motion for summary judgment. *Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013); *see also King v. Simpson,* 189 F.3d 284, 289 (2d Cir. 1999) (finding that more facts were necessary to determine qualified immunity at the motion to dismiss stage); *Kaplan v. County of Orange*, 528 F.Supp.3d 141, 166 (S.D.N.Y. 2021) ("The evidence supporting a finding of qualified immunity is normally adduced during the discovery process and at trial, [and thus,] the defense of qualified immunity [usually] cannot support the grant of a [Rule 12(b)(6)] motion for failure to state a claim." (Internal citation omitted).

The Second Circuit recognizes that the analysis of whether a law is "clearly established" for purposes of a qualified immunity analysis "must be particularized to the facts of the case." *Horn v. Stephenson*, 11 F.4th 163, 169 (2d Cir. 2021). Plaintiffs pleaded coordinated conduct that transpired over a period of nearly seven years, involving sixteen different individual defendants, including some whose identities have not yet been confirmed. *See* Am. Compl. ¶¶ 68–196. Defendants themselves ask the Court to examine their "particular conduct" in light of the "specific context" in which they acted, an inherently fact-based inquiry which may turn on information Plaintiffs can only acquire through discovery. *See* Mot. to Dismiss at 20, 22.

Examining Defendants' conduct and "particularizing" the legal analysis to that conduct is impossible without discovery, including that necessary to establish the identities of some of the Defendants. *See Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U, Will Cty., Ill.*, 46 F.3d 682, 688 (7th Cir. 1995) ("When a collective body such as a school district takes a complex series of actions over a span of years, it may be difficult to pin down individual responsibility without discovery. If the complaint cannot survive a motion [to dismiss] until each person's role is known, however, it may be impossible as a practical matter to obtain complete relief."); *see also Attkisson v. Holder*, 925 F.3d 606, 637 (4th Cir. 2019) ("[T]he difficulty a plaintiff faces in identifying pre-filing a particular wrongdoer that works for a multi-member organization, like the government, is one of the reasons courts allow a plaintiff to sue unnamed wrongdoers and to use pre-trial discovery to identify the wrongdoers' identities.").

The cases cited by Defendants involve more typical qualified immunity issues where all the facts were established and the conduct occurred over a short period of time. For example, in *Wood v. Moss*, the Supreme Court examined whether "secret service agents engaged in crowd control" would have understood a First Amendment obligation "to ensure that groups with different viewpoints are at comparable locations at all times." *Wood,* 572 U.S.744, 759–60 (2014). The identities of the defendants were known, the events took place during a single day, and the court even had the benefit of a map showing various actions at issue. In *Hunter v. Bryant*, qualified immunity turned on whether particular agents had probable cause to arrest a man who made threats against the president—a case premised on quick decisions during a limited time period and based on the "probable cause" standard, which is heavily favorable to law enforcement. 502 U.S. 224 (1991). Similarly, in *White v. Pauly*, 137 S. Ct. 548 (2017), a single police officer was sued for shooting and killing an armed occupant in a house—again a

single act presenting clear legal question. Those cases, therefore, do not support the Court addressing qualified immunity in this matter through a motion to dismiss.

## II.    THE COURT SHOULD ADDRESS BOTH PRONGS OF THE QUALIFIED IMMUNITY ANALYSIS

If the Court decides to address the question of qualified immunity now, Defendants are not entitled to qualified immunity. In determining whether officials are entitled to qualified immunity, courts consider (1) whether the facts presented "make out a violation of a constitutional [or statutory] right, and (2) whether the right at issue was 'clearly established' when it was allegedly violated." *Torcivia v. Suffolk County*, 17 F.4th 342, 367 (2d Cir. 2021) (internal citations omitted). Although the Supreme Court previously required courts to consider these two prongs sequentially in all circumstances, *see Saucier v. Katz,* 533 U.S. 194 (2001), courts are now free to use their "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As described below, under both prongs of the analysis, Defendants are not entitled to qualified immunity. Regardless of the Court's ultimate decision on that question, however, analysis under both prongs will provide necessary guidance to public officials and set important precedent, which will assist courts considering similar claims in the future.

### A.    Addressing the First Prong of the Qualified Immunity Test Is Necessary to Aid in the Development of Law and Limit Abuses

This is one of the first opportunities, after the Supreme Court's decision in *Tanzin v. Tanvir*, for a court to consider a qualified immunity defense related to a RFRA damages claim. Therefore, the ruling on this motion will play an important role in helping to "guide local officials in safeguarding the First Amendment rights of constituents in challenging

circumstances." *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017) (exercising discretion to address the *Saucier* prongs in order). Bypassing the first prong of the test "threatens to leave standards of official conduct permanently in limbo." *Camreta v. Greene* 563 U.S. 692, 706 (2011). "For this reason, [the Supreme Court has] permitted lower courts to avoid avoidance— that is, to determine whether a right exists before examining whether it was clearly established." *Id.*. Here, the Court should examine the first prong to help establish that the conduct alleged by Plaintiffs constitutes a violation of their constitutional and statutory rights and to guide the future conduct of federal law enforcement officials. *See id.* at 702 (noting that government officials could continue to "persist in [a] challenged practice" while "avoid[ing] liability" if multiple courts continue to dismiss claims without exploring first prong of test).

In addition, analysis under the first prong of the qualified immunity test aids the judiciary by "further[ing] the development of Constitutional precedent." *Plumhoff v. Rickard,* 572 U.S. 765 (2014) (Court exercised discretion to first decide constitutional merits of Fourth Amendment excessive force claim to aid in "develop[ing] constitutional precedent" in cases where defendant asserts qualified immunity defense); *see also Pearson,* 555 U.S. at 237 (noting that "the first prong of the *Saucier* procedure is intended to further the development of constitutional precedent."); *Fazaga v. FBI*, 965 F.3d 1015, 1031 (9th Cir. 2020) (beginning with first prong of *Saucier* in order to interpret definition of "electronic surveillance" under FISA). If the Court only addresses the second *Saucier* prong, courts considering similar issues in the future will have a blank slate rather than the guidance of precedent. *See Martinez v. City of Clovis*, 943 F.3d 1260, 1270 (9th Cir. 2019) ("Even in difficult cases, our court tends 'to address both prongs of qualified immunity where the two-step procedure promotes the development of constitutional precedent in an area where this court's guidance is... needed.'") (internal citations omitted).

**B.      Lack of Oversight Has Made the No Fly List Ripe for Persistent Abuse**

The need for judicial guidance on appropriate use of the No Fly List is particularly

important. The FBI's power over the List has produced a secretive system ripe for abuse,

including abuses similar to those Plaintiffs' endured. While the FBI Terrorist Screening Center

("TSC") maintains the master watchlist on the Terrorist Screening Database ("TSDB"), of which

the No Fly List is a sub-set, the FBI is the primary organization that adds persons to it, *see* Am.

Compl. ¶ 19–20, and has developed what a leading scholar refers to as a "proprietary" interest

over the No Fly List. Brief for Jeffrey D. Kahn as Amicus Curiae Supporting Respondents

("Kahn Amicus Brief") at 5, *Tanvir*, 141 S. Ct. 486, (No. 19-71). Under the FBI's control of the

TSDB, it has swelled from a handful of individuals in 2001 to 1.2 million by 2017, including

4,600 American citizens or lawful permanent residents— the vast majority of whom are Muslim.

*See Elhady v. Kable*, 993 F.3d 208, 213 (4th Cir. 2021).

The FBI's power over the List proceeds without rigorous standards or constraint. The

TSC's final inclusion determination merely needs to meet a "reasonable suspicion" standard that

the individual is a known or suspected terrorist, *see id.* at 214, a standard that is broadly

permissive. Kahn Amicus Brief at *11–14. Compounding the low threshold for inclusion, the

official Watchlisting Guidance from 2013 advises that "concrete facts are not necessary" to

render such a determination, urging decision-makers to credit "inferences" by FBI nominating

officials and credibly weigh "uncorroborated" information. *See* Nat'l Counterterrorism Ctr.,

Watchlisting Guidance 34 (2013), https://www.eff.org/files/2014/07/24/2013-watchlist-

guidance_1.pdf. The notoriously elastic criteria for FBI nominations to the master Watchlist,

including the No Fly List, also explicitly permits consideration of First Amendment-protected

activity, including religious affiliation, so long as it does not form the "sole" basis for inclusion.

*See Mohamed v. Holder*, 995 F. Supp. 2d 520, 531–32 (E.D. Va. 2014) (lax protocols ensure that

"an American citizen" can "find himself labeled a suspected terrorist because of a 'reasonable suspicion' based on a 'reasonable suspicion.'"); Jeremy Scahill and Ryan Devreaux, *The Secret Government Rulebook for Labeling You a Terrorist,* The Intercept (Jul. 23, 2014), https://theintercept.com/2014/07/23/blacklisted/.

The lack of oversight has contributed to a culture of unaccountability. For instance, when Plaintiff Algibhah petitioned members of Congress to be taken off the List, agents told him "Congressmen can't do shit for you; we're the only ones who can take you off the list." Am. Compl. ¶ 131. Such experiences are, unfortunately, indicative of a larger and problematic pattern. For example, Dr. Rahinah Ibrahim found herself on the List because an FBI agent accidently checked the wrong box on a form after interviewing her as part of an outreach program targeting mosques in San Francisco, an error the government only discovered immediately after Dr. Ibrahim filed suit. *See Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1158–59, 1163 (9th Cir. 2019). The government knew "all along" that Dr. Ibrahim "did not belong on the list," yet it litigated against her for almost a decade, only admitting its mistake two months before trial. *Id.* at 1159, 1162–1163.

### C.    The FBI Has Not Been Held Accountable for Targeting and Pressuring Muslims to Become Informants

The unencumbered growth of the List has proceeded by targeting Muslim individuals who make up a significantly disproportionate number of the names on the List. The FBI has engaged in widespread, nationwide targeting of American Muslim communities for surveillance and intelligence-gathering. Am. Compl. ¶ 36. The FBI focused on aggressively recruiting and deploying informants in American Muslim communities, organizations, and houses of worship. *Id.* ¶¶ 36, 67. The FBI's near exclusive focus on Muslims, including heavy recruitment of informants, is based on law enforcement agents reflexively conceptualizing Muslim communities

as potential terrorist threats. *See* Shirin Sinnar, *Separate and Unequal: The Law of "Domestic"* *and "International" Terrorism*, 117 Mich. L. Rev. 1333, 1335 (2019). One FBI agent spoke publicly about the pressure agents feel to recruit informants as part of investigations, which boosts office statistics and leads to more funding. *See* Janet Reitman, *I Helped Destroy People,* N.Y. Times (Sept 9, 2021), https://www.nytimes.com/2021/09/01/magazine/fbi-terrorism-terry-albury.html.  Muslim civil rights leaders have come to label the List as a "Muslim registry." Charlie Savage, *Judge Rules Terrorism Watchlist Violates Constitutional Rights*, N.Y. Times (Sept. 4, 2019), https://www.nytimes.com/2019/09/04/us/politics/terrorism-watchlist-constitution.html. Muslim individuals targeted by the List suffer a series of significant harms, including stigmatization, separation from families, loss of business opportunities, and getting stranded in foreign countries. *See* Homa Khaleeli, *The Perils of 'Flying While Muslim'*, The Guardian (Aug. 8, 2016), https://www.theguardian.com/world/2016/aug/08/the-perils-of-flying-while-muslim.

At the community level, Muslim civil rights leaders underscore that the targeting of Muslims and Arabs on the List "just confirms the type of engagement the government has with our community — as seeing us as perpetual suspects." Jeremy Scahill & Ryan Devereaux, *Watch Commander: Barack Obama's Secret Terrorist-Tracking System by the Numbers*, The Intercept (Aug. 5, 2014), https://theintercept.com/2014/08/05/watch-commander/ (quoting Dawud Walid, Executive Director, CAIR-Michigan). That reflexive law enforcement characterization, paired with the absence of oversight or accountability permits other abuses of the kind alleged here. For example, Aswad Khan, visiting the U.S. on a tourist visa after graduating from a U.S. university, was placed on the List after the FBI approached him and offered to pay him and support him in obtaining citizenship if he became an informant. *See* Murtaza Hussain, *The Pariah: He Declined*

*FBI Informant Offer, Then His Life Was Ruined*, The Intercept (Nov. 30, 2021),

https://theintercept.com/2021/11/30/fbi-informant-watchlist-reputation-damage/. Khan declined,

unwilling to spy on people during prayer. *See id.* Shortly thereafter, his friends, acquaintances,

and the people he was connected to on social media were stopped at the U.S. border and

questioned about their relationship with Khan. *See id.* As a result, Khan ultimately lost friends,

experienced depression and has not been able to travel back to the US for almost ten years. *See*

*id.* Yet there have been no consequences for the FBI's attempt to coerce Khan based on his faith.

Similarly, Ashraf Maniar, a Muslim-American citizen, was contacted by the FBI after

British authorities arrested his friend in the United Kingdom. *See* Murtaza Hussain, *One Man's*

*No-Fly List Nightmare*, The Intercept, (May 30, 2021), https://theintercept.com/2021/05/30/no-

fly-list-terrorism-watchlist/. The FBI initially told Maniar that it had no negative information

about him, but still placed him on the List soon after he traveled to Saudi Arabia on a religious

pilgrimage and to Syria to distribute food, medicine and clothing to refugees. *See id.* The

government removed Maniar from the List after he filed an injunctive suit and defeated the

government's motion to dismiss. *See id.*; *Maniar v. Wolf*, Civ. A. No. 18-1362, 2020 WL

1821113 (D.D.C. April 10, 2020).

Other cases also reflect an FBI pattern to evade accountability:  effectively evading

review by, as here, responding to legal actions by belatedly removing an individual from the List,

rather than defend their practice on the merits. The plaintiff in *Fikre v. FBI*, made similar

allegations, although that court found that the plaintiff's RFRA claims were untimely and did not

address the merits. No. 313-cv-00899, 2019 WL2038724, at *8–9 (D. Or. May 8, 2019). The

FBI's response highlights that, as in this case, people placed on the List may never have been a

threat in the first place. The practice of the government of removing people from the List after

they sue means that plaintiffs voluntarily dismiss actions before a court can meaningfully

adjudicate the legality of the FBI's practices. *See, e.g.*, Notice of Voluntary Dismissal, *Chebli v.*

*Kable*, No. 1:21-cv-0937 (D.D.C. May 12, 2021), ECF No. 4 (voluntarily dismissing declaratory

and injunctive claims under RFRA after being removed from List). Absent some form of judicial

review, the FBI can continue to operate without applying proper standards for inclusion on the

List and only assess the basis for the placement if the individual goes   through the effort of

suing.

    If the Court decides qualified immunity at this stage in the litigation, it is an opportunity

to consider the lawfulness of Defendants' conduct and provide guidance to federal law

enforcement officials in the future. Accordingly, if this Court considers qualified immunity now,

it should exercise its discretion to examine whether Plaintiffs have alleged a violation of a right in

the first instance, and then examine whether that right was clearly established.

## III.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

    Defendants are not entitled to qualified immunity because their conduct "violate[s]

clearly established statutory or constitutional rights of which a reasonable person would have

known." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks

omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The right must be defined at

the appropriate level of specificity, *Anderson v. Creighton*, 483 U.S. 635, 641 (1987), and the

Supreme Court has stated that even general statements of law are capable of giving "fair and

clear warning, and in other instances a general constitutional rule already identified in the

decisional law may apply with obvious clarity to the specific conduct in question, even though

'the very action in question has [not] previously been held unlawful.'" *U.S. v. Lanier*, 520 U.S.

259, 271 (1997) (quoting *Anderson*, 483 U.S. at 640). The Free Exercise Clause, applied through RFRA, clearly prohibits the conduct alleged here.

When faced with a qualified immunity defense without identical precedent, courts can identify the "contours of a right" by examining case law in similar circumstances. *Vega v. Semple,* 963 F.3d 259, 278 (2d Cir. 2020). For example, in *Vega*, prison officials asserted a qualified immunity defense where prisoners brought claims regarding radon exposure. *See id.* at 266. The Court held that previous lawsuits seeking money damages for exposure to friable asbestos put the defendants on notice of inmates' Eighth Amendment right to be free from exposure to toxic substances, even though no previous suits had addressed radon. *See id.* at 278. Similarly, as described below, although no court has opined on the legality of the specific conduct alleged here, the contours of RFRA are established by previous jurisprudence on RFRA and the First Amendment.

Defendants have asked this Court to consider their qualified immunity defense on a motion to dismiss. That argument is therefore subject to "the more stringent standard applicable to this procedural route," and Plaintiffs are "entitled to all reasonable inferences from the facts alleged, not only those that support [their] claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). At this stage of the litigation, Plaintiffs only have to plausibly allege that Defendants substantially burdened Plaintiffs' religious exercise and that the right to be free of such burden was clearly established. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); 42 U.S.C. § 2000bb-1. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal* 129 S.Ct. 1937, 1949 (2009). As the Seventh Circuit explained, "the Court [in *Twombly* and *Iqbal*] is

saying... that the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (emphasis in original). This story can be supported by plausible inferences where a plaintiff fails to make a specific allegation. *See, e.g.*, *Duffelmeyer v. Marshall*, No. 07CV2807, 2008 WL 11517823, at *6 (S.D.N.Y. Mar. 24, 2008) (noting that although the complaint did not expressly allege the defendant police lieutenant's motive, qualified immunity was "appropriately denied because it is a plausible inference from the Complaint" that the defendant had a motive).

As a result, although qualified immunity "can be established" at the Motion to Dismiss stage, "motions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense [like qualified immunity] will generally face a difficult road...," *Garcia v. Does*, 779 F.3d 84, 97 (2d Cir. 2015), as the defendant must prove that "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Horn v. Stephenson,* 11 F.4th 163, 170 (2d Cir. 2021).[3] If the court "cannot decide the availability of qualified immunity as a matter of law," it must deny Defendants' Motion. *Id.* at 169. Plaintiffs have pled sufficient facts such that their allegations are "plausible," and are therefore entitled to discovery to test their claims. *See Twombly*, 550 U.S. at 570.

---

[3]     In a 2017 study of qualified immunity defenses across five federal jurisdictions, one scholar found that just 0.6% of cases were dismissed at the motion to dismiss stage, while four times that many were dismissed at summary judgment, highlighting the high burden defendants face when raising qualified immunity in a 12(b)(6) motion. *See* Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L. J. 1, Table 12 (2017).

### A.   Defendants Deprived Plaintiffs of the Right to Be Free of Substantial Burdens on Religion

Plaintiffs have brought claims under RFRA, which prohibits federal officials from placing a substantial burden on a person's exercise of religion unless the officials demonstrate that the burden (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. §§ 2000bb-1(a)–(b); *see Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430 (2006). RFRA's reach "ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997), *superseded on other grounds by statute*, 42 U.S.C. § 2000cc. Because RFRA liability attaches even when "the exercise of religion has been burdened in an incidental way by a law of general application," there is no need to show the government actors' intent or knowledge or even that "the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs." *Id.* at 535. Therefore, to satisfy the first prong of the *Saucier* test, Plaintiffs must show that Defendants' collective conduct substantially burdened Plaintiffs' free exercise of religion, regardless of Defendants' intent.

Plaintiffs have sufficiently alleged that Defendants' conduct substantially burdened Plaintiffs' exercise of religion by imposing an impermissible choice between freely exercising their religion and being able to travel. Plaintiffs allege that before this litigation was filed, FBI leadership had "promulgated, encouraged and tolerated a pattern and practice of aggressively recruiting and deploying informants in American Muslim communities, which the [Individual] Defendants implemented by exploiting the unarticulated and vague standards and the lack of procedural safeguards pertaining to the No Fly List." Am. Compl. ¶ 67. "[I]nstitutional and

supervisory pressure to increase the number of confidential informants in American Muslim communities" encouraged "FBI agents, including the [Individual] Defendants" to use "the No Fly List to retaliate against and coerce individuals in [American Muslim] communities [who had] refused to become informants" even though they did "not pose a threat to aviation safety." *Id.* ¶ 9; *see See* Reitman.

Further, the Amended Complaint alleges that all Plaintiffs here, like "[m]any American Muslims... and many followers of other religions, have sincerely held religious and other objections against becoming informants in their own communities, particularly when they are asked to inform on the communities as a whole rather than specific individuals reasonably suspected of wrongdoing." *Id.* ¶ 65; *see id.* ¶¶ 14–16. For Plaintiffs and others with their religious beliefs, "[a]cting as an informant would require them to lie and would interfere with their ability to associate with other members of their communities on their own terms." *Id.* ¶ 65. "[T]he exercise of Islamic tenets precludes spying on the private lives of others in their communities." *Id.*[4]

Plaintiffs have alleged facts showing that as part of the FBI's "pattern and practice" of aggressive recruitment in Muslim communities, *id.* ¶ 67, Defendants' collective conduct substantially burdened Plaintiffs' free exercise of religion. *First,* Defendants pressured Plaintiffs to abandon their sincerely held religious belief against acting deceptively in their religious community. *Second,* Defendants' coercion punished Plaintiffs' religious exercise by forcing them to incur the penalty of the List and social stigmatization when they refused to become informants.

---

[4]    Plaintiffs need not prove that fundamental tenets of their religion prohibit spying, only that their belief is "sincerely held." *See Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 682 (2014) (RFRA covers "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."). In any event, here, there is a clear Qur'anic prohibition on spying in these circumstances.

### 1.   Defendants Collectively Imposed the Substantial Burden

Plaintiffs are permitted to plead a cause of action based on collective action and the Court should not, as Defendants request, look at the conduct of "any of the Agents" individually to determine whether they violated Plaintiffs' right to freely practice their religion, Mot. to Dismiss, at 26.[5] The Second Circuit recognizes that Defendants can be liable even if they do not have final or exclusive responsibility for the actions at issue. "In this Circuit, a 'direct participant' includes a person who *authorizes*, *orders*, *or helps others* to do the unlawful acts, even if he or she does not commit the acts personally." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) (emphasis added) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)); *see also Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (explaining that, after *Iqbal*, "[p]ersonal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing his hands on him") (alteration in original) (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008)). A defendant may therefore be liable if he or she "set[s] in motion" a constitutional violation. *Veeder v. Nutting*, No. 1:10-CV-665 MAD/CFH, 2013 WL 1337752, at *11 (N.D.N.Y. Mar. 29, 2013) *rev'd on other grounds*, 588 Fed. App'x 18 (2d Cir. 2014) (denying a motion for summary judgment where there was evidence in the record that one of the defendants "set in motion" an illegal search); *see also Harrison v. Machotosh*, No. CV-91-2417, 1992 WL 135028, at *2 (E.D.N.Y. May 28, 1992) ("The requisite causal connection is satisfied if the defendant set in motion a series of events that

---

[5]    Defendants also ask the Court to determine whether damages would be "appropriate relief," in this circumstance. *See* Mot. to Dismiss at 25–26. This suggests that RFRA imposes a pleading standard, requiring Plaintiffs to plead that they are entitled to "appropriate relief" to survive a motion to dismiss. However, the inquiry on a motion to dismiss is not whether damages would be appropriate, but rather whether the plaintiffs have stated a claim. RFRA's language regarding "appropriate relief" refers to the existence of a cause of action, it does not create a pleading requirement. In any event, Plaintiffs have alleged that they suffered specific monetary damages, including unused plane tickets and lost employment, as a result of Defendants' actions.

the defendant knew or should have known would cause others to deprive the plaintiff of her constitutional rights.") (quoting *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988)); *Morrison v. LeFevre*, 592 F. Supp. 1052, 1077 (S.D.N.Y. 1984) (state actors may be liable if the deprivation of rights occurs as the "natural and foreseeable" consequence of their conduct).

With the benefit of all reasonable inferences, Plaintiffs plausibly allege through the Amended Complaint that the Defendants who interacted with each Plaintiff were part of a coordinated effort to coerce that Plaintiff into becoming an informant. Some of the evidence of coordination is nearly explicit, as when Defendant Tanzin told Mr. Tanvir to "cooperate" with the FBI agent who would be contacting him soon. Am. Compl. ¶ 92. Defendants Harley and Steven LNU told Mr. Shinwari they needed to "confer with higher ups" regarding next steps. *Id.* ¶ 150. The similarity of questioning across different defendants also supports an inference of coordination. For example, when Defendants Garcia and John LNU met with Mr. Tanvir in Queens, they asked Mr. Tanvir the same questions that Defendants Tanzin and John Doe #2/3. *Id.* ¶ 101. Similarly, Mr. Shinwari was asked substantially the same questions in interactions with agents in Washington, D.C. and in Dubai. *Id.* ¶ 153. Not only do these facts make the allegation of coordination plausible, but it is implausible to suggest that, by mere coincidence, multiple FBI agents approached the same Plaintiff in different places and happened to ask substantially similar questions, without any coordination within the single agency, and asked each Plaintiff to serve as an informant for that agency.

Because the "natural and foreseeable" consequences of Defendants' actions are ultimately questions of fact, Plaintiffs need not demonstrate at this stage that their injuries were proximately the result of each Defendant's actions. *See Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 216 (2d Cir. 2002) ("[F]oreseeability and causation... are issues generally and

more suitably entrusted to fact finder adjudication.") (second alteration in original) (internal quotations and citations omitted). Instead, Plaintiffs need only to have alleged facts from which the Court can reasonably infer that the Defendants individually took action that, in the aggregate, foreseeably infringed on Plaintiffs' right to the free exercise of religion. Furthermore, Plaintiffs did not need to allege that Plaintiffs "made these Agents (or any Agent) aware" that Defendants' conduct would burden their exercise of religion. Mot. to Dismiss at 30. Rather, Plaintiffs need to plead facts showing that such a burden was a foreseeable result of the agents' collective conduct. Plaintiffs have done so.

### 2. Defendants Violated Plaintiffs' Rights by Forcing Them to Choose Between their Religious Exercise and Their Ability to Travel

Defendants substantially burdened Plaintiffs' exercise of religion by presenting them with an impermissible choice that would have required them to transgress seriously held beliefs and modify their behavior in order to be removed from the List. A substantial burden "exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (alteration in original) (quoting *Thomas v. Review Bd. of the Indiana Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)); *see also Fazaga*, 965 F.3d at 1061 (substantial burden exists "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit," or are "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions" (quotation marks and citation omitted)). The Free Exercise Clause even protects against "indirect coercion," in which a promised benefit is denied unless a religious adherent changes their practice. *Espinoza v. Montana Dep't of Revenue,* 140 S.Ct. 2246, 2256 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017)).

Defendants forced Plaintiffs to choose between freely exercising their religion, on the one hand—by adhering to the Qur'an's prohibition on spying and acting deceptively in one's religious community, and by participating in religious spaces in the time and manner of their election—and, on the other hand, being able to travel by airplane. The fulcrum for the coercion was the No Fly List and each Plaintiff's need to travel. Defendants asked Mr. Algibhah to "participate in certain online Islamic forums and 'act like an extremist' Am. Compl. ¶ 121; asked Mr. Tanvir to inform on the Desi community, which would require Mr. Tanvir to engage with people in his community in a deceptive manner, *Id.* ¶ 84; and stopped Mr. Shinwari at multiple airports, asking him about videos of religious sermons he had watched and asking him to work as an informant. *Id.* ¶ 163. Each Plaintiff alleges that Defendants promised to remove him from the List if he answered questions from the agents agreed to act as an informant. *See id.* ¶¶ 102-04, 131-34, 161. Agents told Mr. Algibhah three times that they would remove him from the List if he agreed to serve as an informant. *See id.* ¶ 136. Plaintiffs only received confirmation that they were removed from the List after they sued. *See* Dkt. 92, Letter Withdrawing Opp'n to Def. Mot. to Stay.

The first substantial burden alleged is Defendants' attempts to coerce Plaintiffs to violate their sincerely held belief against spying on their religious community. The Amended Complaint alleges that "the exercise of Islamic tenets precludes spying on the private lives of others in their communities." *Id.* ¶ 65. In direct conflict with this belief, Defendants sought to exploit Plaintiffs' religious affiliation and have them act in a deceptive manner with their fellow Muslims by passing information to the FBI. *See id.* ¶ 84, 122, 157. This pressure on Plaintiffs to act at odds with tenets of their religion is plainly prohibited by RFRA. *See Wisconsin v. Yoder*, 406 U.S.

205, 218 (1972) (striking down law that compelled members of the Amish faith, under threat of sanction, "to perform acts undeniably at odds with fundamental tenets of their religious beliefs").

In addition to the pressure to violate an express prohibition of the Qur'an, Defendants' actions chilled Plaintiffs' religious exercise by using the List as a "stick" to influence how Plaintiffs participated in religious spaces. This "coercive pressure" constituted a substantial burden because it influenced Plaintiffs' "'real choice' about whether to participate in worship or prayer," *DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397, 412 (2d Cir. 2001) (citing *Lee v. Weisman*, 505 U.S. 577, 592, 595 (1992)). Under the First Amendment, Plaintiffs have a right to participate in religious spaces without government pressure. *See Lee v. Weisman*, 505 U.S. at 587 ("It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to... participate in religion or its exercise"). The Ninth Circuit has held that government surveillance of confessions, which the Catholic religion teaches to be confidential, imposes a substantial burden due to the chilling effect on church participation. *See Mockaitis v. Harcleroad*, 104 F.3d 1522, 1530 (9th Cir. 1997) (substantial burden would result from deterrence of participation in the Catholic sacrament of confession if prosecutors were entitled to tape confessions in a Catholic church). The First Amendment's protection extends to the manner in which religious adherents attend worship and practice their religion. *See, e.g. Tandon v. Newsom*, 141 S. Ct. 1294, 1297, 209 L. Ed. 2d 355 (2021) (per curiam) (COVID-19 public health restrictions which limited at home religious exercise while permitting comparable at home secular activities ran afoul of the Free Exercise Clause); *Roman Cath. Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63, 68, 208 L. Ed. 2d 206 (2021) (per curiam) (holding that "[t]he restrictions at issue here, by effectively barring many from attending religious services, strike at the very heart of the First Amendment's guarantee of religious liberty.").

Plaintiffs were predictably chilled from exercising their religion in a time, place, and manner of their choosing due to their knowledge that the FBI was seeking out ordinary Muslims like them to infiltrate their religious communities, that the FBI was monitoring their religious activity, and that Plaintiffs may have suffered social pressure if it became known that the FBI was interested in them. Agent Artusa and John Doe 5 asked Mr. Algibhah invasive questions about his places of worship and websites he visited, *see* Am. Compl. ¶ 132, and pressured him to participate in a Muslim online space in a deceptive way, *see id.* Am. ¶¶ 133, 137. Mr. Shinwari and Mr. Algibhah allege they were reluctant to participate in Muslim organizations and attended mosques less frequently after being approached repeatedly by federal agents. *See id.* ¶¶ 142, 171.

Due to their refusal to accede to the FBI's demands, Plaintiffs suffered severe consequences. As a result of Defendants' actions, Plaintiffs could not visit family members for years. *See id.* ¶¶ 104, 109, 143, 160. Mr. Tanvir and Mr. Shinwari both lost jobs because they were unable to fly to different parts of the country. *See id.* ¶¶ 95, 171. Mr. Algibhah was stigmatized by his community after the FBI approached his family and acquaintances, losing employment as a result. *See id.* ¶ 142. Furthermore, Defendants' actions caused each Plaintiff to suffer great distress. *See id.* ¶¶ 116, 144, 170. The imposition of these consequences as a direct result of Plaintiffs' religious affiliation reinforces the claim that Plaintiffs' exercise was substantially burdened.

Defendants' repeated citation to *El Ali v. Barr* for the proposition that pressure or coercion to serve as an informant could not amount to a RFRA violation is unavailing. *See* Mot. to Dismiss at 38, 40, 41, 45 (citing *El Ali v. Barr*, 473 F. Supp. 479 (D. Md. 2020)). As a preliminary matter, the defendants in *El Ali* did not contest that their conduct violated those plaintiffs' sincerely held religious beliefs. *See id.* at 527 ("Defendants do not contest that acting

as an informant is in fact at odds with [Plaintiffs'] sincerely held religious beliefs."). So *El Ali* has no bearing on the first prong of the qualified immunity analysis here. Moreover, the conduct of the defendants in *El Ali* was not as nearly coercive or egregious as what is alleged here. The relevant plaintiffs in *El Ali* were allowed to fly but were subject to interrogation and disruption during their trips. *See id.* Plaintiffs here were denied boarding on any flight over U.S. airspace for years, and so the pressure to become an informant was far more significant. The court in *El Ali* describes the plaintiffs as merely given "a chance to cooperate" which is quite distinct from the coordinated scheme of coercion as alleged in the Amended Complaint. *Id.* at 527.

### 3.    The TSC's Involvement Does Not Break the Causal Chain Between Defendants' Coercion and Plaintiffs' Burden

Plaintiffs have sufficiently pleaded facts supporting the inference that their placement and retention on the No Fly List was the result of their refusal to serve as informants. Defendants argue that because the TSC reviews and accepts nominations to the No Fly List, the Special Agent Defendants should be completely insulated from liability. *See* Mot. to Dismiss at 32–33. As a matter of law, however, third-party action does not break a chain of causation if that action was foreseeable. Defendants are and remain liable when they can "reasonably foresee that [their] misconduct will contribute to an 'independent' decision that results in a deprivation of liberty." *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000); *see also Kerman v. City of N.Y.*, 374 F.3d 93, 126 (2d Cir. 2004) ("[A]n actor may be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." (quoting *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1997)); *See also Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 688 (2d Cir. 1998) ("[A] defendant may be held liable for 'those consequences attributable to reasonably foreseeable intervening forces, including the acts

of third parties.'") (quoting *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1997)); *Kerman v. City of N.Y.*, 374 F.3d 93, 126 (2d Cir. 2004) (same).

In comparable circumstances, courts have found that third-party action did not break the causal chain. In *Warner v. Orange County Department of Probation* for example, the probation department recommended that the plaintiff attend the religious-based Alcoholics Anonymous program ("A.A."), and the sentencing judge subsequently adopted that recommendation. *See Warner*, 115 F.3d at 1070. The plaintiff asserted that the A.A. meetings forced him to participate in religious activity in violation of his First Amendment rights. *See id.* at 1069. Because of the "high likelihood" that the court would adopt the probation department's recommendation, the district court and the Second Circuit both concluded that the probation department could still be liable for violating the plaintiff's First Amendment rights even after the sentencing judge adopted its recommendation that he attend A.A. *Id.* at 1070–73; *see also Malley v. Briggs*, 475 U.S. 335 (1986) (magistrate judge's approval of police officer's application for a warrant did not shield officer from liability); *Myers v. Cnty. of Orange*, 157 F.3d 66, 73–74 (2d Cir. 1998) (despite assistant district attorney's independent decision to prosecute arrestee, police department was liable for its policy of only accepting the first complaint when multiple persons were injured in dispute); *Ross v. Lichtenfeld*, 755 F. Supp. 2d 467, 476 (S.D.N.Y. 2010), *rev'd on other grounds sub nom. Ross v. Breslin*, 693 F.3d 300 (2d Cir. 2012) (ultimate authority of school board to terminate employment did not shield school district superintendent from liability given his recommendation to fire employee).

Plaintiffs have sufficiently pleaded facts supporting the inference that Defendants were involved in placing or keeping Plaintiffs on the List because they refused to serve as informants. Each Plaintiff alleges that he found out he was on the List following agents' pressure to become

an informant. *See* Am. Compl. ¶¶. 96 (Tanvir), 125 (Algibhah), 158 (Shinwari). And the complaint alleges that Defendants promised to remove each Plaintiff from the No Fly List if he agreed to act as an informant. Along with the allegations that Defendants represented to Plaintiffs that they had the ability to remove them from the List, Plaintiffs allege that the FBI is one of the primary agencies responsible for making "nominations" to the Terrorist Screening Database ("TSDB")[6], *see* Am. Compl.¶ 41, and that "the TSC rarely rejects any of the names proposed for the TSDB," *id.* ¶ 47. Although the TSC is "responsible for reviewing and accepting nominations to the No Fly List from agencies, including the FBI," *id.* ¶ 20, the TSC's review and eventual approval is wholly foreseeable[7] and does not constitute an "intervening event" capable of breaking the causal connection between nomination and placement.

At the time of the events detailed in the Amended Complaint, placement on the List was supposed to be limited to individuals who were "known or suspected terrorist[s]" and about whom there was some additional "derogatory information" demonstrating that the person "pose[s] a threat of committing a terrorist act with respect to an aircraft." Am. Compl. ¶ 42 (second alteration in original). No Plaintiff has ever been a known or suspected terrorist or a potential or actual threat to civil aviation, nor could any Defendant have had a proper basis to believe that they were. *See id.* ¶¶ 108, 135, 166. Accordingly, there was no proper basis for placing or keeping any Plaintiff on the List, *see id.* ¶ 42, and Defendants' alleged conduct took advantage of the lack of procedural safeguards to use the List as a cudgel in their attempts to

---

[6]     As of October 2021 or later, the TSDB is referred to as the Terrorist Screening Dataset (TSDS). *See* DEX3, Dec. of Jason Herring ¶ 5, *Moharam v. FBI*, No. 21-cv-02607 (D.D.C. Jan. 18, 2022), ECF No 20-5.

[7]     "From FY2009 to FY2013, approximately 1.6 million individuals were nominated [to the TSDB] and only about 1% (just over 14,000) were rejected." Bjelopera et al, Cong. Research Serv., R44678, The Terrorist Screening Database and Preventing Terrorist Travel 10 (2016).

force the Plaintiffs into becoming informants —substantially burdening the exercise of their religious beliefs in the process.

Defendants' collective coercion burdened Plaintiffs' rights under RFRA to the free exercise of religion by forcing them to choose between their ability to travel, on the one hand, and adhering to the tenets of their religion and participating in religious spaces in the time and manner of their choosing, on the other. Therefore, Plaintiffs have pleaded a violation of right, meeting the first prong of the *Saucier* test.

### B.   Defendants Violated a Clearly Established Right

The second prong of the *Saucier* test is also satisfied here—Plaintiffs' right to the free exercise of religion in these circumstances was clearly established. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson*, 483 U.S. at 640). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Critically, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also United States v. Lanier*, 520 U.S. 259, 270 (1997). The defendants must only have had "fair warning" that their conduct was unlawful. *Hope* 536 at 740 (2002); *Taylor v. Riojas*, 141 S.Ct. 52 (2020) (rejecting qualified immunity for prison guards who engaged in sustained and obvious deliberate indifference despite absence of direct precedent). As described below, Defendants had "fair warning" that they were violating the law from jurisprudence addressing RFRA and the Free Exercise Clause.

35

### 1. Plaintiffs' Right to Participate in their Religious Community and to Refrain from Acting Deceptively Free from Coercion was Clearly Established

It was clearly established that the type of coercion applied by Defendants here would violate RFRA. As a baseline, RFRA itself put Defendants on notice that a substantial burden on the free exercise of religion would violate the law. Statutory provisions in existence at the time of an individual's conduct can help create "fair warning" for the officer that their conduct would violate a plaintiff's rights. *Okin v. Village of Cornwall-On-Hudson Police Dep't.,* 577 F.3d 415, 433–34 (2d Cir. 2009). Defendants were on notice of Plaintiffs' rights due to many decades of First Amendment jurisprudence, which RFRA was enacted to codify.

RFRA and First Amendment jurisprudence clearly enshrine the right to be free from government pressure that forces an individual to violate sincerely held religious beliefs. This includes requiring students to participate in prayer at school graduations, *see Lee v. Weisman,* 505 U.S. 577, 587 (1992) and mandating that employees of closely-held corporations fund contraception for other employees, *see Burwell v. Hobby Lobby Stores,* 573 U.S. 682 (2014). Pressure from government officials rises to the level of a substantial burden when it prevents an individual from participating in religious activity as a matter of a "genuine personal choice." *DeStefano* 247 F.3d at 412 (First Amendment is violated when atheist prisoners are pressured to attend support groups that require professing certain religious beliefs). Coercion that forces a religious adherent to be physically present in a space contrary to their beliefs has also been held unconstitutional. *See Yoder,* 406 U.S. at 218 (First Amendment protects Amish parents from being forced to send their children to school through age 16); *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) ("[T]he conduct alleged here—that Washington was severely punished for engaging in protected activity—rises to the level of a substantial burden on the free exercise of religion.").

The RFRA statute itself, along with many years of case law addressing religious liberty, sufficiently draws the "contours" of Plaintiffs' right to free exercise. In light of that authority, it would be unreasonable, to say the least, for Defendants to believe that their conduct, as alleged in the Amended Complaint, was appropriate and lawful. For example, it is hard to imagine any FBI agent could think they could lawfully use the No Fly List (or even threaten to use it) to coerce an observant Presbyterian to infiltrate a Bible study group, or a Catholic to record a confessional, or a Jew to spy on mourners while sitting shiva. And yet, Defendants contend that because no court has explicitly addressed the exact factual circumstances at issue here, there was no way they could have known that their conduct violated Plaintiffs' rights. *See* Mot. to Dismiss at 22. But the Supreme Court has clarified that its qualified immunity jurisprudence should not be construed to "say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful…" *Hope,* 536 U.S. at 739. Consistent with *Hope* and *Vega,* the Court can look to other sources to determine whether Defendants had fair warning about their "particular conduct."

It should be obvious to any reasonable official that Defendants' alleged harassment of law-abiding Muslims in order to use them to infiltrate Muslim spaces would substantially burden their exercise of religion. Defendants' conduct, as alleged in the Amended Complaint, reflects that they were aware of Plaintiffs' religious affiliations; indeed, that is precisely why they targeted them for recruitment, and probed them about their communities and their religious beliefs. *See* Am. Compl. ¶¶ 36–38, 66; 70, 76, 101 (Mr. Tanvir); 120–21, 136, 142 (Mr. Algibhah); 148, 153, 155–56 (Mr. Shinwari). The fact that Defendants were interested in discussions in Muslim spaces suggests that they understood that those were places of trust where people would speak honestly. Defendants explicitly sought to exploit this aspect of Muslim

communities. In light of these facts, Defendants clearly had "fair warning" that forcing Plaintiffs to choose between the ability to travel and informing on their communities would impose a substantial burden.[8]

Furthermore, it is plausible to infer that Defendants would have been aware of Plaintiffs' religious objections through their training and experience. Defendants' aggressive recruitment of Plaintiffs was part of a specialized, decades-long program seeking to infiltrate Muslim communities. Am. Compl. ¶¶ 8–10, 36–39, 63–67. This specialized program would have included briefing FBI employees on features of their targets' faith, likely including the clear Qur'anic prohibition on spying and acting deceptively among Muslims.

### 2.    Defendants Define the Relevant Right Too Narrowly

Defendants do not contest Plaintiffs' right to be free from substantial burden on their religion, but instead attempt to improperly narrowly define the right as "the right not to serve as an informant against others within the same religious community." Mot. to Dismiss, at 22. The Court should reject Defendants' attempt to "[c]haracterize[] the right too narrowly to the facts of the case." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2d Cir. 2001). In several cases, the Second Circuit has rejected assertions of qualified immunity that rested on a too narrow construction of the right at issue. *See Johnson*, 239 F.3d at 253 (claims asserting a right "'not to be struck by a teacher' construes the right too narrowly"); *LaBounty v. Coughlin*, 137 F.3d 68, 74 (2d Cir. 1998) (district court's description of issue as "right to be free from

---

8    RFRA itself does not require that a burden on the exercise of religion be intentional to make it a violation—it only requires that the burden be substantial. 42 U.S.C. § 2000bb-1; *Tanvir v. Tanzin*, 894 F.3d 449, 461 (2nd Cir. 2018) (RFRA's "[s]weeping coverage," "was designed to provide very broad protection for religious liberty," and "prohibit[s] official actions of almost every description and regardless of subject matter.") (quoting City of Boerne v. Flores, 521 U.S. 507, 532, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) and Hobby Lobby, 134 S.Ct. at 2767)); *City of Boerne v. Flores*, 521 U.S. 507, 535 (1997), superseded on other grounds by statute, 42 U.S.C. § 2000cc. (RFRA's substantial-burden test is so sweeping that it is more than "even a discriminatory effects or disparate-impact test.").

crumbling asbestos" was overly restrictive when a plaintiff alleged placement in unconstitutional prison conditions); *Husain v. Springer*, 494 F.3d 108, 132 (2d Cir. 2007) (where public college president cancelled student government election in response to content of student newspaper, court held "unlawfulness" of the school president's actions "was 'apparent' 'in the light of pre-existing law,'" despite lack of precedent involving chilling speech by specifically cancelling elections).

The cases cited by Defendants in support of their assertion of qualified immunity are inapposite, as they involve facts and claims substantively different than those alleged here. *Burns v. Martuscello*, 890 F.3d 77, 94 (2d Cir. 2018), which Defendants cite in support of their contention that there is no right not to be an informant, involved a *freedom of speech* claim, not a *free exercise* claim. *See* Mot. to Dismiss at 22 (citing *Burns* 890 F.3d at 94). Plaintiffs here do not allege a "right not to serve as an informant" under the Free Speech Clause, they assert their right to be free from a substantial burden on their exercise of religion, and the Court should consider whether *that* right was clearly established.

Plaintiffs have plausibly alleged that Defendants substantially burdened their clearly established right under RFRA to religious exercise, and therefore Defendants are not entitled to qualified immunity.

## IV.  PLAINTIFFS HAVE STATED A CLAIM AGAINST EACH INDIVIDUAL DEFENDANT FOR VIOLATING RFRA BY SUBSTANTIALLY BURDENING PLAINTIFFS' EXERCISE OF RELIGION

Plaintiffs have pleaded facts sufficient to sustain their claims against Defendants because each Defendant's actions—taken in the context of Defendants' concerted conduct—substantially burdened Plaintiffs' exercise of their religion. Accordingly, and for the reasons that follow, Defendants' motion to dismiss the claims pursuant to Rule 12(b)(6) should be denied.

As discussed above, a substantial burden on exercise of religion "exists where the [defendant] 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quoting *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981)); *see also Fazaga*, 965 F.3d at 1061 (substantial burden exists "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit," or are "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions" (quotation marks and citation omitted)). Here, Defendants' collective conduct placed significant pressure over a long period of time on Plaintiffs to inform on their religious communities.

As detailed in the Amended Complaint and summarized below, each individual Defendant took part in a protracted and escalating pressure campaign to convince Plaintiffs to inform on their religious communities despite the substantial burden that Defendants' conduct placed on the exercise of Plaintiffs' religion, and that campaign included placing or keeping the Plaintiffs on the No Fly List without justification. Interim steps in those campaigns— including repeated questioning, suggesting that individual travel waivers could be granted in exchange for providing information, attempting to coerce two Plaintiffs into taking polygraph tests, questioning family members and friends about one Plaintiff, and other similar tactics— all contributed to the ultimate goal of pressuring Plaintiffs into becoming informants in violation of their sincerely held religious beliefs, and otherwise substantially burdening Plaintiffs' exercise of religion.

### A.   Defendants FNU Tanzin, Garcia, John LNU, and John Does #1–3 Substantially Burdened Plaintiff Tanvir's Religious Exercise

As alleged in the First Amended Complaint, from February 2007 through at least November 2012, Defendants Tanzin, Garcia, John LNU, and John Does #1–3[9] subjected Plaintiff Tanvir to protracted and concerted pressure to become an FBI informant, which culminated in placing and keeping him on the List without justification. The agents asked Mr. Tanvir for information about the American Muslim community, asked about an old acquaintance, and asked him to become an informant. Am. Compl. ¶¶ 69–70. Mr. Tanvir was placed on the List by Agents Tanzin and/or Defendants John Does #1–3 at some time during or before October 2010 because he refused to become an informant against his community and refused to speak or associate further with the agents.[10] *Id.* ¶ 90. In December 2008, upon his return to the US from Pakistan, his passport was confiscated and he was searched and interrogated, from which it is a fair inference that his status on the TSDB had changed. *Id.* ¶ 71. The agents leveraged the confiscation of Mr. Tanvir's passport to attempt to coerce him into becoming an informant, threatening Mr. Tanvir with deportation and arrest. *Id.* ¶¶ 75–76,79. Over the next several weeks, Agents Tanzin and John Doe #2[11]  repeatedly showed up at Mr. Tanvir's place of employment to

---

[9]     Although John Doe #2 is proceeding as John Doe #2–3, Plaintiffs refer to both original named Defendants for clarity. *See* Mot. to Dismiss, at 9 n. 1.

[10]    While Defendants make liberal use of the term "conclusory" in their motion to dismiss, "well-pleaded factual allegations" such as this one must be taken as true at this stage of the litigation. *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006)

[11]    As noted above, the references to John Doe # 1 at ¶¶ 82–84 of the Amended Complaint are typographical errors. Those should have been references to John Doe # 2. Nevertheless, Mr. Tanvir has plausibly alleged that John Doe #1 substantially burdened his exercise of religion. Indeed, John Doe #1, accompanied by with Agent Tanzin, visited Mr. Tanvir in February 2007. Am. Compl. ¶ 69. This was prior to John Doe # 1's claimed retirement date of December 31, 2007. Dkt. 42, Decl. of John Doe #1. Although the topic of serving as an informant was not brought up in that discussion, only two days later, Agent Tanzin asked Mr. Tanvir to provide information about the Muslim community. Am. Compl. ¶ 70. Given that John Doe # 1 had helped conduct the first interview and in light of the short period of time between that initial interview and Agent Tanzin's request that Mr. Tanvir share information about the Muslim community, a plausible inference can be drawn that John Doe # 1 was involved in the formulation and/or implementation of the larger plan to pressure Mr. Tanvir to become an informant.

41

ask him additional questions, and to attempt to convince him to become an informant. *Id.* ¶¶ 82–84.

When Mr. Tanvir was unable to board a flight from Atlanta to New York City, Agent Tanzin told him a new agent would be reaching out to him soon. *Id.* ¶¶ 91–94. Shortly thereafter, Agent Garcia continued the pattern of coercion, telling Mr. Tanvir that she could help him get off of the List if he answered her questions, which were the same as those posed by Agents Tanzin and John Does #1-3. *Id* ¶¶ 94, 99–100. After Mr. Tanvir refused to answer questions, Agents Garcia and John LNU offered to help facilitate a one-time travel waiver if he promised to keep speaking with the agents and take a polygraph test. *Id.* ¶ 102-–04. As stated in the FBI's Domestic Investigations and Operations Guide, polygraph testing is part of the assessment type specifically for the recruitment of informants. Fed. Bureau of Investigation, U.S. Dep't of Justice, 0667DPG, Domestic Investigations and Operations Guide, §5.6.3.4.8 (J) (2013). When Mr. Tanvir again tried to visit his ailing mother in Pakistan November 2012, he was denied boarding, and another Special Agent told that him that he would not be removed from the List until he met with Agent Garcia. *Id* ¶ 104.

### B.   Defendants Artousa and John Does #4–5 Substantially Burdened Plaintiff Algibhah's Religious Exercise

From December 17, 2009 through at least November 2012, Defendants Artousa and John Does #4–5 subjected Plaintiff Algibhah to protracted and concerted pressure to become an FBI informant, which culminated in placing and keeping him on the List without justification.

On December 17, 2009 Artousa and John Doe #4 came to Mr. Algibhah's place of business, questioned him regarding his Muslim friends and acquaintances and his religious

observances, asked him to infiltrate a mosque, and asked him to inform on his religious community. *Id*. ¶¶ 120, 121. Mr. Algibhah declined. *Id*.

The next time Mr. Algibhah tried to board a flight, he was denied boarding. *Id*. ¶ 124. For years after, Mr. Algibhah tried in vain to have his name taken off the No Fly List, availing himself of the TRIP process and even enlisting the aid of the offices of United States Congressman Jose E. Serrano and Senator Charles Schumer. *Id*. ¶¶ 126–130.

Agents Artousa and John Doe #5 continued to leverage the No Fly List to pressure Mr. Algibhah. Agents Artousa and John Doe #5 stopped Mr. Algibhah's car in order to question him again about his religious practices, his religious community, and the people who attend his mosque. *Id*. ¶ 133. They asked him to visit Islamic websites and "act extremist" in order to cultivate information for them. *Id*. ¶ 131. They told Mr. Algibhah that they were the only ones who could take Mr. Algibhah off the list, and that they would do so if he acted as an informant. *Id*. ¶¶ 131, 134.

### C.   Defendants Steven LNU, Harley, Michael LNU, Grossoehmig, Dun, Langenberg, and John Doe #6 Substantially Burdened Plaintiff Shinwari's Religious Exercise

From February 26, 2012 through at least March 2013, Defendants Steven LNU, Harley, Michael LNU, Grossoehmig, Dun, Langenberg, and John Doe #6 subjected Plaintiff Shinwari to protracted and concerted pressure to become an FBI informant, which culminated in placing and keeping him on the No Fly List without justification.

On February 27, 2012, the day after he had been denied boarding in Dubai, Agents Steven LNU and Harley interrogated Mr. Shinwari about his activities in Afghanistan and his religious activities. *Id*. ¶ 148. The Agents informed Mr. Shinwari that they would confer with their superiors before allowing him to fly back to the United States. *Id*. ¶ 150. In addition, they

asked Mr. Shinwari to take a polygraph test, which, as noted above, is used for the assessment type specifically for the recruitment of informants. Fed. Bureau of Investigation, U.S. Dep't of Justice, 0667DPG, Domestic Investigations and Operations Guide, §5.6.3.4.8 (J)(2013). Upon his return to the United States, Agents Michael LNU and Grossoehmig interrogated Mr. Shinwari for another two hours at Dulles Airport, asking substantially similar questions as Agents Harley and Steven LNU, in order to "verify" his statements in Dubai. *Id.* ¶ 153.

One week later, Michael LNU and John Doe #6 appeared at Mr. Shinwari's home in Omaha, Nebraska and offered to pay him if he informed on Muslim communities. *Id.* ¶ 155–56. Mr. Shinwari declined. *Id.* A few weeks later, on March 11, 2012, he was denied boarding for a flight from Omaha to Orlando, and informed that he was on the List. *Id.* ¶ 158–59. The following day, Agents Michael LNU and John Doe 6 again visited his home in Omaha, and again asked Mr. Shinwari to become an informant. *Id.*

On March 21, 2012, Mr. Shinwari and his counsel met with Special Agent in Charge Weysan Dun and Assistant Special Agent in Charge James C. Langenberg at the FBI's Omaha Division. *Id.* ¶ 163. Agents Dun and Langenberg offered to look into obtaining a one-time waiver which would allow Mr. Shinwari to fly, leading Mr. Shinwari to believe that they "offered him the waiver in exchange for all the information he had provided them about himself," and "as a 'reward' for his agreement to submit to questioning and to encourage him to provide more information." *Id.* ¶¶ 163–164.

## V.   PLAINTIFFS REQUIRE LIMITED DISCOVERY TO ESTABLISH PERSONAL JURISDICTION OVER DEFENDANTS STEVEN LNU AND MICHAEL LNU; AGENTS HARLEY, GROSSOEHMIG, DUN, AND LANGENBERG; AND JOHN DOE 6[12]

To properly respond to Defendants' motion to dismiss for lack of personal jurisdiction, Plaintiffs require limited jurisdictional discovery to confirm whether Defendants' coordination involved a sufficient nexus with New York. *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (discussing standard for material relevant to personal jurisdiction). This discovery is likely to uncover additional facts supporting jurisdiction, and will create a complete record upon which the Court can make an ultimate ruling on the merits with respect to personal jurisdiction.

Upon challenge by the defendant, a district court should "take care 'to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). This rule is even more pronounced when the jurisdictional facts sought lie "peculiarly within the knowledge of the opposing party." *Sullivan v. Ringling Coll. of Art & Design, Inc.*, No. 19-CV-1302 (RA), 2019 WL 6529823, at *6 (S.D.N.Y. Dec. 4, 2019) (Abrams, J.) (quoting *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004)). When that is the case, as it is here, "[c]ourts generally require that plaintiffs be given an opportunity to conduct discovery." *Id.*

### A.   Allegations of Coordination Establish a Prima Facie Case That This Court Has Jurisdiction Over Defendants

The facts alleged in the Amended Complaint constitute "non-conclusory fact-specific allegations…showing that activity that constitutes the basis of jurisdiction has taken place,"

---

[12] Plaintiffs no longer seek jurisdictional discovery as to John Doe 12, as Mr. Sajjad is no longer a plaintiff.

*Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 18–19 (2d Cir. 2015) (citing

*Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 186 (2d Cir. 1998)). "Although "[t]he standard

for awarding jurisdictional discovery is low," a district court may still choose to deny such

discovery if a plaintiff cannot make out a *prima facie* case for personal jurisdiction in order to be

awarded discovery. *NetSoc, LLC v. Chegg Inc.*, No. 18-CV-10262 (RA), 2019 WL 4857340, at

*4 (S.D.N.Y. Oct. 2, 2019) (Abrams, J.) However, the facts of the Amended Complaint support a

*prima facie* showing of personal jurisdiction more than necessary to satisfy the "low" standard

for awarding jurisdictional discovery. *Universal Trading & Inv. Co. v. Credit Suisse (Guernsey)*

*Ltd.*, 560 F. App'x 52, 55–56 (2d Cir. 2014). *Bracken v. MH Pillars Inc.*, No. 15-CV-7302 (RA),

2016 WL 7496735, at *5 (S.D.N.Y. Dec. 29, 2016) (Abrams, J.) ("Even where a plaintiff has

failed to make a *prima facie* showing of personal jurisdiction, a court may allow for

jurisdictional discovery.").

     In New York, personal jurisdiction exists when government agents coordinated their

conduct and "la[id] the groundwork" for an investigation within the state. *See Kronisch v. United*

*States*, 150 F.3d 112, 131 (2d Cir. 1998) (CIA agent drugged plaintiff with LSD in Paris after

planning the testing program in New York). Importantly, personal jurisdiction can be established

through digital contacts with the state, *see Deutsche Bank Securities Inc. v. Montana Bd. of*

*Investment*, 7 N.Y.3d 65, 71–72 (N.Y. 2006) (holding that over-the-phone negotiations were

sufficient to establish personal jurisdiction)—physical presence within the state is not required

by the Federal Rules, the Constitution, or New York's Long Arm Statute. *See Walden v. Fiore*,

571 U.S. 277, 283 (2014) ("[A] nonresident's physical presence within the territorial jurisdiction

of the court is not required."); *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (N.Y. 1988)

(New York's Long Arm Statute "is a 'single act statute' and proof of one transaction in New

York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.").

Although physical presence within the state is simply not a requirement for personal jurisdiction, Defendants argument for lack of personal jurisdiction rests on their absence from New York, *see* Dkt. Nos. 43–49 (Declarations of Agents John Doe 6, Dun, Grossoehmig, Harley, Langenberg, Michael LNU, and Steven LNU, respectively); Dkt. No. 39 at 63 (expressly incorporated into Defendants' argument by Dkt. No. 128 at 46). Other activities would be sufficient to confer personal jurisdiction, for example coordination through the New York field office directly, or through the New York field office via Washington, D.C.

Jurisdictional discovery may find evidence of such coordination. Plaintiffs allege that Defendants were participants in the FBI's program to "track and manage" informants from "American Muslim communities," Am. Compl. ¶ 37, a program which also operated in New York. On multiple occasions, Defendants made clear to Mr. Shinwari that they operated in coordination with one another and with various FBI offices: While in Dubai, Defendants Harley and Steven LNU told Mr. Shinwari they had to "confer with higher-ups in DC" before they could allow him to fly. *Id.* ¶ 150. Days later, Agent Harley told Mr. Shinwari he received the "go-ahead" for Mr. Shinwari to fly, again implying consultation with others. *Id.* ¶ 151. After Mr. Shinwari landed at Dulles International Airport, Defendants Michael LNU and Agent Grossoehmig told him they wanted to "verify" what he told Agents Harley and Steven LNU. *Id.* ¶ 153. In Virginia, Defendants told Mr. Shinwari to expect a visit at his home in Omaha, and that subsequently happened when Agents Michael LNU and John Doe 6 "appeared at Mr. Shinwari's home." Am. Compl. ¶¶ 153, 155. John Doe 6 could not have known about Mr. Shinwari without

coordination among him, Michael LNU, and Agent Grossoehmig. Finally, Agent Harley told Mr.
Shinwari that if he helped the FBI, the FBI would help him in return, suggesting Agent Harley
had the ability to interface with people across FBI offices. Am. Compl. ¶ 161.

Jurisdictional discovery is likely to uncover evidence of Defendants' contacts with the
Southern District of New York. The New York office contained the FBI's first Joint Terrorism
Task Force (JTTF) in the country, and it has been described by a Bureau head as the
"granddaddy of them all." *Model Partnership: New York Joint Terrorism Task Force Celebrates
35 Years*, F.B.I. News (Dec. 8, 2015), https://www.fbi.gov/news/stories/new-york-jttf-celebrates-
35-years. Despite expansion of the JTTF model to over 100 cities nationwide, the FBI has
highlighted that relevant federal, state, and local agencies "work together to investigate and
prevent domestic and international terrorism." *Id.* Accordingly, it is plausible that Defendants,
even if not physically present in New York, coordinated with the New York JTTF office and
"la[id] the groundwork" of their interactions with Mr. Shinwari. *Kronisch*, 150 F.3d at 131.

## B. Defendants' Use of Declarations Underscores the Need to Allow Plaintiffs' Jurisdictional Discovery

Where affidavits are the basis for a motion to dismiss for lack of jurisdiction, limited
discovery "will lead to a more accurate judgment than one made solely on the basis of
affidavits." *GTFM Inc. v. Int'l Basic Source, Inc*., No. 01 Civ. 6203, 2002 WL 42884, at *2
(S.D.N.Y. Jan. 11, 2002). Defendants have submitted eight declarations to support their
contention that they were not physically present in New York, and thus this Court does not have
personal jurisdiction over them. As explained above, these declarations do not rebut personal
jurisdiction. Instead, they highlight the need for discovery to learn whether, and how, Defendants
acted in concert, and to what extent their actions involve New York. This information lies
exclusively with Defendants and the FBI. It would be impossible for Plaintiffs to allege

Defendants' connections with New York in more detail without allowing Plaintiffs limited discovery to establish personal jurisdiction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motion to dismiss the First Amended Complaint be denied.


Dated: New York, New York
      February 25, 2022

|  |  |
|---|---|
| |   /s/ Jennifer R. Cowan |
| Ramzi Kassem | Jennifer R. Cowan |
| Naz Ahmad | Erol N. Gulay |
| Princess Masilungan | Christopher S. Ford |
| Mudassar Toppa | William C. Mattessich |
| CLEAR PROJECT | Ryan C. Mullally |
| Main Street Legal Services, Inc. | DEBEVOISE & PLIMPTON LLP |
| City University of New York School of Law | 919 Third Avenue |
| 2 Court Square | New York, NY 10022 |
| Long Island City, NY 11101 | Tel.: (212) 909-6000 |
| Tel.: (718) 340-4558 | Email: jrcowan@debevoise.com |
| Email: ramzi.kassem@law.cuny.edu | |


Baher Azmy
Shayana Kadidal
Diala Shamas
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel.: (212) 614-6491
Email: kadidal@ccrjustice.org
*Counsel for Plaintiffs*