UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MUHAMMAD TANVIR, JAMEEL
ALGIBHAH, and NAVEED SHINWARI,

                            Plaintiffs,

            v.

FNU TANZIN, *et al.*,

                            Defendants.

13-CV-6951 (RA)


<u>OPINION & ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

Plaintiffs Muhammad Tanvir, Jameel Algibhah, and Naveed Shinwari brought this action to remedy alleged violations of their constitutional and federal statutory rights. Specifically, they allege that, in an effort to bolster intelligence gathering in the aftermath of the terrorist attacks on September 11, 2001, agents of the Federal Bureau of Investigation ("FBI") placed or kept them on the Terrorist Screening Center's No Fly List in retaliation for their refusal to act as informants by spying on members of Muslim communities, and in order to pressure them to reconsider. Plaintiffs claim that they refused to gather information about their fellow Muslims because doing so would have contravened their sincerely held religious beliefs, and that the FBI agents' efforts thus substantially burdened their religious exercise in violation of federal law.

The suit initially named agents of the federal government in their official capacities, and sought Plaintiffs' removal from the No Fly List. Plaintiffs have since been removed from the No Fly List, and the sole remaining claims are against Defendant FBI agents in their individual capacities for money damages available under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.* ("RFRA"). Namely, Plaintiffs seek damages from Defendants FNU ("First Name Unknown") Tanzin, Sanya Garcia, Francisco Artousa, John LNU ("Last Name Unknown"), Steven

LNU, John C. Harley III, Michael LNU, Gregg Grossoehmig, Weysan Dun, James C. Langenberg, and John Does 1–6.[1]   Now before the Court is Defendants' renewed motion to dismiss the remaining claims in the Amended Complaint for failure to state a claim and under the doctrine of qualified immunity.

The Court is sympathetic to Plaintiffs, who claim that, despite never posing a threat to aviation security, they were, for years, unable to visit ailing loved ones outside of the United States, burdened financially with the loss of job opportunities which required them to travel, and repeatedly forced to endure the basic indignity of being denied boarding passes for flights to which they had legitimately purchased tickets.   Accepting their allegations as true, Plaintiffs were subjected to this treatment by way of the FBI's misuse of the No Fly List simply because they were Muslim, and because they refused to spy on other members of their faith.

Nevertheless—and notwithstanding varied criticisms of the doctrine of qualified immunity, *see, e.g., Baxter v. Bracey*, 140 S. Ct. 1862 (2020) (Thomas, J., dissenting from denial of certiorari); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting)—the Court is required to apply the law faithfully to the issues before it.   Accordingly, for the reasons that follow, Defendants are entitled to qualified immunity and the motion to dismiss is granted.

## BACKGROUND

The allegations of the tactics undertaken by the FBI giving rise to this action are by now familiar to counsel and the parties.   In the main, Plaintiffs allege that they were "among the many innocent people" who were "swept up" in the years since 9/11 by the federal government's

---

[1]      Pursuant to the Stipulation and Order filed July 24, 2014, Defendants FNU Tanzin, John LNU, Steven LNU, Michael LNU, and John Does 1–6 are currently proceeding under the pseudonyms specified in the Amended Complaint.   *See* Dkt. 30 ¶¶ 1–2.   John Doe 2 is proceeding as John Doe 2/3.   *See id.* ¶ 1(f).   A fourth Plaintiff, Awais Sajjad, did not assert claims under RFRA, *see* Dkt. 15, and thus is no longer party to the remaining claims in this action.   Accordingly, there are no longer pending claims against Defendants John Does 9–13, Michael Rutowski, or William Gale.   Finally, John Does 7 and 8 were previously dismissed from this action.   *See* Dkt. 104 at 36.

"secretive watch list dragnet." Compl. ¶ 4. Plaintiffs claim that the process for placing individuals

on the No Fly List, which is maintained by the Terrorist Screening Center ("TSC"), *id.* ¶ 40–41, is

"shrouded in secrecy and ripe for abuse," *id.* ¶ 63. "To be properly placed on the No Fly List, an

individual must be a 'known or suspected terrorist'" and "there must be some additional

'derogatory information' demonstrating that the person 'poses a threat of committing a terrorist

act with respect to an aircraft." *Id.* ¶ 42. Despite never posing a threat—or even being accused of

posing a threat—to aviation safety, Plaintiffs allege that they were each either placed or kept on

the List merely for refusing to become informants for the FBI against fellow Muslims. *Id.* ¶¶ 8–

9, 65–67, 68, 118, 145. They urge that their inclusion on the No Fly List was thus the product of

abusive investigative practices by the FBI which violated their clearly established constitutional

and statutory rights, including under RFRA. *Id.* ¶¶ 205–15.

## I.    Plaintiff Muhammad Tanvir

Muhammad Tanvir is a lawful permanent resident of the United States who last resided in

Queens, has family in Pakistan, and is Muslim. *Id.* ¶¶ 14, 68. Tanvir interacted with Defendants

FNU Tanzin, John Doe 1, John Doe 2/3, Garcia, and John LNU. *Id.* ¶¶ 68–113. He was first

approached by Defendants Tanzin and John Doe 2/3 in February 2007 at his workplace in the

Bronx, and was asked about a former acquaintance who they claimed had attempted to enter the

country illegally. *Id.* ¶ 69. Two days later, Tanvir was contacted by Tanzin who asked him "what

people in the Muslim community generally discussed, and whether there was anything that he

knew about within the American Muslim community that he 'could share' with the FBI." *Id.* ¶ 70.

Tanvir told Tanzin that "he did not know of anything that would concern law enforcement." *Id.*

Initially, Tanvir's life continued unaltered following these early interactions with the FBI.

He was able to fly to Pakistan in July 2008, for instance, and to return in December 2008. *Id.* ¶ 71.

But after returning from Pakistan, Tanvir alleges that his passport was confiscated by government officials, he was detained for five hours at the airport, and was given an appointment with the Department of Homeland Security ("DHS") to retrieve his passport.  *Id*.  Before the date of that meeting, however, Tanzin and John Doe 2/3 came to his new workplace in Queens and asked him to accompany them to the Manhattan office of the FBI.  *Id*. ¶¶ 73–74.

There, he was brought to an interrogation room and subjected to questioning about terrorist training camps near the village where he grew up, whether he had trained with the Taliban, and whether he would work as a government informant in Pakistan or Afghanistan.  *Id*. ¶¶ 75–78.  To incentivize Tanvir to work as an informant, the agents offered him financial assistance, including for his parents in Pakistan so that they could go on religious pilgrimage to Saudi Arabia; nevertheless, Tanvir refused, telling them that he was "afraid" and that working as a "United States government informant" in Pakistan would be "very dangerous."  *Id*. ¶¶ 76–78.

The next day, Tanvir alleges that Tanzin called and "threatened" him, saying he would "authorize the release of [Tanvir's] passport if [he] agreed to become an informant," but that, if he declined, he "would be deported if he went to the airport to pick up his passport."  *Id*. ¶ 79.  Tanvir again refused, and was able to retrieve his passport notwithstanding the threats of deportation.  *Id*. ¶¶ 79–80.  In the weeks that followed, Tanvir was repeatedly called by agents who urged him to become an FBI informant.  *Id*. ¶¶ 82–84.  Time and again, Tanvir refused.  *Id*.  Tanzin and John Doe 2/3 eventually asked him to take a polygraph test and threatened to arrest him if he declined.  *Id*. ¶¶ 86–87.  He declined, and the agents left without placing him under arrest.  *Id*.

In key part, Tanvir alleges that he repeatedly refused to serve as an FBI informant because he had "sincerely held religious and personal objections to spying on innocent members of his community," and that the agents had placed "significant pressure on [him] to violate his sincerely

4

held religious beliefs." *Id*. ¶ 84.  Speaking to Tanvir's religious objections more generally, as well as those of the other Plaintiffs, the Amended Complaint alleges that:

> Many American Muslims, like many other Americans, and many followers of other religions, have sincerely held religious and other objections against becoming informants in their own communities, particularly when they are asked to inform on the communities as a whole rather than specific individuals reasonably suspected of wrongdoing.  Acting as an informant would require them to lie and would interfere with their ability to associate with other members of their communities on their own terms.  For these American Muslims, the exercise of Islamic tenets precludes spying on the private lives of others in their communities.

*Id*. ¶ 65.

After his interactions with Defendants Tanzin and Doe 2/3, Tanvir discovered that he had been placed on the No Fly List.  "Upon information and belief," he alleges that he was "placed on the No Fly List . . . because he refused to become an informant against his community and refused to speak or associate further with the agents." *Id*. ¶ 90.  In October 2010, while traveling for work, he made plans to fly from Atlanta to New York City but was told by an airline employee that he was unable to fly when he tried to check in for the flight. *Id*. ¶ 91.  FBI agents then approached him at the airport, told him that he should contact the agents in New York with whom he had previously spoken, and escorted him to a bus station in Atlanta, where Tanvir was forced to take a 24-hour bus ride to return home to New York. *Id*. ¶ 93.  Two days later, Tanvir was contacted by Defendant Garcia, who told him that his name could be removed from the No Fly List if he would agree to speak with her and answer her questions. *Id*. ¶ 94.  Tanvir insisted that he had repeatedly answered the FBI's questions and that he did not wish to speak with agents of the FBI again. *Id*.

Tanvir next purchased airline tickets when he was trying to visit his sick mother in Pakistan in November 2011. *Id*. ¶¶ 98–100.  The day before his scheduled departure, however, Garcia contacted him again, informing him that he would not be permitted to fly the next day because he had "hung up on her" in October 2010. *Id*.  She again insisted that he would not be able to fly

without answering her questions. *Id.* Tanvir reluctantly agreed to meet Garcia and John LNU at a restaurant in Queens, where he was again questioned about his family, religion, and politics; Tanvir answered their inquiries, believing that he needed to do so in order to be able to fly to Pakistan. *Id.* ¶ 101. Although Garcia initially told Tanvir that she would obtain a one-time waiver to allow him to travel because he had answered the FBI's questions, she called the next day to inform him that he would not be able to travel after all. *Id.* ¶ 102. Instead, Garcia now insisted that her offer of a one-time waiver was contingent on Tanvir going to FBI headquarters to take a polygraph test. *Id.* ¶ 104. He cancelled his flight to Pakistan thereafter. *Id.*

Tanvir again bought a ticket to see his mother in Pakistan in December 2011, after engaging counsel to file a Traveler Redress Inquiry Program ("TRIP") complaint, but was again denied boarding because he was on the No Fly List. *Id.* ¶ 109. Tanvir learned that, despite his TRIP complaint, no changes or corrections would be made to the List, and appealed that determination. *Id.* ¶¶ 110, 112. In November 2012, he again purchased a ticket to travel to Pakistan, and once again was denied boarding. *Id.* ¶ 113. This time, Tanvir was approached by an FBI agent and told that he would need to meet once again with Garcia in order to be removed from the List. *Id.*

On March 28, 2013, Tanvir finally received a response to his TRIP appeal indicating that the government had "made updates" to its records based on his complaint. *Id.* ¶ 114. Tanvir then successfully flew to Pakistan from New York on June 27, 2013. *Id.* ¶ 115. He did not receive official confirmation of his removal from the No Fly List, however, until June 2015, after filing the present action. Dkt. 92.

## II.    Plaintiff Jameel Algibhhah

Jameel Algibhah is a United States citizen, resides in the Bronx, has a wife and three daughters in Yemen, and is Muslim. Compl. ¶¶ 15, 118. He alleges that he interacted with

Defendants Artousa, John Doe 4, and John Doe 5 between 2009 and 2013. *Id.* ¶¶ 119–40. Artusa and John Doe 4 first tried to recruit Algibhah to serve as an informant in Muslim communities, including in his own neighborhood, by approaching him at his workplace and asking him to accompany them to an FBI van. *Id.* ¶¶ 119–20. After Aglibhah answered their initial questions, they specifically asked that he infiltrate a mosque in Queens, and that he act like an "extremist" in online Islamic forums. *Id.* ¶ 121. Algibhah claims he refused because doing so violated his sincerely held religious and personal beliefs and would have required him to act in a deceptive manner in his community. *Id.* ¶ 122; *see also id.* ¶ 65 (alleging there are "Islamic tenets preclud[ing] spying on" fellow Muslims). Upon information and belief, he alleges that, in retaliation for his refusal to act as an informant for the FBI, and in order to pressure him to reconsider his decision, he was placed on the No Fly List shortly after this encounter. *Id.* ¶ 124.

Algibhah attempted to visit his wife and daughters in Yemen in May 2010, but was denied a boarding pass at JFK International Airport and told that he was not permitted to fly. *Id.* ¶ 125. Algibhah filed a TRIP complaint, and attempted again to fly to Yemen in September of the same year, but was again denied a boarding pass. *Id.* ¶¶ 126–27.

In June 2012, after seeking assistance from his elected representatives, Algibhah was stopped by Artusa and John Doe 5 who allegedly said: "Congressmen can't do shit for you; we're the only ones who can take you off the list." *Id.* ¶ 131. Artusa told Algibhah that he would need to answer more questions from the FBI, and that if he chose to cooperate, he would be removed from the No Fly List. *Id.* After answering their questions, however, Algibhah was told that in order to be removed from the List, he would need to work as an informant, including by going on Islamic websites and "act[ing] extremist." *Id.* ¶ 133. Algibhah retained counsel, to whom Artusa reiterated the same offer: Algibhah's name could be removed from the List, but only if he would

agree to go onto Islamic websites to seek out "extremist" discussions and undertake "aggressive information gathering." *Id*. ¶ 136. When Artusa called Algibhah directly once again in May 2013, Algibhah directed him to his counsel. *Id*. ¶ 139–40.

Like Tanvir, Algibhah did not receive confirmation that he had been removed from the No Fly List until June 2015, after filing this action. Dkt. 92.

### III.    Plaintiff Naveed Shinwari

Naveed Shinwari is a lawful permanent resident living in Connecticut, has family in Afghanistan, and is Muslim. *Id*. ¶¶ 16, 145. He alleges that he interacted with Defendants Steven LNU, Harley, Grossoehmig, Michael LNU, John Doe 6, Dun, and Langenberg in 2012. *Id*. ¶¶ 146–64. In February 2012, Shinwari was traveling with his mother from Kabul, Afghanistan to Omaha, Nebraska, where he was living at the time, when he was denied boarding on his connecting flight departing from Dubai and told that he needed to contact the U.S. embassy before he would be permitted to fly. *Id*. ¶ 146.

The next day, Shinwari met with Defendants Steven LNU and Harley at the U.S. consulate in Dubai, where he was taken to an interrogation room and questioned for several hours about whether he had visited any "training camps" while in Afghanistan and whether he was associated with "bad guys." *Id*. ¶ 148. He was also questioned about his mosque and religious activities, asked to take a polygraph test, and told that doing so would allow him to return home to Nebraska. *Id*. ¶ 149. Several days later, Shinwari was permitted to fly after purchasing new tickets on a U.S.-based airline. *Id*. ¶¶ 150–51. After landing at Dulles International Airport in Virginia, Shinwari was interrogated for two hours by Defendants Michael LNU and Grossoehmig, who said that they needed to "verify" what he had told the other agents in Dubai. *Id*. ¶¶ 152–53. After he answered their questions, Shinwari was released and flew home to Omaha. *Id*. ¶ 154.

The next month, in March 2012, Defendants Michael LNU and John Doe 6 appeared at Shinwari's home, and again questioned him about his religion and personal background. *Id.* ¶ 155. This time, the agents said that they knew Shinwari was then unemployed, and offered to pay him to work as an informant with the FBI. *Id.* ¶ 156. Based on his sincerely held religious and personal beliefs, Shinwari alleges, he declined the invitation to work as an informant. *Id.* ¶¶ 156–57; *see also id.* ¶ 65 (asserting that many Muslims "have sincerely held religious and other objections against becoming informants in their own communities").

When Shinwari tried to board a flight from Omaha to Orlando for temporary work later that month, he was denied a boarding pass and approached by police officers who told him that he was on the No Fly List. *Id.* ¶ 158. His placement on the List caused Shinwari significant financial hardship, as he was unable to take the temporary job, and was also prevented from visiting his family in Afghanistan. *Id.* ¶160. After Shinwari emailed Harley for help in getting removed from the No Fly List, Michael LNU and Doe 6 returned to his home and again asked that he become an informant, telling him that if he helped the FBI, the FBI would "help" him. *Id.* ¶ 161. Shinwari declined to serve as an informant, although he understood the agents to be offering to remove him from the No Fly List. *Id.*

Thereafter, Shinwari retained counsel and submitted two TRIP complaints about his inclusion on the List. *Id.* ¶¶ 165–68. He did not receive confirmation that he had been removed from the List until June 2015, after filing this action. Dkt. 92.

## PROCEDURAL HISTORY

As relevant to the present motion, this Court previously dismissed Plaintiffs' RFRA claims, holding that the relief afforded by the statute—which provides that, where a person's "religious exercise has been burdened," that person "may assert that violation as a claim" and "obtain

appropriate relief against a government," 42 U.S.C. § 2000bb-1(c)—did not include money damages against officials in their personal capacities.  *Tanvir v. Lynch*, 128 F. Supp. 3d 756, 780–81 (S.D.N.Y. 2015).  Because the Court found that "appropriate relief" under RFRA did not provide for money damages, it did not address whether Defendants were entitled to qualified immunity.[2]

Plaintiffs appealed, and the Second Circuit reversed in part, determining RFRA "permits a plaintiff to recover money damages against federal officers sued in their individual capacities." *Tanvir v. Tanzin*, 894 F.3d 449, 453 (2d Cir. 2018).  The Circuit remanded for this Court to determine in the first instance whether Defendants are entitled to qualified immunity, expressly noting that it was "sensitive to the notion that qualified immunity should be resolved at the earliest possible stage in the litigation," including "in a Rule 12(b)(6) motion."  *Id*. at 472 (cleaned up).

Prior to remand, however, the Supreme Court granted certiorari.  *Tanzin v. Tanvir*, 140 S. Ct. 550 (2019).  It ultimately affirmed the Second Circuit's statutory construction, holding that "appropriate relief" within the meaning of RFRA includes claims for money damages for officials sued in their individual capacities.  *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020).  Like the Court of Appeals before it, however, the Supreme Court expressly cautioned that Defendants may be entitled to qualified immunity—and indeed that Plaintiffs had themselves repeatedly argued as much on appeal—stating:

> Both the Government and respondents agree that government officials are entitled to assert a qualified immunity defense when sued in their individual capacities for money damages under RFRA.  Indeed, respondents emphasize that the "qualified immunity defense was created for precisely these circumstances," Brief for

---

[2]	The claims against Defendants in their official capacities were previously stayed on consent of all parties after Plaintiffs were apprised that they were no longer on the No Fly List.  *See* Dkt. 92, 93.  The Court also previously dismissed Plaintiffs' First Amendment claims brought against Defendants in their individual capacities, reasoning that the Supreme Court had "declined to extend *Bivens* to a claim sounding in the First Amendment."  *Tanvir*, 128 F. Supp. 3d at 769.  That determination was not appealed, and thus is not at issue on remand.  *See Tanvir v. Tanzin*, 894 F.3d 449, 457 (2d Cir. 2018).

> Respondents 22, and is a "powerful shield" that "protects all but the plainly
> incompetent or those who flout clearly established law," Tr. of Oral Arg. 42, *see
> District of Columbia v. Wesby*, 138 S. Ct. 577 , 589–91 (2018).

*Id*. at 492 n.2.[3]

On remand, Defendants have thus filed a renewed motion to dismiss the remaining claims

in the Amended Complaint for failure to state a claim and under the doctrine of qualified

immunity.[4]  Plaintiffs timely opposed the motion, after which the Court heard oral argument.

## LEGAL STANDARDS

On a Rule 12(b)(6) motion, the Court must accept all factual allegations in the complaint

as true and draw all reasonable inferences in the plaintiff's favor.  *See Cnty. of Erie v. Colgan Air,

Inc.*, 711 F.3d 147, 149 (2d Cir. 2013).  "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 533, 570

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

The Court need not accept "legal conclusions" or "threadbare recitals of the elements of the cause

of action," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and a plaintiff must provide "more than

labels and conclusions" to make out a claim upon which relief can be granted, *Twombly*, 550 U.S.

---

[3]     *See also Tanzin v. Tanvir*, Tr. of Oral Arg. at 35–36 (Oct. 6, 2020) (Justice Thomas asking counsel for Plaintiffs how an officer is to know whether the "burden they're imposing is the least restrictive means of furthering a governmental interest," and counsel answering, "that is, of course, an argument . . . that [Defendants] could have presented in . . . the qualified immunity defense that they made"); *id*. at 52–54 (counsel for Plaintiffs further explaining that "the law accounts for [this concern] . . . due to well-established and robust doctrine of qualified immunity," and Justice Kavanaugh responding "that's a good answer about qualified immunity").

[4]     Defendants Steven LNU, Harley, Grossoehmig, Michael LNU, John Doe 6, Dun, and Langenberg also renewed their Rule 12(b)(2) motion to dismiss the claims against them for lack of personal jurisdiction.  Because the Court concludes that, accepting all allegations in the Amended Complaint as true, none of the Defendants violated clearly established law, and thus are all entitled to dismissal under the doctrine of qualified immunity, it does not reach the jurisdictional question raised by this subset of Defendants.

at 555.

"RFRA prohibits the government from 'substantially burden[ing] a person's exercise of religion' unless 'application of the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Sabir v. Williams*, 52 F.4th 51, 59 (2d Cir. 2022) (quoting 42 U.S.C. § 2000bb-1(a)–(b)).  To establish a "prima facie RFRA violation, the plaintiffs must demonstrate that they sought to engage in the exercise of religion and that the defendant-officials substantially burdened that exercise." *Id*.  The government then faces an "exceptionally demanding" burden to show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties."  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014).

In assessing whether officials are entitled to qualified immunity, a court conducts a two-step analysis, considering (1) whether the facts presented "make out a violation of a constitutional [or statutory] right, and (2) whether the right at issue was 'clearly established' when it was allegedly violated."  *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 367 (2d Cir. 2021) (cleaned up).  Although the Supreme Court previously required courts to consider the two prongs sequentially in all circumstances, *see Saucier v. Katz*, 533 U.S. 194 (2001), courts are now free to use "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand," *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Thus, where "prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages." *Camreta v. Greene*, 563 U.S. 692, 705 (2011).

While often invoked as a defense to constitutional claims, qualified immunity may also be invoked against statutory claims.  *See Harlow v. Fizgerald*, 457 U.S. 800, 818 (1982).  More

specifically, qualified immunity may apply to actions brought under RFRA.  *See Sabir*, 52 F.4th at 58–60; *Fazaga v. FBI*, 965 F.3d 1015, 1061 (9th Cir. 2020), *rev'd on other grounds*, 141 S. Ct. 2720 (2021); *Lebron v. Rumsfeld*, 670 F.3d 540, 557 (4th Cir. 2012); *Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1285 (11th Cir. 2012); *Rasul v. Myers*, 563 F.3d 527, 533 n.6 (D.C. Cir. 2009) (per curiam).  Indeed, as the Supreme Court noted in this very action, Plaintiffs have themselves conceded that "government officials are entitled to assert a qualified immunity defense" under RFRA.  *Tanzin*, 141 S. Ct. at 492 n.2.

## DISCUSSION

In their effort to allege that Defendants here violated clearly established law, such that they are not entitled to qualified immunity, Plaintiffs make two main arguments.  First, they assert that caselaw existing at the time of their interactions with the FBI articulated a general "right to be free from government pressure that forces an individual to violate sincerely held religious beliefs," and that such precedent provided clear notice that Defendants' alleged conduct violated RFRA.  Opp. at 36.  Second, they argue that, in any event, "the RFRA statute itself"—given its general prohibition against imposing a "substantial burden" on religious exercise—is sufficient to have put Defendants on notice of the purported illegality of their alleged conduct.  *See* Opp. at 36–37.

For the reasons articulated below, the Court disagrees.  Accepting each of the factual allegations in the Amended Complaint as true, a reasonable officer in Defendants' position would not have known—much less "known for certain," *Ziglar v. Abassi*, 137 S. Ct. 1843, 1867 (2017)— that their conduct would impose a substantial burden on Plaintiffs' religious exercise and thus violate RFRA.  Defendants are accordingly entitled to qualified immunity, and the renewed motion to dismiss the Amended Complaint is granted.

## I.     Clearly Established Law Analysis

To be clearly established, the contours of the right at issue must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).   The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Mullenix*, 577 U.S. at 11 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).   Instead, "the dispositive question is whether the violative nature of *particular* conduct is clearly established." *Ziglar*, 137 S. Ct. at 1866 (emphasis in original) (quoting *Mullenix*, 577 U.S. at 12); *see also Wesby*, 138 S. Ct. at 590 ("The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him.").

The inquiry regarding whether a right was clearly established must therefore be "undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 577 U.S. at 12.   While there need not be "a case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*   "It is not enough that the rule is suggested by then-existing precedent."  *Wesby*, 138 S. Ct. at 590.   In other words, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *Id.*; *see also Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (to determine whether a right is clearly established, courts look to prior Supreme Court and circuit precedent "directly addressing the right at issue" or "clearly foreshadow[ing] a particular ruling on the issue").   An officer is immune from liability if "a reasonable officer might not have known for certain that the conduct was unlawful."  *Ziglar*, 137 S. Ct. at 1867.   "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate

the law," *Mullenix*, 577 U.S. at 12 (cleaned up), and affords "breathing room to make reasonable but mistaken judgments about open legal questions," *al-Kidd*, 563 U.S. at 743; *accord Wesby*, 138 S. Ct. at 589 (2018).

As a threshold matter, the Court must evaluate the parties' competing definitions of the particular right at issue.  Defendants define the right as the right not to be "recruit[ed] as [a] confidential government informant[] through the retaliatory or coercive use of the No Fly List." Mot. at 22.  Plaintiffs, meanwhile, articulate it as the "right to be free from government pressure that forces an individual to violate sincerely held religious beliefs."  Opp. at 36.  By characterizing the right in such a generalized and vague fashion, however, Plaintiffs render their definition legally meaningless.  The Supreme Court has held that "clearly established law must be particularized to the facts of the case."  *White v. Pauly*, 580 U.S. 73, 79 (2017).  "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  *Id.* (quoting *Anderson v. Creighton*, 438 U.S. 635, 639 (1987)); *see also Mullenix*, 577 U.S. at 12.

Unsurprisingly, then, courts considering qualified immunity defenses against claims brought under RFRA regularly delineate the right at issue with a considerable degree of particularity—and much more narrowly than Plaintiffs propose.  *See, e.g., Smadi v. Michaelis*, 2020 WL 7491296, at *4–6 (S.D. Ill. Dec. 21, 2020) (the "right to accommodation for an inmate's idiosyncratic dietary restrictions associated with his religion"); *Fernandez-Torres v. Watts*, 2017 WL 9485591, at *3 (S.D. Ga. Jan. 30, 2017), *report and recommendation adopted by* 2017 WL 1173923 (S.D. Ga. Mar. 29, 2017) (the right for prisoners to receive "religious property from outside sources when the religious items available through authorized means are not sufficient to meet the prisoner's religious needs").  Indeed, considering—and ultimately rejecting—claims

similar to those presented here, the district court in *El Ali v. Barr* construed the complaint to concern the right not to be subjected to "persistent inquiry into [one's] religious beliefs and practices" with "pressure . . . to modify or violate those beliefs or risk being subjected to the pattern of detentions and interrogations in connection with their travel." 473 F. Supp. 3d 479, 526 (D. Md. 2020).

The Court therefore construes the right presented by Plaintiffs' claims here as the right not to be pressured by law enforcement to inform on members of their religious communities through the coercive or retaliatory use of the No Fly List. So understood, for the reasons set forth below, the Court concludes that such a right was not clearly established at the time of the alleged violations. Even if the right were defined more broadly, such as the right not to be pressured to inform on members of one's religious community through the coercive or retaliatory use of *any* governmental tool, the Court nevertheless concludes that such a right was still not clearly established at the time of the events giving rise to the Complaint.

### A.  Precedent at the Time Did Not Clearly Establish that Defendants Violated RFRA

At the time of Defendants' alleged activity, no federal court had addressed claims—let alone actually held—that law enforcement pressuring individuals to inform on members of their religious communities through retaliatory or coercive means substantially burdened their religious exercise in violation of RFRA. Plaintiffs point to four cases in an attempt to make out their claim of clearly established law at the time of the alleged violations, but each of those cases are plainly distinguishable.

First, *Lee v. Weisman*, 505 U.S. 577 (1992), involved Establishment Clause challenges to prayer held during a public school graduation ceremony. Observing that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary

and secondary public schools," *id*. at 592, the Supreme Court in *Weisman* found an Establishment

Clause violation because "young graduates who object [to the prayer] [we]re induced to conform,"

*id*. at 599; *see also id.* ("No holding by this Court suggests that a school can persuade or compel a

student to participate in a religious exercise.").  It was the specific context of the "prayer exercises

in public schools" which the Court found carried a "particular risk of indirect coercion."  *Id*. at

592.  While acknowledging that the "heightened concern" of such coercion "may not be limited to

the context of schools," the Court observed that "it is most pronounced there."  *Id*.

None of the allegations in the Complaint here, of course, concern the purported coercion

of school-age children to engage in religious exercise, nor do Plaintiffs contend that they were

coerced to engage in prayer to which they objected.  Rather, their particular complaint is that they

were "placed or kept on the [No Fly] List when [they] refused to become []informant[s] for the

FBI against fellow American Muslims" because informing on their fellow Muslims would have

violated their sincerely held religious beliefs.  Opp. at 2.  Plaintiffs' attempt to stretch *Weisman*'s

holding to fit the facts alleged in the Complaint is unavailing, as the Supreme Court has plainly

instructed that the clearly established inquiry must be "undertaken in light of the specific context

of the case, not as a broad general proposition." *Mullenix*, 577 U.S. at 12 (cleaned up).  *Weisman*,

put simply, does not place the statutory question of whether Defendants were violating RFRA

"beyond debate." *Id*.

The Second Circuit's decision in *DeStefano v. Emergency Housing Group, Inc*., 247 F.3d

397 (2d Cir. 2001), is also inapposite, as it concerned state funding of a treatment facility that

hosted Alcoholics Anonymous sessions which were religious in nature.  In that case, the Circuit

found that the mere inclusion of A.A. programs in services offered by the state-funded facility did

not violate the Establishment Clause, nor, moreover, did the facility employees' "strong[]

17

urg[ing]" and "actively encourage[ment]" of client participation in the programs.  *Id.* at 408–10.  The Court found that, to the extent there were facts sufficient to establish that employees were involved in the "inculcation of religious beliefs," such facts could constitute governmental indoctrination in violation of the Establishment Clause, but that factual questions remained about whether the staff's behavior rose to the level of "inculcation."  *Id.* at 420.[5]

Here, there is no suggestion that Defendants' actions were in any way "designed to inculcate the views of a particular religious faith" or to "indoctrinate."  *Id.* at 411, 414.  Rather, Defendants were engaged in the discrete task of seeking intelligence about Muslim adherents in the interest of national security, by, among other things, encouraging Plaintiffs to attend services or engage in conversation in online Islamic chatrooms.  And, as *DeStefano* itself held, "[u]rging people to attend [religious] meetings or explaining to them why, in the view of the speaker, it is in their best interests to attend [such meetings] is not, without more, indoctrination."  *Id.* at 415.  Such encouragement "does not imbue clients with [a religious] point of view, nor does it inculcate or impress [] beliefs upon the mind of the listener by frequent instruction or repetition."  *Id.* (cleaned up).

Third, the seminal case of *Wisconsin v. Yoder*, 406 U.S. 205 (1972), involved the wholly unrelated application of state compulsory education laws to Amish students whose religious beliefs prevented them from attending school beyond the eighth grade.  In fact, the Supreme Court's holding in *Yoder* was as much grounded in the so-called *Meyer-Pierce* line of cases establishing parents' due process rights to control their children's upbringing as it was a case about religious

---

[5]     Contrary to Plaintiffs' claim that *DeStefano* held that "[p]ressure from government officials rises to the level of a substantial burden when it prevents an individual from participating in religious activity as a matter of a genuine personal choice," Opp. at 36, the Second Circuit expressly declined to "decide the issue of coercion," finding that it "ha[d] not been squarely presented," 247 F.3d at 411.  Any discussion of "coercion" was therefore dicta, and cannot be construed as clearly established law.  *See, e.g., Jones v. Treubig*, 963 F.3d 214, 226 n.7 (2d Cir. 2020) ("[W]e do not rely on any dicta . . . for the purpose of determining clearly established law.").

liberty.  *See Yoder*, 406 U.S. at 232–33 ("Under the doctrine of *Meyer v. Nebraska*, 262 U.S. 390 [(1923)], we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control."); *see also id*. at 233 ("However read, the Court's holding *Pierce* [*v. Society of Sisters*, 268 U.S. 510 (1925)] stands as a charter of the rights of parents to direct the religious upbringing of their children.").  To the extent that the case established any broad right of religious exercise, it was, at most, limited to the "power of the State to promulgate reasonable" educational standards which did not "impair[] the free exercise of religion" for schoolchildren.  *Id*. at 236.[6]  It had nothing to do with law enforcement officers pressuring religious adherents to inform on co-religionists. *Yoder* thus did not "directly address[] the right at issue," and did not "clearly foreshadow[] a particular ruling" on Plaintiffs' RFRA claims.  *Garcia*, 779 F.3d at 92.

It is thus unsurprising that the Ninth Circuit, considering claims analogous to those at issue here, determined that "it was not clearly established in 2006 or 2007 that covert surveillance conducted on the basis of religion would meet the RFRA standards for constituting a substantial burden on individual congregants."  *Fazaga*, 965 F.3d at 1061.  Considering the state of the law at a time long after *Weisman* and *Yoder* were decided, it held that "[t]here simply was no case law in 2006 or 2007 that would have put the Agent Defendants on notice that covert surveillance on the basis of religion could violate RFRA."  *Id*.

Finally, Plaintiffs insist that the general definition of a religious "burden" used by the

---

[6]     Given the emphasis *Yoder* placed on the unique position of Amish children in American life, it is unclear what, if any, applicability the case has in in the context of other religious communities.  *See, e.g., id*. at 235 (observing that, given a unique "history of three centuries as an identified religious sect and a long history as a successful and self-sufficient segment of American society, the Amish in this case have convincingly demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, [and] the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization").  The Court need not address that question here.

Supreme Court in *Thomas v. Review Bd. of the Indiana Emp. Sec. Div.*, 450 U.S. 707, 718 (1981) (and restated by the Second Circuit in *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)) was alone sufficient to put Defendants on notice of the purported illegality of their requests.  *See* Oral Arg. Tr. at 29 (counsel seemingly changing their argument and stating "I don't think you need to use" the three cases relied upon in Plaintiffs' brief and discussed above, and arguing, instead, "you can rely on the Supreme Court precedent of *Thomas* and the Second Circuit precedent of *Jolly*"). The Court is unpersuaded.

To start, *Thomas* stated simply that "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior or violate his beliefs, a burden upon religion exists."  450 U.S. at 717–18. This broad proposition, however, says nothing about when such a "burden" becomes a "substantial burden"—let alone when such a substantial burden, within the meaning of RFRA (a statute not yet enacted when *Thomas* was decided), is no longer justified in "furtherance of a compelling governmental interest."  42 U.S.C. § 2000bb-1(a)–(b).  Moreover, *Thomas* did not address factual circumstances even remotely akin to those presented here.  Instead, it concerned whether a State's denial of unemployment benefits to an employee allegedly terminated because of his religious convictions violated his free exercise rights.  *See* 450 U.S. 707–20.

Although *Jolly* reiterated *Thomas*'s language in weighing a claimed RFRA violation some fifteen years later, the case's procedural posture limits its reach.  There, the Second Circuit held only that an inmate had demonstrated a substantial likelihood of success on the merits of his RFRA claim, such that a district court's issuance of a preliminary injunction was not an abuse of discretion.  *See* 76 F.3d at 471–73.  But even if *Jolly* did constitute a decision on the merits of the

RFRA claim, it too is distinguishable, as it involved a plaintiff-inmate who argued that his confinement to a "medical keeplock" for three-and-a-half years for refusing to submit to a test for tuberculosis based upon religious objections violated RFRA. *Id*. at 470–72. The clearly established law analysis must be "undertaken in light of the specific context of the case" in which qualified immunity has been asserted, and, at bottom, neither *Thomas* nor *Jolly* would have placed the statutory [] question" presented by Plaintiffs here "beyond debate." *Mullenix*, 577 U.S. at 12.

Each of the two additional cases which Plaintiffs cite to make out their claim of clearly established law were decided after Defendants' last alleged interactions with Plaintiffs in November 2011 (Tanvir), March 2012 (Shinwari), and May 2013 (Algibhah). *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *Washington v. Gonyea*, 538 F. App'x 23 (2d Cir. Sept. 10, 2013). Thus, even to the extent those cases squarely addressed the claimed violation of RFRA—and they do not—they could not possibly have provided any relevant notice to Defendants because they did not "exist[] at the time of the alleged violation." *Okin*, 577 F.3d at 433. (Never mind, moreover, that the Second Circuit's unpublished summary order in *Washington* could not constitute "precedent" for purposes of establishing clearly established law. *See Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001) (observing an unpublished decision "does not determine whether a right was clearly established")).

Even if given the benefit of all available precedent today, a decade after the last alleged violations in the Amended Complaint, Plaintiffs' argument that Defendants' actions violated clearly established law would likely still fail. For one, *Burwell* and *Washington* involved factual circumstances plainly distinguishable from the alleged violations in the Complaint. *See Burwell*, 573 U.S. at 688–91 (holding that RFRA prohibited the Department of Health and Human Services from enforcing regulations requiring employers to provide health-insurance coverage for

contraception against closely-held corporations whose owners had religious objections to contraception); *Washington*, 538 F. App'x at 26–27 (construing a *pro se* complaint to state a First Amendment retaliation claim where prison officials had allegedly denied religious services to the plaintiff for providing a Quran to another inmate); *see also id.* (observing that "the contours of the burden standard are not precisely drawn" for RFRA claims).

Indeed, the only federal court to have directly addressed the claims at issue here rejected the argument that they stated a RFRA violation.  *See El Ali v. Barr*, 473 F. Supp. 3d 479, 527 (D. Md. 2020).  In that case, as here, the plaintiffs claimed that "offers to act as informants for the FBI in exchange for resolution of their travel woes substantially burden[ed] their free exercise of religion," because "their religious beliefs restrict[ed] bearing false witness and betraying the trust of their religious community," and thus prohibited them from agreeing to serve as informants.  *Id.* The district court held that law enforcement's efforts to persuade the plaintiffs to serve as informants on their religious community members—even if accompanied by an offer of assistance to remove them from a watchlist—did not impose a substantial burden on religious exercise.  *See id.*  A "mere 'ask' for assistance in exchange for favorable treatment," it reasoned, "does not constitute a substantial burden on free exercise."  *Id.*  The court continued:

> As with all potential law enforcement informants, the relationship begins with an "ask," and possible favorable treatment in exchange for helpful information.  Also, as with many "asks," they too begin with the potential informant having something to gain, and often something to lose, from saying yes.  Suspects are sometimes paid for their testimony or "work off charges" in exchange for turning on their friends, coworkers, family, and community leaders.  This Hobson's choice is the same faced by scores of suspects who enter into cooperation agreements with the government on a daily basis.  Plaintiffs' choice is a variation on this theme.

*Id.*  Finding the requests from law enforcement analogous to any number of standard requests for information, the court in *El Ali* "discern[ed] no principled reason to find the mere offer of a chance to cooperate as placing a substantial burden on the exercise of religion sufficient to support a RFRA

violation." *Id*; *cf. Fikre v. FBI*, 2019 WL 2030724, at *8–9 (D. Or. May 8, 2019) (expressing similar "concerns regarding the pleading adequacy of Plaintiff's RFRA claim" where the complaint alleged that the defendants "attempted to use Plaintiff's presence on the No-Fly List as leverage to coerce [him] into becoming an informant regarding activities in [his] mosque," but ultimately rejecting claim on timeliness grounds).

Accordingly, the Court concludes that precedent did not clearly establish at the time of the alleged violations that pressuring an individual to inform on members of their religious community, in violation of their sincerely held beliefs, substantially burdened religious exercise in violation of RFRA.

### B.  The Statute Itself Does Not Clearly Establish that Defendants Violated RFRA

Plaintiffs alternatively insist, relying on the Second Circuit's recent decision in *Sabir v. Williams*, 52 F.4th 51 (2d Cir. 2022), that the language of RFRA, itself, should have provided clear notice to the agents, such that their activity which is the subject of this action violated clearly established law.  "Based on RFRA's requirements" alone, they quote from *Sabir*, "it is not difficult for an official to know whether an unjustified substantial burden on religious exercise will be deemed reasonable."  *Id*. at 65 (cleaned up).

By selectively quoting *Sabir*, Plaintiffs cite the case for a proposition broader than the one articulated by the Second Circuit.  As an initial matter, *Sabir* concerned textbook violations of law clearly establishing that "preventing a prisoner from engaging in congregational prayer constitutes a substantial burden on the prisoner's religious exercise."  52 F.4th at 65 n.9; *see also id*. ("[W]e have consistently recognized that policies restricting access to group prayer impose a burden on prisoners' free exercise rights.") (citing *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993)).  Moreover, in *Sabir*, unlike here, the plaintiffs specifically and repeatedly raised their religious

objections to the defendant wardens' conduct preventing them from participating in group prayer. *See, e.g.*, 52 F.4th at 55–56.

But even accepting Plaintiffs' premise that *Sabir* also stands for the proposition that RFRA itself may, in some contexts, provide clear notice to would-be offenders, their reliance on the case remains unavailing.  To be sure, statutory provisions in existence at the time of an individual's conduct can create "fair warning" for the officer that their conduct would violate a plaintiff's rights. *Okin v. Village of Cornwall-on-Hudson Police Department*, 577 F.3d 415, 433–34 (2d Cir. 2009). Accordingly, *Sabir* reasoned that there are "some contexts in which a higher degree of specificity is required to establish the law for purposes of qualified immunity than in others."  52 F.4th at 65. "For example, the Fourth Amendment's prohibition of 'unreasonable searches and seizures' is an 'abstract right[]' because 'it may be difficult for an officer to know whether a search or seizure will be deemed reasonable given the precise situation encountered."  *Id*. (quoting *Ziglar*, 137 S. Ct. at 1866).  But the Circuit emphasized that "[n]o such concerns [were] present" in *Sabir*, because, "[b]ased on RFRA's requirements, it is not difficult for an official to know whether an unjustified substantial burden on religious exercise will be deemed reasonable."  *Id*. at 65 (cleaned up).  "As the text of the statute itself explains: 'Government may substantially burden a person's exercise of religion *only if it demonstrates* that application of the burden . . . is *in furtherance* of a compelling governmental interest.'"  *Id*. (emphasis in original).  Because the prison wardens in *Sabir* denied the plaintiffs' requests for group prayer "with no justification" whatsoever, RFRA itself provided clear warning that doing so—without justification—violated the law.  *Id*. at 66. "Put another way, if an official substantially burdens a sincere religious exercise but cannot point to evidence that the application of the burden was in service of any interest—let alone a compelling one—the official has violated RFRA."  *Id*.

Accepting further that Defendants could have known from RFRA's text, let alone "known for certain," *Ziglar*, 137 S. Ct. at 1867, that their attempts to pressure Plaintiffs to inform on fellow Muslims "substantially burdened" their religious exercise, it cannot be said Defendants made the requests "with no justification," *Sabir*, 52 F.4th at 66.  Defendants, like the FBI and DHS more broadly, were actively engaged in an effort to gather intelligence related to national security in the aftermath of the 9/11 terrorist attacks.  The Complaint itself acknowledges that the No Fly List existed to reduce "significant threats to aviation safety," and was maintained by the TSC with the goal of "coordinating the government's approach to terrorism screening."  Compl. ¶¶ 2, 20.  Put differently, even to the extent that the Complaint plausibly alleges that Defendants improperly burdened religious exercise, it does not allege that they did so with no justification whatsoever. *Contra Sabir*, 52 F.4th at 66 (where the wardens could not point to evidence "that the application of the burden was in service of any interest").

The text of RFRA itself is thus not dispositive to the question of whether clearly established law would have put Defendants on notice that their requests to Plaintiffs violated RFRA, and the Court must look to the state of Supreme Court and Second Circuit precedent in existence at the time.  *See supra*, pp. 16–21.

## II.     Leave to Amend

Finally, whether to grant leave to further amend a complaint is committed to the "sound discretion of the district court," and may be denied when amendment would prove futile. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  For instance, "[g]ranting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim."  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009).  Here, Plaintiffs do not specifically seek leave for

further amendment.  The Court has concluded, given the state of the law at the time of the interactions at issue, that it was not clearly established that Defendants' pressuring of Plaintiffs to inform on their fellow Muslims would have violated RFRA.  Further amendment would thus be futile, as no amendment to the pleadings could change the state of the law then in existence. Accordingly, the Court thus finds dismissal with prejudice to be warranted.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entry 127, and to close this action.


SO ORDERED.

Dated:          February 24, 2023
                New York, New York

Hon. Ronnie Abrams
United States District Judge